# IN THE UNITED STATES DISTRICT COURT
## FOR THE NORTHERN DISTRICT OF GEORGIA
### ATLANTA DIVISION

HILDA BRUCKER, *et al.*,                :
                                        :
    Plaintiffs,     :
                                        :
    v.              :    CIVIL ACTION NO.
                                        :    1:18-CV-02375-RWS
CITY OF DORAVILLE, a Georgia           :
municipal corporation,                  :
                                        :
    Defendant.      :
                                        :
                                        :

## ORDER

This case involves the City of Doraville's practice of including projected revenue from fines, fees, and forfeitures in its municipal budget. The Plaintiffs—four individuals who were cited for various infractions by the City—challenge that practice as unconstitutional. Specifically, Plaintiffs argue that by relying on its municipal courts, prosecutors, and law enforcement officers to generate revenue, Doraville has created impermissible financial incentives for those civil servants, thus violating the Due Process Clause of the Fourteenth Amendment. The case is now before the Court on Doraville's Motion to Dismiss [15]. After reviewing the record, the Court enters the

following Order.

## Background[1]

Doraville is a municipality that is home to about 8,330 people. Like other Georgia "home rule" municipalities, Doraville passes its own criminal ordinances and tries violations of those ordinances in a municipal court. Doraville's City Attorney and Police Department primarily enforce the City's ordinances, except for property violations, which are handled by a private firm called Clark Patterson Lee.

Doraville's city council has executive and judicial roles. In its executive capacity, the city council appoints city prosecutors, funds the police department, and creates the City's annual budget. In its judicial role, the city council appoints a municipal court judge who "hold[s] office at the pleasure of the City Council." Doraville Municipal Code § 9-1.

Doraville relies on its municipal court as a source of revenue. The City issues thousands of tickets and citations every year and consistently generates $3 million or more annually from fines, fees, and forfeitures, all of which are

---

[1] These facts are taken from the Complaint [1] and for the purposes of this Order are accepted as true.

prosecuted in municipal court. This revenue constitutes anywhere from 17 to 30 percent of the City's total yearly revenues. And, at least according to one source, it ranks Doraville 6th in the country for percentage of total revenues from fines, fees, and forfeitures of cities with more than 5,000 people.

Plaintiffs have all been convicted or threatened with conviction in Doraville's municipal court. Two of them live in Doraville: Hilda Brucker and Jeff Thorton. Ms. Brucker was prosecuted for the condition of her home. She paid a fine and was sentenced to a six-month probation term before her conviction was eventually vacated and the charges dropped. Similarly, Mr. Thorton was prosecuted for having improperly stacked wood in his backyard. And after a trial, Mr. Thorton was found guilty, fined $300, and sentenced to 12 months of probation. The other two Plaintiffs were cited for traffic violations while driving through Doraville—Janice Craig for "chang[ing] lanes in a way that held up traffic" and Byron Billingsley for changing lanes without using a turn signal. Ms. Craig paid $215 in fines, and Mr. Billingsley paid a $100 fine.

Plaintiffs bring two claims for relief under 42 U.S.C. § 1983, seeking nominal damages and injunctive relief. Broadly, those claims allege that "the

City's institutional reliance on revenue from fines and fees" incentivizes "the City to ticket, convict, and fine defendants, regardless of the nature of an individual's offense," which violates Plaintiffs' due process rights under the Fourteenth Amendment. Count I challenges the City's adjudication of municipal violations, while Count II focuses on the incentives for law enforcement officers and prosecutors to obtain convictions. Doraville now moves to dismiss.

## Discussion

Doraville argues this case should be dismissed for two reasons: (1) the Court lacks subject matter jurisdiction, and (2) Plaintiffs' Complaint fails to state a claim as a matter of law. The Court begins, as it must, with those issues implicating the Court's jurisdiction. See McCants v. Alabama-W. Fla. Conference of United Methodist Church, Inc., 372 F. App'x 39, 40 (11th Cir. 2010) (per curiam) ("When a district court has pending before it both a 12(b)(1) motion and a 12(b)(6) motion, the generally preferable approach, if the 12(b)(1) motion essentially challenges the existence of a federal cause of action, is for the court to find jurisdiction and then decide the 12(b)(6) motion." (quoting Jones v. State of Ga., 725 F.2d 622, 623 (11th Cir.1984))).

