UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF GEORGIA
ATLANTA DIVISION

HILDA BRUCKER, *et al.*,

Plaintiffs,

v.

CITY OF DORAVILLE, a Georgia
municipal corporation,

Defendant.

CIVIL ACTION NO.

1:18-CV-02375-RWS

## **O R D E R**

This case comes before the Court for reconsideration of the City of

Doraville's Motion to Dismiss [15].  After reviewing the record and with the

benefit of oral argument, the Court enters the following Order.

### **Background**[1]

This case involves the system through which Doraville raises revenue from

fines, fees, and forfeitures.  Doraville, like other Georgia "home rule"

municipalities, passes its own criminal ordinances and tries violations of those

---

[1]  The facts of this case were fully set out in a previous Order partially ruling on the
City's Motion to Dismiss.  (Apr. 1, 2019 Order, Dkt. [30].)   For the purposes of this
Order, the Court includes a nearly identical—but slightly abbreviated—background to set
the stage for deciding the remaining issues.

ordinances in a municipal court. Doraville's police department primarily enforces the City's ordinances, except for property violations, which are handled by a private firm. Those municipal servants issue thousands of tickets and citations every year. And the individuals cited or ticketed are ordered to appear at Doraville's municipal court.

At municipal court hearings, the City Attorney acts as prosecutor. The judge presiding over those proceedings is appointed by the City Council and "hold[s] office at the pleasure of the City Council." Doraville Municipal Code § 9-1. The municipal court judge is authorized to impose criminal penalties for violations of the City's code. The standard penalty is a fine of up to $1,000 or six months imprisonment.

Overall, the City generates $3 million or more annually from fines, fees, and forfeitures that are prosecuted through the municipal court. Those funds constitute anywhere from 17 to 30 percent of the City's total yearly revenue. Hence, the City is highly dependent on revenue it derives from its municipal court. And so the City Council includes projected revenue from fines, fees, and forfeitures in its municipal budget.

According to Plaintiffs—four individuals who have each been convicted or threatened with conviction in Doraville's municipal court—"the City's institutional

reliance on revenue from fines and fees" incentivizes "the City to ticket, convict, and fine defendants, regardless of the nature of an individual's offense" in violation of Plaintiffs' due process rights under the Fourteenth Amendment. Plaintiffs filed this lawsuit challenging the City's conduct under 42 U.S.C. § 1983. Count I challenges the City's adjudication of municipal violations, while Count II focuses on the incentives for law enforcement officers and prosecutors to obtain convictions.

Doraville timely moved to dismiss both counts, (Dkt. [15]). The City argued this case should be dismissed because the Court lacks subject matter jurisdiction and because Plaintiffs' Complaint fails to state a claim as a matter of law. On April 1, 2019, the Court denied Doraville's motion, finding that it did indeed have jurisdiction. The Court went on, however, to grant reconsideration (*sua sponte*) on the Rule 12(b)(6) portion of the motion and invited supplemental briefing from the parties "to address which standard of review should guide the Court's analysis . . . and define the parameters of this case, should it move forward." Both parties submitted briefs and appeared for oral argument to discuss their positions on June 4, 2019. The Court now reconsiders its previous denial of Doraville's motion.

**Discussion**

## I. Motion to Dismiss Standard

Federal Rule of Civil Procedure 8(a)(2) requires that a pleading contain a "short and plain statement of the claim showing that the pleader is entitled to relief." While this pleading standard does not require "detailed factual allegations," "labels and conclusions" or "a formulaic recitation of the elements of a cause of action will not do." Ashcroft v. Iqbal, 556 U.S. 662, 678 (2009) (quoting Bell Atl. Corp. v. Twombly, 550 U.S. 544, 555 (2007)). In order to withstand a motion to dismiss, "a complaint must contain sufficient factual matter, accepted as true, to 'state a claim to relief that is plausible on its face.'" Id. (quoting Twombly, 550 U.S. at 570). A complaint is plausible on its face when the plaintiff pleads factual content necessary for the court to draw the reasonable inference that the defendant is liable for the conduct alleged. Id.