AO 72A
(Rev.8/82)

## I. Subject Matter Jurisdiction

Doraville's challenge to the Court's jurisdiction is two-fold: first, that Plaintiffs lack standing to bring this lawsuit, and second, that Plaintiffs' claims are barred under the *Rooker-Feldman* doctrine. The Court lays out the applicable legal standard before considering these arguments on the merits.

### A. Legal Standard: Rule 12(b)(1)

Rule 12(b)(1) attacks on subject matter jurisdiction come in two forms: facial attacks and factual attacks. See McElmurray v. Consol. Gov't of Augusta-Richmond Cty., 501 F.3d 1244, 1251 (11th Cir. 2007). Factual attacks often require the Court to consider and weigh extrinsic evidence to "satisfy itself as to the existence of its power to hear the case." Garcia v. Copenhaver, Bell & Associates, M.D.'s, P.A., 104 F.3d 1256, 1261 (11th Cir. 1997). But where, as here, the movant is making a facial attack, the Court need not go beyond the four corners of the Complaint. Rather, the Court is simply to "look and see if [the] plaintiff has sufficiently alleged a basis of subject matter jurisdiction," and in doing so, accept the allegations in the complaint as true. McElmurray, 501 F.3d at 1251; see also Houston v. Marod Supermarkets, Inc., 733 F.3d 1323, 1335 (11th Cir. 2013).

5

B.    Standing

Article III of the Constitution confines the reach of federal jurisdiction to "Cases" and "Controversies." U.S. CONST. art. III, § 2. A case or controversy exists for purposes of Article III when there is (1) an injury in fact; (2) causation; and (3) redressability. Steel Co. v. Citizens for a Better Env't, 523 U.S. 83, 102–04, (1998); see also Vt. Agency of Natural Res. v. United States ex rel Stevens, 529 U.S. 765, 771 (2000); 31 Foster Children v. Bush, 329 F.3d 1255, 1263 (11th Cir. 2003). At issue here is the first element—injury in fact.

Under Article III's injury in fact element, the plaintiff must prove that he suffered an "invasion of a legally protected interest" that is both "concrete and particularized"—*i.e.*, which "affect[s] the plaintiff in a personal and individual way"—as well as "actual or imminent" (as opposed to "conjectural" or "hypothetical"). Lujan v. Defs. of Wildlife, 504 U.S. 555, 560 & n.1 (1992). Steel Co., 523 U.S. at 103. A generalized grievance, by contrast, is where a plaintiff "seek[s] relief that no more directly and tangibly benefits him than it does the public at large[.]" Id. at 574; see also Perkins v. Lukens Steel Co., 310 U.S. 113, 125 (1940) (explaining that to have standing, plaintiffs must "show an injury or threat to a particular right of their own, as distinguished

6

from the public's interest in the administration of the law"). And in that

instance, Article III's particularity requirement bars the plaintiff's claim. See

Spokeo, Inc. v. Robins, 136 S. Ct. 1540, 1555 (2016) (Ginsburg, J.,

concurring).

Here, Doraville argues that Plaintiffs lack standing because they have

failed to establish an injury in fact and their claims amount to mere generalized

grievances. According to Doraville, "the only injury alleged in the complaint is

a common injury" of the sort that any person living in Doraville, owning

property there, or simply passing through, could be subjected to if he or she

violates an ordinance or state law. (MTD, Dkt. [15-1] at 14.) Doraville adds

that Plaintiffs' claim for declaratory and injunctive relief must fail because the

only threat of future injury to Plaintiffs is the "remote possibility" of being

charged, prosecuted, and fined by the City "someday" in the future. (Id. at 16.)

See Church v. City of Huntsville, 30 F.3d 1332, 1337 (11th Cir. 1994) ("[A]

party has standing to seek injunctive relief only if the party alleges, and

ultimately proves, a real and immediate—as opposed to a merely conjectural or

hypothetical—threat of *future* injury.").