At the motion to dismiss stage, "all well-pleaded facts are accepted as true, and the reasonable inferences therefrom are construed in the light most favorable to the plaintiff." Bryant v. Avado Brands, Inc., 187 F.3d 1271, 1273 n.1 (11th Cir. 1999). However, the same does not apply to legal conclusions set forth in the complaint. Sinaltrainal v. Coca-Cola Co., 578 F.3d 1252, 1260 (11th Cir. 2009) (citing Iqbal, 556 U.S. at 678). "Threadbare recitals of the elements of a cause of action, supported by mere conclusory statements, do not suffice." Iqbal, 556 U.S.

at 678.  Furthermore, the court does not "accept as true a legal conclusion couched as a factual allegation."  <u>Twombly</u>, 550 U.S. at 555.

## II.    Analysis

At the heart of Plaintiffs' case is the City's reliance on fines, fees, and forfeitures and the influence that reliance might have on those issuing tickets and resolving offenses in the City's municipal court.  According to Plaintiffs, the City's institutional practices generate two impermissible conflicts of interest.  First, municipal court personnel, including Doraville's municipal court judges, are financially incentivized to convict defendants appearing before them.  And second, the City's law enforcement personnel, including its prosecutors and police officers, have a financial incentive to ticket and prosecute citizens and passers-through.  Plaintiffs argue these conflicts of interest deprived them and others of their rights under the Due Process Clause of the Fourteenth Amendment.

### A.    Doraville's Municipal Court

The Fourteenth Amendment guarantees that states will not deprive "any person of life liberty, or property, without due process of law."  U.S. CONST. amend. XIV, § 1.  Inherent in this guarantee is the concept of neutrality: that people are entitled to "impartial and disinterested" tribunals in civil and criminal proceedings.  <u>Marshall v. Jerrico, Inc.</u>, 446 U.S. 238, 242 (1980).  The neutrality

requirement ensures that litigants and criminal defendants will be able to present their cases before arbiters who are "not predisposed to find against [them]." Id. Due process is violated, then, when judges have financial interests in the cases over which they preside.

So, in *Tumey v. Ohio* the Supreme Court overturned a conviction from a "liquor court" where the town's mayor served as judge because a portion of the mayor's salary came from costs and fees he imposed while acting in a judicial capacity. 273 U.S. 510, 521–22, 535 (1927). The mayor was therefore disqualified from deciding the plaintiff's case because he had a "direct pecuniary interest in the outcome." Id. at 535.

Not every case is so clear, however. And justice, it has been said, must also "satisfy the *appearance* of justice." Offutt v. United States, 348 U.S. 11, 14 (1954) (emphasis added). As a result, due process might be violated even if the judge has no "direct, personal, substantial pecuniary interest" in the proceedings, Tumey, 273 U.S. at 523, but there nevertheless exists a "probability of unfairness." In re Murchison, 349 U.S. 133, 136 (1955); Marshall, 446 U.S. at 243.

For example, in *Ward v. Village of Monroeville*, the Supreme Court found that another mayor/judge's interest in city finances was impermissible under the Fourteenth Amendment, even though he did not directly receive any portion of the

6

fees he collected, but a "major part" of the village's total operating funds came from the mayor's court. 409 U.S. 57, 58, 61–62 (1972). The Court described the applicable test as:

> whether the [judge's] situation is one "which would offer a possible temptation to the average man as a judge to forget the burden of proof required to convict the defendant, or which might lead him not to hold the balance nice, clear, and true between the state and the accused."

Id. at 60 (quoting Tumey, 273 U.S. at 532). The mayor's court in *Ward* failed under this test because "[p]lainly [such a] 'possible temptation' may also exist when the mayor's executive responsibilities for village finances may make him partisan to maintain the high level of contribution from the mayor's court." Id.; see also Tumey, 273 U.S. 535 (finding, too, that the mayor had an "official motive to convict and to graduate the fine [in the plaintiff's case] to help the financial needs of the village").