The Court disagrees and finds that Plaintiffs have sufficiently alleged

standing under Article III.  The Complaint is replete with allegations showing

that Plaintiffs were personally harmed—and are likely to be harmed in the

future—from the City's allegedly unlawful reliance on revenue from ticketing,

convicting, and fining residents as well as passers-through.  Thus, whatever

difficulties other courts may face in deciding questions of concreteness and

particularity, there are no such difficulties here, where each of the Plaintiffs

was cited and subjected to the City's allegedly unlawful scheme (albeit to

varying degrees).

Take, for instance, Hilda Brucker.  According to the Complaint she was

ticketed for a number of violations related to the condition of her home.  Those

tickets were for having (1) "rotted wood" on her house and "chipping paint" on

its fascia boards; (2) "high weeds" in the backyard and ivy on a tree and vines

in the front; and (3) a driveway in a "state of disrepair."  (Compl., Dkt. [1]

¶ 112.)  Ms. Brucker had to appear in Doraville's municipal court "to explain

why she failed to correct" those issues.  And during the proceedings, the

municipal court "suspended" two of the citations.  As for the third, Ms. Brucker

pleaded no contest and was fined and sentenced to a 6-month probationary

term, which carried the possibility of arrest.  That ticket was ultimately

8

dropped. But not before Ms. Brucker obtained a home equity line of credit so she could afford to fix her house, if ordered to do so by the City.

Taking these factual allegations as true, and drawing all reasonable inferences in Plaintiffs' favor, Ms. Brucker has a sufficient injury and threat of injury to have standing. She was not only forced to go to municipal court and pay a fine, but there is also no suggestion in the Complaint that Ms. Brucker has since made any changes to her home to fix the maladies that led to her being ticketed in the first place. And those maladies, it is clear, carry the very real possibility of additional fines or even imprisonment.

That Ms. Brucker has not actually been ticketed since the initial proceedings is beside the point: "Pleading a complaint for prospective relief does not require oracular vision[.]" Elend v. Basham, 471 F.3d 1199, 1208 (11th Cir. 2006). And for that reason, the Eleventh Circuit has found that a past injury can be sufficiently indicative of imminent future harm where "the plaintiff has alleged with particularity that a future injury would likely occur in substantially the same manner as the previous injury." Id.; Church, 30 F.3d at 1339 (standing to pursue a preliminary injunction against the city to prevent arrest, harassment, or removal of the plaintiffs based on their homeless status);

9

Lynch v. Baxley, 744 F.2d 1452, 1456 (11th Cir.1984) (standing for mentally ill patient to pursue preliminary injunction even though he was not currently incarcerated because "there [was] every indication that [he] could continue to be the subject of [future] involuntary commitment petitions"); see also Zanders v. Swanson, 573 F.3d 591, 594 (8th Cir. 2009) ("A plaintiff suffers Article III injury when he or she must either make significant changes to obey the regulation, or risk a criminal enforcement action by disobeying the regulation." (alterations, internal quotations, and citation omitted)); Cutshall v. Sundquist, 193 F.3d 466, 472 (6th Cir. 1999) (standing to challenge statute allowing for the potential release of plaintiff's status as a convicted sex offender "at any time" because "he face[d] a specific threat of being subject to the release of registry information every day"). Here, the City is engaged in a broad pattern of allegedly unconstitutional behavior that is ongoing. As a result of that practice, the City's officers write dozens of tickets for ordinance and statutory violations, on a daily basis. Ms. Brucker has already been ticketed multiple times, but is yet to take action that would inhibit future citations for the exact same infractions. And should Ms. Brucker be ticketed again, she will be subjected to—as she already has been—a court said to systematically deprive

10

people of their due process rights. The Court therefore finds that Ms. Brucker continues to face a sufficiently imminent threat of injury.