The principles from *Tumey* and *Ward* still echo today, and the Supreme Court has applied them in various contexts. See, e.g., Connally v. Georgia, 429 U.S. 245 (1977) (per curiam) (striking down a statute that compensated justices of the peace based on the issuance of search warrants); Gibson v. Berryhill, 411 U.S. 564 (1973) (invalidating a system in which a board of optometrists adjudicated charges of professional misconduct filed against other optometrists who would be in competition with the board members); Morrissey v. Brewer, 408 U.S. 471, 485–

86  (1972) (finding parole officers cannot make a determination that reasonable grounds exist for revocation of parole; rather, that decision should be made by someone who is not directly involved in the case).  As have many courts of appeals.  See, e.g., DePiero v. City of Macedonia, 180 F.3d 770, 779 (6th Cir. 1999); Alpha Epsilon Phi Tau Chapter Housing Ass'n v. City of Berkeley, 114 F.3d 840, 844 (9th Cir. 1997); Van Harken v. City of Chicago, 103 F.3d 1346 (7th Cir. 1997); In re Al-Nashiri, 921 F.3d 224, 226 (D.C. Cir. 2019).  The Eleventh Circuit, on the other hand, has not.[2]  But in early 1981, the former Fifth Circuit issued *Brown v. Vance*, which is binding on this Court to the extent it is applicable.[3]  637 F.2d 272 (5th Cir. 1981).  In *Brown*, the former Fifth Circuit struck down a Mississippi fee system that compensated justices of the peace based on the number of cases they heard.  Id.  That system, the court found, created a temptation for judges to depart from judicial neutrality in order to entice

---

[2]  The Eleventh Circuit has, in fact, relied on *Tumey* and *Ward* when analyzing procedural due process challenges, just not in a situation like the one at hand.  See, e.g., Davis v. Jones, 506 F.3d 1325 (11th Cir. 2007) (habeas corpus action stemming from judge's fraternal relationship to one of the prosecutors); but see Harris v. Conradi, 675 F.2d 1212, 1217 (11th Cir. 1982) (citing *Tumey* and explaining that criminal justice must "be administered in an objectively impartial manner" and "reasonable objective impartiality necessarily relates to the amount of discretion the principle actors enjoy within the system").

[3]  In *Bonner v. City of Prichard*, the Eleventh Circuit Court of Appeals adopted as binding precedent all decisions of the former Fifth Circuit decided before October 1, 1981.  661 F.2d 1206, 1209 (11th Cir. 1981) (en banc).

plaintiffs—who were allowed to choose where they filed cases—to litigate before them. Id. Significant for present purposes, the court also expounded upon the *Tumey-Ward* test:

> In *Tumey* and *Ward* the Supreme Court, as we read the opinions in those cases, was not as interested in the probity of an individual judge or perhaps even, of the great majority of judges. It was interested rather in the inherent defect in the legislative framework arising from the vulnerability of the average man-as the system works in practice and as it appears to defendants and to the public. The Court's inquiry there and our inquiry here is not whether a particular man has succumbed to temptation, but whether the economic realities make the design of the fee system vulnerable to a "possible temptation" to the "average man" as judge. Here we have no need to be solicitous of the honor of a particular judge; none has been questioned. Nor do concerns of judicial administration necessarily require a high evidentiary barrier. The *Tumey-Ward* test, in sum, *is levelled at the system, not the individual judge*. This is the reason it speaks of temptation to the average man. The "average man as judge" concept was made the heart of the test to introduce a humble Everyman, prey to the vicissitudes of life, the need for bread on the table, and for small favors from the right people.