The other Plaintiffs have also been ticketed and subjected to the City's allegedly unlawful practices for, among other things, having a "large pile of tree logs in backyard" and "fail[ing] to obey traffic signs or control." The Court, however, need not analyze each Plaintiffs' injuries individually. It is sufficient for present purposes that Ms. Brucker has standing to bring the claims alleged. Parker v. Scrap Metal Processors, Inc., 386 F.3d 993, 1003 n.10 (11th Cir. 2004) (citing Jackson v. Okaloosa Cty., 21 F.3d 1531, 1536–37 (11th Cir.1994) (noting that "at least one named plaintiff must have standing for each of the claims")).

B.   *Rooker-Feldman* Doctrine

The Court looks next to whether this action is barred by the *Rooker-Feldman* doctrine. See Cormier v. Horkan, 397 Fed. App'x 550 (11th Cir. 2010) (vacating the district court's dismissal of a complaint alleging constitutional and statutory violations in connection with state court divorce proceedings for failure to state a claim and remanding with instructions to dismiss for lack of jurisdiction under *Rooker-Feldman*). That doctrine

embodies the reality that federal district courts do not have jurisdiction to act as appellate courts, and thereby precludes district courts from reviewing final state court decisions. Green v. Jefferson Cty. Comm'n, 563 F.3d 1243, 1249 (11th Cir. 2009). The Supreme Court clarified the scope of the *Rooker-Feldman* doctrine and held that it is "confined to cases of the kind from which the doctrine acquired its name: cases brought by state-court losers complaining of injuries caused by state-court judgments rendered before the district court proceedings commenced and inviting district court review and rejection of those judgments." Exxon Mobil Corp. v. Saudi Basic Indus. Corp., 544 U.S. 280, 284 (2005). But that includes—at least in this Circuit—"not only [the] constitutional claims presented or adjudicated by a state court, but also [] claims that are 'inextricably intertwined' with a state court judgment." Goodman ex rel. Goodman v. Sipos, 259 F.3d 1327, 1332 (11th Cir. 2001) (quoting Siegel v. LePore, 234 F.3d 1163, 1172 (11th Cir. 2000) ). "A claim is 'inextricably intertwined' if it would 'effectively nullify' the state court judgment, or [if] it 'succeeds only to the extent that the state court wrongly decided the issues.'" May v. Morgan Cty., 878 F.3d 1001, 1005 (11th Cir. 2017) (quoting Casale v. Tillman, 558 F.3d 1258, 1260 (11th Cir. 2009)).

12

Doraville argues that the *Rooker-Feldman* doctrine bars this action because Plaintiffs' claims are "inextricably intertwined" with prior municipal court judgments. That is so, the City argues, because a finding that the City's budgetary practices violate Plaintiffs' due process rights necessarily requires finding that Plaintiffs' charges, prosecutions, and sentences were unlawful, and would thereby "effectively nullify" the state court judgments. But that very argument undermines the City's position.

One of Plaintiffs' claims—"Biased Prosecution and Law Enforcement"—concerns citations and prosecutorial motives that occurred before Plaintiffs ever appeared in court. And Plaintiffs' other claim—"Biased Adjudication"—does not challenge the municipal court's finding that Plaintiffs violated the law (or, more accurately, its taking of guilty pleas), but rather the overarching scheme that led Plaintiffs to court in the first instance. Hence, these claims do not ask the Court to find that the municipal court made an incorrect legal ruling. Rather, they ask the Court to decide whether the City uses unconstitutional practices to incentivize ticketing or taint courtroom procedures in violation of Plaintiffs' constitutional rights. Simply put, there is a difference between challenging actions taken in the course of obtaining a

13

judgment and challenging the judgment itself.  See, e.g., Brokaw v. Weaver, 305 F.3d 660, 665–66 (7th Cir. 2002) (quoting Holloway v. Brush, 220 F.3d 767, 779 (6th Cir. 2000)); see also Powers v. Hamilton Cty. Pub. Def. Comm'n, 501 F.3d 592, 606 (6th Cir. 2007) ("Assertions of injury that do not implicate state-court judgments are beyond the purview of the *Rooker-Feldman* doctrine.").