Id. at 284 (emphasis added). For this reason, the Court is not convinced that the inquiry should be completely affixed on the individual decision-maker (that is, the one actually adjudicating cases as opposed to the municipal structure more broadly) like Doraville suggests. Instead, *Brown* makes clear that the Court's focus should be on the municipal structure as a whole and whether it would appear,

to the average citizen, that that system potentially fuels impropriety in judicial

proceedings.  Id.[4]

Still, the parties disagree over how to evaluate the existence of such

institutional bias.  In other words, how do the principles described above translate

into a workable test?  While the case law makes clear that certain arrangements are

clearly unconstitutional—*e.g.*, where the judicial officer has a "direct, personal,

substantial pecuniary interest" in the proceedings, Tumey, 273 U.S. at 523—it does

not elucidate how to determine when less concrete financial incentives—such as

those at issue here—make the likelihood of impartiality so great as to violate due

process.  For Doraville, the threshold issue when deciding if institutional bias

exists is whether the system vests in the decision-maker both judicial and executive

authority.  And in this case, Doraville insists, that issue is dispositive because the

City's municipal court judges lack any executive responsibilities; they are, instead,

simply judges.

---

[4]  This is not to suggest that the Court's focus is entirely on the City Council either, as
Plaintiffs seem to advocate.  There is no case, to the Court's knowledge, that takes such
an approach, and Plaintiffs have not articulated why, for instance, a wholly independent
judiciary—say, with judges having life tenure—that operates under the same system as
Doraville would nevertheless violate the Due Process Clause.  No, instead the caselaw
strikes a middle ground between the parties.  That precedent instructs the Court to
examine whether *Doraville's* municipal structure and systemic reliance on fines, fees,
and forfeitures creates a potential for biasing *City officials* sufficient to violate due
process.

The City's best case on this point is *Dugan v. Ohio*. 277 U.S. 61 (1928). There, the Supreme Court found that the institutional interests of a mayor exercising judicial functions were too remote to create an unconstitutional conflict of interest. Influential in the Court's analysis was that, unlike the mayor in *Tumey*, the mayor in *Dugan* had no executive authority. Id. at 63. Instead, a city manager served as "active executive," while a commission—of which the mayor was one of five members—exercised "the legislative power of the city." Id. And the mayor/judge's salary was fixed by the other four members of the commission (although that salary was paid from a general fund that included revenue from fines obtained through the mayor court). Id. Thus, the Supreme Court found that the mayor/judge's role was primarily judicial, and his alleged financial interests were too "remote" to violate the due process rights of those appearing before him. Id. at 65.

The Court is not persuaded, however, that *Dugan* means to suggest that executive-judicial comingling is categorically required in these types of cases. Certainly, the blending of governmental responsibilities is relevant, but it is not, in this Court's opinion, dispositive. Instead, the Court agrees with Plaintiffs that the first question in the analysis is, more broadly, whether there exists a conflict of interest.

In reaching this conclusion, the Court is guided by common sense and precedent. As for common sense, look just a bit further than the allegations in the Complaint. All else being equal, imagine that direct evidence comes to light that one of Doraville's municipal court judges is, in fact, finding citizens guilty for violating City ordinances, even where proof of culpability is lacking, solely to increase revenue for the City. In that event, could it be said that the tribunal is "impartial and disinterested," Marshall, 446 U.S. at 242, even though the judge has neither a "direct pecuniary interest in the outcome" of cases, Tumey, 273 U.S. at 523, nor executive responsibilities? Surely not.

But even setting hypotheticals aside, the Supreme Court's decision in *Marshall v. Jerrico, Inc.* offers some guidance. 446 U.S. 238 (1980). To begin, that case involved "administrative prosecutors" charged with enforcing certain provisions of the Fair Labor Standards Act involving child labor; they were not judges, and *Marshall* makes clear that while the Due Process Clause imposes certain limits on prosecutors, those limits are less stringent than the ones applicable to judges. See also infra Part II.B. Necessarily, then, a threshold inquiry is whether the official is "performing judicial or quasi-judicial functions," or is instead a public official "acting in a prosecutorial or plaintiff-like capacity." Id. at 248. The importance of this distinction—at least for present purposes—is that the

12

*Marshall* Court confirmed that due process applies, not just to judges, but to other public officials as well, albeit to a lesser extent.   And as for judges, the Court clarified that *Tumey* and *Ward*'s stricter standards control because it is the duty of judges "to make the final decision," and it is judges "whose impartiality serves as the ultimate guarantee of a fair and meaningful proceeding in our constitutional regime."  Id. at 250.  This tenet applies with equal force to judges across the board—regardless of which level of government they serve and regardless of whether their functions are wholly judicial or quasi-judicial.