In that way, this case is similar to the Sixth Circuit's decision in *Powers*. There, the plaintiff challenged a custom or practice at the public defender's office of failing to ask for indigency hearings—specifically, he argued that "incarceration, in the absence of any inquiry into [the plaintiff's] ability to pay the court-imposed fine, violated his [constitutional] rights." Powers, 501 F.3d at 597.  As a result, the plaintiff's claims necessarily criticized the state trial court's decision to incarcerate the plaintiff without conducting indigency hearings that the public defenders failed to request.  Nevertheless, the *Powers* court held that *Rooker-Feldman* did not apply because the plaintiff was "not alleg[ing] that he was deprived of his constitutional rights by the state-court judgment, but rather by the Public Defender's conduct in failing to ask for an indigency hearing as a prerequisite to his incarceration." Id. at 606.  Likewise,

14

here, Plaintiffs do not challenge the fines or sentences imposed by the municipal court. Instead, they claim that the *City* violated their constitutional rights by implementing a custom or policy that caused them to be deprived of due process. Cf. Arthur v. JP Morgan Chase Bank, NA, 569 F. App'x 669, 675 (11th Cir. 2014) (finding that the *Rooker-Feldman* doctrine did not bar plaintiffs' suit for fraud related to the generation of foreclosure-related documents); Ray v. Judicial Corr. Servs., No. 2:12-CV-02819-RDP, 2013 WL 5428360, at *9 (N.D. Ala. Sept. 26, 2013). Just because those claims raise questions about the municipal court's incentives does not mean they are foreclosed by the *Rooker-Feldman* doctrine. Accordingly, the Court finds that it has subject matter jurisdiction to proceed with this case. Doraville's motion under Rule 12(b)(1) is therefore **DENIED**.

## II.     Failure to State a Claim

Doraville also moves to dismiss the Complaint under Rule 12(b)(6) for failing to state a plausible claim for relief. Like an attack on jurisdiction under Rule 12(b)(1), when dealing with a motion to dismiss under Rule 12(b)(6), "all well-pleaded facts are accepted as true," and the Court draws all reasonable inference "in the light most favorable to the plaintiff." Bryant v. Avado

15

Brands, Inc., 187 F.3d 1271, 1273 n.1 (11th Cir. 1999). In the end, the Court's task is to determine whether the complaint has "sufficient factual matter, accepted as true, to 'state a claim to relief that is plausible on its face.'" Ashcroft v. Iqbal, 556 U.S. 662, 678 (2009) (quoting Bell Atl. Corp. v. Twombly, 550 U.S. 544, 570 (2007)).

In this case, however, the Court finds itself unable to adequately assess whether Plaintiffs' claims are legally cognizable. And that is as a result of the paucity of relevant case law. Indeed, the constitutionality of financially incentivized municipal courts and law enforcement officials has not been a lively point of discussion in the federal courts. There is, however, some guidance in a series of Supreme Court decisions concerning Ohio mayors' courts—*i.e.*, courts over which the mayor presided. See e.g., Tumey v. Ohio, 273 U.S. 510 (1927); Dugan v. Ohio, 277 U.S. 61 (1928); Ward v. Village of Monroeville, 409 U.S. 57 (1972).

First, in *Tumey*, the Supreme Court found that a statutory scheme under which a mayor/judge was directly compensated for each conviction in his court violated due process. Tumey, 273 U.S. at 521. A year later in *Dugan*, the Supreme Court dealt with a differently-structured mayor court. In that case, the

16

mayor/judge served as one of five city commissioners, but unlike the mayor in

*Tumey*, he had no executive authority.  <u>Dugan</u>, 277 U.S. at 63.  Instead, a city

manager served as "active executive," while the commission exercised "the

legislative power of the city."  <u>Id.</u>  And the mayor/judge's salary was fixed by

the other four members of the commission (although that salary was paid from

a general fund that included revenue from fines obtained through the mayor

court).  <u>Id.</u>  Ultimately, the Supreme Court found that the mayor/judge's role

was primarily judicial, and his alleged financial interests were too "remote" to

violate the due process rights of those appearing before him.  <u>Id.</u> at 65.  Nearly

fifty years later, however, the Supreme Court found that another mayor/judge's

interest in city finances was impermissible under the Fourteenth Amendment,

even though he did not directly receive any portion of the fees collected

through court proceedings.  <u>Ward</u>, 409 U.S. 57.  In reaching that conclusion,

the Supreme Court explained:

> the test is whether the mayor's situation is one which would offer
> a possible temptation to the average man as a judge to forget the
> burden of proof required to convict the defendant, or which might
> lead him not to hold the balance nice, clear, and true between the
> state and the accused.  Plainly that 'possible temptation' may also
> exist when the mayor's executive responsibilities for village
> finances may make him partisan to maintain the high level of

17

> contribution from the mayor's court.  This, too, is a situation in
> which an official perforce occupies two practically and seriously
> inconsistent positions, one partisan and the other judicial, (and)
> necessarily involves a lack of due process of law in the trial of
> defendants charged with crimes before him.

Id. at 60 (internal quotations, citations, and alterations omitted); see also

Connally v. Georgia, 429 U.S. 245 (1977) (per curiam) (applying these

principles to strike down a statute that compensated justices of the peace based

on the issuance of search warrants) .

With this precedent, alone, the Court cannot say whether Plaintiffs'

Complaint states a plausible violation of their due process rights.  Although

these cases are instructive and reveal that certain arrangements are clearly

unconstitutional—*e.g.*, where the judicial officer has a "direct, personal,

substantial pecuniary interest" in the proceedings, Tumey, 273 U.S. at

523—they do not provide guidance on how to determine when less concrete

financial incentives—such as the ones at issue here—make the likelihood of

impartiality so great as to violate due process.

The Eleventh Circuit is yet to weigh in on this matter.  However, other

Circuits have endeavored to expound upon the precedent described above and

come up with a workable standard.  The Sixth Circuit, for instance, has said:

18

The amount of mayor's court fee revenues is just one measure of whether the mayor may reasonably be questioned as being impartial. The more substantial the amount (or percentage) of revenue produced from a mayor's court, the more reasonable it is to question the impartiality of a mayor who has any executive authority. In similar fashion, the more executive authority vested in the mayor, the more reasonable it is to question the impartiality of a mayor who collected even a relatively minor amount of general revenue through a mayor's court. Thus, inadequate separation of powers in a mayor-judge may occur despite the mayor's court's collection of a fairly small percentage of general fund revenue.

DePiero v. City of Macedonia, 180 F.3d 770, 779 (6th Cir. 1999) (adopting the standard articulated in Rose v. Vill. of Peninsula, 875 F. Supp. 442, 452 (N.D. Ohio 1995)). The Ninth Circuit, on the other hand, seems to be more interested in quantifying the analysis. Stepping back, the Ninth Circuit has explained that there are two forms of bias that may violate an individual's procedural due process rights: (1) where the decision maker has "direct, personal, substantial pecuniary interest in the proceedings;" and (2) when the decision maker does not stand to gain personally but has a strong motive "to rule in a way that would aid the institution." Alpha Epsilon Phi Tau Chapter Housing Ass'n v. City of Berkeley, 114 F.3d 840, 844 (9th Cir. 1997). In dealing with the latter form—which this case appears to implicate—the Ninth Circuit has focused on

19

the amount of revenue generated by fines and penalties to decide "whether the official motive is [so] strong . . . that it reasonably warrants fear of partisan influence on the judgment." Id. at 846 (internal quotations, citations, and alterations omitted).

Given the uncertainty in this area, the Court finds that a hearing would be useful. Specifically, the Court wishes to address which standard of review should guide the Court's analysis in ruling on Doraville's motion to dismiss and define the parameters of this case, should it move forward.

## Conclusion

For the reasons described above, Doraville's Motion to Dismiss [15] is **DENIED**. However, the Court grants, *sua sponte*, a reconsideration of the motion's arguments under Rule 12(b)(6). The Court **ORDERS** the Parties to appear for a hearing to address the proper standard of review and its application in this case. The Courtroom Deputy Clerk will contact counsel to schedule that hearing. The parties may file supplemental briefs addressing these issues not later than 14 days before the hearing.

AO 72A
(Rev.8/82)

**SO ORDERED**, this 1st day of April, 2019.

_____
**RICHARD W. STORY**
United States District Judge

AO 72A
(Rev.8/82)