The Supreme Court also alluded to several factors that might bear on whether a law, procedure, or program unconstitutionally biases an official.  A judge in another district summarized those factors as follows: "(i) whether the amount of penalties or prosecutions affects an official's salary; (ii) the official's authority over allocating the penalty funds; (iii) the percentage of the budget that the fees and penalties constitute; and (iv) whether surplus funds are allocated to the program or to other programs."  Harjo v. City of Albuquerque, 326 F. Supp. 3d 1145, 1184 (D.N.M. 2018) (citing Marshall, 446 U.S. at 245–46, 250–51).  The Court does not suggest that this list of factors is exhaustive, nor is any one factor dispositive.  But the Justices' consideration of them suggests that due process

concerns might be raised even absent the vesting of nonjudicial functions in the courts.

This approach also tracks recent decisions from another district. <u>Cain v. City of New Orleans</u>, 281 F. Supp. 3d 624, 654–59 (E.D. La. 2017); <u>Caliste v. Cantrell</u>, 329 F. Supp. 3d 296, 317–18 (E.D. La. 2018). The Court agrees with those judges and Plaintiffs that the relevant standard involves two questions: First, is there a conflict of interest? Second, is the conflict of interest substantial?

While the need for the first question should be obvious, the reasoning behind the second might not be. It is derived from *Tumey*. The Supreme Court, there, emphasized that mayor courts are not, in every event, unconstitutional because "[t]he minor penalties usually attaching to the ordinances of a village council, or to the misdemeanors in which the mayor may pronounce final judgment without a jury, do not involve any such addition to the revenue of the village as to justify the fear that the mayor would be influenced in his judicial judgment by that fact." <u>Tumey</u>, 273 U.S. at 534. So institutional conflicts of interest with minimal effects do not implicate due process because they do not provide a legitimate incentive for officials to stray from neutrality; instead, the official motive must be, as then-retired Justice White described it, "strong"—so strong that it "reasonably warrants fear of partisan influence on the judgment." <u>Alpha Epsilon Phi Tau Chapter Hous.</u>

Ass'n v. City of Berkeley, 114 F.3d 840, 847 (9th Cir. 1997) (alterations omitted);

and compare Rose v. Vill. of Peninsula, 875 F. Supp. 442, 451 (N.D. Ohio 1995)

(annual collection of fines amounting to more than 10 percent of the city's general

revenue fund was "substantial"), with Wolkenstein v. Reville, 694 F.2d 35, 43 (2d

Cir. 1982) (fees imposed "sporadic[ally]" or "occasional[ly]" and represented little

more than 0.5 percent of the budget were not substantial).

      As for the conflict, itself, a variety of factors could bear on whether a

conflict of interest exists, see, e.g., Harjo, 326 F. Supp. 3d at 1184, and the absence

of one or more factors might be outweighed by the substantiality of other factors

under the test's second prong. As an example, the amount of revenues produced

from the court is one measure of whether the judge may reasonably be perceived as

impartial, and the degree of executive authority transferred to the judge is another.

The more substantial the percentage of revenues, the more reasonable it is to

question the impartiality of the judge, even if that judge has little to no executive

authority. Likewise, if the judge is vested with broad executive authority, it might

be reasonable to question that judge's neutrality even if the court is responsible for

only a minor percentage of the city's overall revenue. Cf. DePiero v. City of

Macedonia, 180 F.3d 770, 779 (6th Cir. 1999).

In sum, to state a plausible due process claim for institutional bias, Plaintiffs must allege sufficient facts to establish two things: (1) that there is a conflict of interest and (2) that the conflict of interest is substantial. Applying that standard to Count I, the Court now considers whether Doraville's municipal court comports with the requirements of procedural due process.

### 1. Is there a conflict of interest?

To begin, it is important to reiterate that Doraville's municipal court judges lack any executive authority. They are not members on the City Council, nor do Plaintiffs allege that they have any say in the allocation of City funds. But, while an arrangement in which judges are vested with broad executive responsibilities could raise separation of powers concerns, see Ward, 409 U.S. at 60, equally threatening to judicial independence is a local governing body's authority to summarily remove local judges or magistrates, cf. Winter v. Coor, 695 P.2d 1094 (Ariz. 1985); State ex rel. Morales v. City Comm'n of City of Helena, 570 P.2d 887 (Mont. 1977). In Doraville, that is exactly what is happening: The municipal court judge "hold[s] office at the pleasure of the City Council." Doraville Municipal Code § 9-1.

To that end, a critical aspect of Plaintiffs' argument is that Doraville's municipal court judges are hired by and can be fired at will by the City Council.

Doraville responds that the City Council does not enjoy unfettered authority to terminate municipal court judges because that authority is abated by Georgia law. Specifically, O.C.G.A. § 36-32-2.1 prohibits removal of municipal court judges without cause that "adversely affects the administration of the office of the judge and the rights and interests of the public" and requires a two-thirds' vote of the governing authority following notice and a public hearing. O.C.G.A. § 36-32-2.1(a)–(c), (d). At this stage, however, Doraville's position is unavailing. For one thing, there are no allegations in the Complaint suggesting that Doraville's City Council actually follows these restrictions, or that it would should municipal court revenues fall. Nor, for that matter, is it entirely clear that firing a judge who allowed court revenues to fall—and hence compromised the City's financial well-being—would run afoul of § 36-32-2.1.

Thus, while a municipal court judge's success undoubtedly depends on a variety of factors, chief among them is the support and good will of the City Council. The City Council, in turn, has an obvious incentive to maximize revenue from the municipal court. Of course, it is true that the City Council's concerns transcend the collection of fines, fees, and forfeitures. But the importance of municipal court revenues in Doraville cannot be ignored. Millions of dollars each year are generated from the enforcement of Doraville's criminal ordinances. And

the Court cannot assume that Doraville is more interested in compliance with its criminal ordinances than it is with collecting fines and fees from those who violate them. After all, many of the ordinances at issue were not enacted in furtherance of public health and safety (at least not at face value); they deal, instead, with aesthetics—for instance, a home having chipped paint, overgrown vegetation, or logs stacked in the yard. Doraville therefore has as much to gain (if not more) from citizens violating these ordinances, as it does from everyone adhering to them. And a violation of the City's ordinances is no minor ordeal. It carries the potential for serious criminal penalties including hefty fines or even jail time. As one legal authority puts it, "Embodied in the due process concept are the basic rights of a defendant in criminal proceedings," *Due process of law*, BLACK'S LAW DICTIONARY (6th ed. 1990), which as we know, includes the opportunity to appear before "a neutral and detached judge." Ward v. Vill. of Monroeville, 409 U.S. 57, 62 (1972).

The City Council's control over the appointment and tenure of municipal court judges is therefore concerning because it calls into question those judges' autonomy. What is more, the City Council essentially sets a target for municipal court judges to hit: It "budgets [each year] to receive millions of dollars from

municipal fines, fees, and forfeitures," (Compl., Dkt. [1] ¶ 7), all of which are imposed and assessed by municipal court judges.

Equally important is the percentage those criminal penalties make up of the City's general fund—indeed, up to 30 percent. "In both *Tumey* and *Ward* the [Supreme] Court put great emphasis on the fact that the revenues generated by the [courts at issue] were very substantial and vitally important to the village's fiscal well being." Wolkenstein v. Reville, 694 F.2d 35, 43 (2d Cir. 1982) (citing Tumey, 273 U.S. at 521; Ward, 409 U.S. at 58–59). So too in Doraville. The City is heavily reliant on revenues from its municipal courts, meaning that failure to maintain a strict policy of conviction might make it impossible for the City to balance its budget. In that event the municipal court would likely suffer too. Since such a significant portion of Doraville's yearly revenue comes from fines, fees, and forfeitures, it is reasonable to infer that the municipal court is dependent on those funds. And by extension, that if fine, fee, and forfeiture revenues fall too much or disappear completely, the officials working there would face pay cuts or lose their jobs.

Doraville's municipal court judges, then, are not well insulated from the pressures of their partisan superiors or the burden of funding the municipality. So much so that an "average man" in those judges' shoes could fail "to hold the

balance nice, clear, and true between the state and the accused." <u>Ward</u>, 409 U.S. at

60. The Court thus finds that Plaintiffs have sufficiently alleged that a conflict of

interest exists.

> 2.    *Is the conflict substantial?*

Doraville does not seriously dispute that, assuming a conflict exists (as the

Court has already found) the conflict is substantial. Indeed, revenues from the

municipal court are obviously important to the City: fines, fees, and forfeitures

account for up to 30 percent of the City's total budget. <u>See also</u> Compl., Dkt. [1]

¶ 62 (referencing a 2015 newsletter that boasted, "[a]veraging nearly 15,000 cases

and bringing in over $3 million annually, [Doraville's] court system contributes

heavily to the city's bottom line."). That is comparable to the substantiality of

fines and fees deemed unconstitutional in several cases, <u>Cain v. City of New

Orleans</u>, 281 F. Supp. 3d 624, 657 (E.D. La. 2017) (10 percent of total budget and

a quarter of judicial expense fund), <u>Caliste v. Cantrell</u>, 329 F. Supp. 3d 296, 317–

18 (E.D. La. 2018) (bond fees "represent[ed] roughly 20–25% of the total Fund").

And it eclipses others, <u>DePiero v. City of Macedonia</u>, 180 F.3d 770, 780 (6th Cir.

1999) (only a "fairly small amount of general fund revenue [collected] through the

mayor's court" (citation omitted)), and <u>cf.</u> <u>Rose v. Vill. of Peninsula</u>, 875 F. Supp.

442, 454 (N.D. Ohio 1995) (denying summary judgment on due process claim

where 11.8 to 13.9 percent of the city's general fund came from the mayor's court). The municipal court's own reliance on these funds can be inferred as well, since fines and fees account for such a considerable portion of the City's budget.

It is worth noting, too, that in all likelihood municipal courts like Doraville's are the courts with which most people have the most contact. Thus, in looking "at the system," Brown, 637 F.2d at 284, it seems that the scope of apparent impropriety in the City's municipal court would be augmented by the number of people exposed to and potentially affected by it.

All things considered, then, the Court the finds that (based on the allegations in the Complaint) the City and its municipal court depend heavily on fines and fees revenue, and Doraville's municipal court judges have a strong enough motive to maximize those revenue to warrant a reasonable fear of partisan influence in decisions related to ordinance violations and the assessing of criminal penalties. See DePiero, 180 F.3d at 782 ("The Supreme Court's test does not call for proof of actual temptation. The mere possibility of temptation . . . is all that is required."). Accordingly, the City's motion is **DENIED** as to Count I.

B.    Doraville's Law Enforcement Personnel

Beginning with the obvious: Doraville's police officers and its City Attorney are not judges. And recall that *Tumey* and *Ward*'s "rigid requirements" do not

apply "to those acting in a prosecutorial or plaintiff-like capacity." Marshall v.

Jerrico, Inc., 446 U.S. 238, 248 (1980). That is because, as the Supreme Court put

it, "[i]n an adversary system, [prosecutors] are necessarily permitted to be zealous

in their enforcement of the law." Id. But at the same time the *Marshall* Court

made clear that it was not suggesting "the Due Process Clause imposes no limits

on the partisanship of [] prosecutors"; they too are "public officials" who "must

serve the public interest." Id. at 249. And as a result, in some cases, a prosecutor's

enforcement decisions may "raise serious constitutional questions," for instance

where a scheme injects "a personal interest, financial or otherwise, into the

enforcement process" that brings "irrelevant or impermissible factors" into the

decision-making process. Id. at 249–50.

The Court finds that the allegations in the Complaint, construed in the light

most favorable to Plaintiffs, describe such an impermissible scheme. The conflicts

facing the City's law enforcement personnel are largely the same as those facing its

municipal court judges. See *infra* Part II.A. That is, the City's police department

and City Attorney's office, like the municipal court, are dependent on revenues

from fines, fees, and forfeitures, and Doraville's law enforcement personnel, much

like its municipal court judges, are subject to the partisan influences of its City

Council which is free to de-fund those offices, should it choose. Id.

This might seem insufficient considering the line drawn between judges and those acting in a prosecutorial capacity.  See generally  Marshall, 446 U.S. at 246–50.  But in *Marshall*, the Supreme Court did not "say with precision what limits there may be on a financial or personal interest of one who performs a prosecutorial function, [because in that case] the influence alleged to impose improper bias [was] exceptionally remote."  Id. at 250.  In reaching that conclusion, the Court considered, among other things, the degree to which the prosecuting agency depended on the financial penalties it collected.  Id. at 250–51.  And where, as there, the civil penalties made up "substantially less than 1% of the [agency's] budget," due process cannot be violated because "[u]nlike in *Ward* and *Tumey*, it is plain that the enforcing agent is in no sense financially dependent on the maintenance of a high level of penalties."  Id.

Here, by contrast, the City relies heavily on revenues derived from prosecuting alleged violations of municipal ordinances—indeed, so much so that it is reasonable to infer that Doraville's law enforcement arms rely on those funds too.  The extent of this profit incentive and its potential to distort these officials' judgment is a factual issue that the Court cannot resolve on a motion to dismiss.  See Marshall, 446 U.S. at 241 (resolved after discovery); Harjo v. City of Albuquerque, 326 F. Supp. 3d 1145, 1193–98 (D.N.M. 2018) (same); see also

Sourovelis v. City of Philadelphia, 103 F. Supp. 3d 694, 709 (E.D. Pa. 2015)

(denying motion to dismiss on a due process claim challenging the police and

prosecutors' "retention of forfeited property and monetary proceeds" because it

presented "inherently a factual issue").  As a result, the Court concludes that

Plaintiffs have stated a plausible claim sufficient to survive a motion to dismiss.

The City's motion is **DENIED** as to Count II.

## Conclusion

Overall, this case presents difficult questions, and the Court allows it to

proceed cautiously.  The Court is not discounting the fact that most cases relied on

by the parties involved a decision-maker who exercised both judicial and executive

power.  And here, by contrast, there is no allegation that Doraville's municipal

court judges participate in any executive processes, nor do they appear to have any

responsibilities beyond those routinely vested in members of the judiciary.

Equally troubling is the speculative nature of the alleged financial or personal

interests weighing on Doraville's law enforcement personnel.  Whether a number

of the facts alleged by Plaintiffs are able to be substantiated will ultimately be

critical to Plaintiffs' case.  Discovery in this case may, or may not, support

Plaintiffs' allegations that Doraville's municipal scheme and institutional reliance

on fines, fees, and forfeitures impermissibly incentivize the City's police officers,

City Attorney, and municipal court judges. But at this stage, the Court is unwilling—and in fact, unable—to dismiss Plaintiffs' claims.

For this reason and others described above, after reconsideration, Doraville's Motion to Dismiss [15] is **DENIED**.

**SO ORDERED** this 9th day of July, 2019.

_____
**RICHARD W. STORY**
United States District Judge