## IN THE UNITED STATES DISTRICT COURT
## FOR THE NORTHERN DISTRICT OF GEORGIA
## ATLANTA DIVISION

| | |
|---|---|
| HILDA BRUCKER; JEFFERY THORNTON; JANICE CRAIG; and BYRON BILLINGSLEY, | |
| Plaintiffs, | Civil Action No. 1:18-cv-02375-RWS |
| vs. | |
| THE CITY OF DORAVILLE, a Georgia municipal corporation, | |
| Defendant. | |

## DECLARATION OF NANCY ZIELKE

*1.*    I, Nancy Zielke, am a Senior Director in Alvarez & Marshal Public Sector Services, LLC ("A&M"). The Institute for Justice, on behalf of Hilda Brucker, *et al.* ("Plaintiffs"), hired A&M to perform various analyses of the Defendant, the City of Doraville, Georgia, ("Doraville" or the "City") related to Civil Action No. 1:18-CV-02375-RWS, and to serve as a consulting expert in connection with the Action.

*2.*    Plaintiffs also tasked A&M with preparation of a financial analysis and expert report inclusive of the following:

- Analysis of the City of Doraville financial statements, fiscal practices, and financial conditions;

- Analysis of the Defendant's history of citations, including frequency of citations, enforcement outcomes, fines collected, incarceration consequences, and all related enforcement expenses, such as municipal court and police costs (pending on the availability of usable and relevant information); and

- Best and leading practice review of financial management for local government as established by relevant and independent authorities.

*3.*     I produced an expert report, along with other information required by the Federal Rules of Civil Procedure, that Plaintiffs' counsel provided to Defendant. That report is attached as Attachment A to this Declaration. Defendant's counsel then took my deposition. I then reviewed Defendant's expert report, which responded to my report, and viewed his deposition taken by Plaintiffs' counsel. I then produced a rebuttal report, which is attached as Attachment B to this Declaration.

## I.     SUMMARY OF OPINION

*4.*     Upon an analysis of Doraville's financial statements and revenue generation practices, I make the following observations:

- The City's General Fund is highly dependent on Fines and Forfeitures revenue ("Fines and Forfeitures"), which includes Municipal Court fees,

and the City has limited alternatives for revenue generation;[1]

- The City relied on Fines and Forfeitures to generate an average of 21.9 percent of its annual General Fund revenue between Fiscal Years ("FY") 2008 and 2019;

- The City's Police Department and Municipal Court expenditures are three to four times larger than other cities of its size; and

- The City approved a Municipal Court fee to raise General Fund revenues and did not follow best practices in establishing Charges for Service for this fee.

## II.   EXPERT QUALIFICATIONS AND COMPENSATION

5.      As the principal author of this report, my professional background includes serving as a financial advisor and consultant to a wide range of public sector organizations. As part of my consulting work, I have advised municipalities, school districts, State governments, and public utilities on a variety of issues including financial analyses, pro forma budgets, deficit elimination plans, long-term revenue and expense projections, internal controls, and operational and efficiency improvement studies.

---

[1] Fines and Forfeitures revenue is also inclusive of bond forfeitures (*i.e.*, bond payments forfeited when a defendant does not appear in court as required), but not of asset forfeitures (*i.e.*, police seizure of a vehicle).

6.     Most recently, the United States District Court of the Southern District of New York appointed me as an "Independent Consultant" to the Town of Ramapo, New York, to review and recommend improvements to the Town of Ramapo and the Ramapo Local Department Corporation financial reporting procedures and controls.

7.     Prior to joining A&M, I spent over 20 years working within several City, County, and State government entities in key financial administrative positions, including: Finance/Budget Director for the City of Kansas City, Kansas; Assistant General Manager of Finance for the Kansas City, Kansas Board of Public Utilities; and the Assistant Vice Chancellor for Finance with the University of Missouri-Kansas City. I also served as the national President of the Government Finance Officers Association[2] ("GFOA") of the United States and Canada.

8.     I earned a Master's degree in Public Administration from the University of Kansas and a Bachelor of Arts in Business Administration with an academic focus on economics and marketing from Adrian College. I hold an Emergency Manager certificate from Michigan State University, which enables me to support management of government entities in crisis in the State of Michigan.

_____

[2] GFOA is the professional association for Federal, State, and local government officials in the United States and Canada, as well as associated professional services firms, committed to advancing excellence in public finance.

4

*9.*     I continue to be an active member of GFOA, serving as an Advisor to the Standing Committee on Governmental Budgeting and Fiscal Policy and a past Budget Reviewer for the Distinguished Budget Awards Program. I am a frequent presenter at regional and national GFOA conferences on best practices in budgeting and financial management and have authored several articles on improving financial performance in local government. A copy of my curriculum vitae is attached as Appendix A to Exhibit A.

*10.*     Founded in 1983, A&M has 55 offices across the United States and 24 countries, with 4,500 professionals providing consulting services to public and private sector clients. A&M offers financial and operational restructuring, agency modernization, project turnaround, performance improvement, crisis management, large-scale program management, asset management, real estate analysis, financial management, supply chain management, and IT strategy solutions to our clients.

*11.*     A&M is renowned for large restructuring projects, including interim management of Lehman Brothers post-bankruptcy declaration, the largest bankruptcy in the world. In addition to high-profile assignments for public and private corporations, A&M has served the public sector since 2003. We became the first traditional corporate restructuring firm to restructure a public entity, St. Louis Public Schools, which was on the brink of bankruptcy. We have since led other high-

profile financial and operational restructuring and operational efficiency engagements for government organizations.

12. Our professionals have experience working with large public corporations, such as New York, New York; New Orleans, Louisiana; Detroit, Michigan, Ramapo, New York; the Detroit Public Schools; North Bay Village, Florida; Harrisburg, Pennsylvania; Mammoth Lakes, California; Jefferson County, Alabama; and Nassau County, New York, among many others. A&M has consistently built on its reputation for improving the operational and financial performance of both private-sector companies and public-sector organizations.

13. A&M will be compensated for my work in this matter at an hourly rate. I have supervised other A&M employees in conducting research and production of this expert report and they will be compensated for their work. A&M's fees for this engagement range from $300 to $475 per hour with an estimated blended rate of $340. Since our assignment is not complete and may entail testimony at deposition, or at the submission of this report, it is not possible to determine the total compensation to be paid to Alvarez & Marsal Public Sector Services for this engagement.

14. I have formulated my opinions to a reasonable degree of professional certainty.

### III.   DORAVILLE'S RELIANCE ON FINES AND FORFEITURES FOR REVENUE

*15.*   The General Fund is a municipality's primary fund appropriation used to pay for day-to-day operations. From FY 2008 to FY 2019, General Fund revenues accounted for 88.9 percent of Doraville's total revenues (Exhibit 1). The City's General Fund is the primary focus of analysis for this report.

**Exhibit 1: Doraville's General Fund Revenues Compared to Total Revenues**
*Source: Doraville Comprehensive Annual Finance Reports*



*16.*   Fines and Forfeitures constitute a significant percentage of Doraville's annual General Fund revenues. Between FY 2008 and FY 2019, the percentage of the City's

annual General Fund revenue based on Fines and Forfeitures ranged from 11.6 to 33.8 percent, with an average of 21.9 percent (Exhibit 2).[3]

**Exhibit 2: Doraville Fines and Forfeitures as a Percentage of General Fund Revenue**
*Source: Doraville Comprehensive Annual Finance Reports*



17.    Municipal governments such as Doraville's typically fund their operations with a combination of Property Taxes, Sales Taxes, Charges for Service (e.g., Parks and Recreation), Business Licenses and Permits, Fines and Forfeitures, and other Miscellaneous Taxes and Revenues (e.g., taxes on businesses or specific occupations). Much of the information on Doraville's Fines and Forfeitures was obtained from their Comprehensive Annual Financial Reports ("CAFRs").

_____

[3] Doraville Comprehensive Annual Financial Reports.

Doraville, like other State and local governments, issues an annual CAFR, which includes independently audited financial statements that comply with the accounting requirements of the Governmental Accounting Standards Board ("GASB"). Each CAFR also includes a Management Discussion and Analysis and Statistical Section that describes financial management issues of the City, as well as demographic and statistical information.

18.    While Doraville's Fines and Forfeitures are declining as a percentage of actual General Fund revenue, the dollar amount of Fines and Forfeitures collected each year has ranged between $1.7 million and $3.2 million, with an average of $2.4 million (Exhibits 3 and 4).[4] In FY 2010, the City collected more Fines and Forfeitures than the period average ($3.2 million versus $2.4 million), with Fines and Forfeitures revenue exceeding the budget by 75 percent.[5]

---

[4] Doraville Comprehensive Annual Financial Reports.
[5] Ibid.

### Exhibit 3: Doraville General Fund Revenues by Source

*Source: Doraville Comprehensive Annual Financial Reports*

| Revenue Source | FY08 | FY09 | FY10 | FY11 | FY12 | FY13 |
|---|---|---|---|---|---|---|
| Property Tax | $2,775,432 | $2,956,653 | $2,493,512 | $2,597,723 | $2,794,696 | $2,973,126 |
| Fines/Forfeitures | 1,914,795 | 2,996,019 | 3,182,231 | 2,836,348 | 2,210,209 | 2,164,279 |
| Business Tax | 2,119,759 | 2,233,856 | 1,398,641 | 1,690,098 | 2,059,015 | 2,254,385 |
| Licenses and Permits | 541,069 | 283,955 | 230,896 | 289,897 | 274,933 | 282,476 |
| Charges for Service | 292,425 | 340,123 | 336,800 | 291,084 | 202,323 | 96,039 |
| Intergovernmental | 67,443 | 41,354 | 124,702 | 1,229,070 | 177,196 | 96,009 |
| All Other Taxes * | 1,734,158 | 1,646,385 | 1,295,421 | 1,342,386 | 1,253,385 | 1,199,520 |
| All Other Revenues ** | 532,256 | 439,322 | 348,619 | 241,207 | 183,096 | 125,017 |
| *Total Revenue* | *9,977,337* | *10,937,667* | *9,410,822* | *10,517,813* | *9,154,853* | *9,190,851* |

* includes sales tax, franchise tax, motor vehicle tax, and others

** includes investment income, contributions and donations, and other revenues

| Revenue Source | FY14 | FY15 | FY16 | FY17 | FY18 | FY19 |
|---|---|---|---|---|---|---|
| Property Tax | $3,272,093 | $3,279,172 | $4,284,115 | $4,296,393 | $4,969,450 | $6,426,369 |
| Fines/Forfeitures | 2,622,863 | 2,771,989 | 2,180,262 | 1,976,042 | 2,051,582 | 1,701,616 |
| Business Tax | 1,753,718 | 2,189,812 | 1,583,323 | 1,493,516 | 1,632,516 | 1,883,019 |
| Licenses and Permits | 302,234 | 678,161 | 1,709,969 | 908,912 | 1,262,976 | 1,138,754 |
| Charges for Service | 109,976 | 129,130 | 141,151 | 99,402 | 115,037 | 108,811 |
| Intergovernmental | 60,172 | 67,158 | 80,802 | 89,887 | 34,977 | 80,041 |
| All Other Taxes * | 1,241,896 | 1,406,603 | 1,735,954 | 1,930,313 | 2,345,000 | 3,205,622 |
| All Other Revenues ** | 635,472 | 319,214 | 118,476 | 554,651 | 84,600 | 121,130 |
| *Total Revenue* | *9,998,424* | *10,841,239* | *11,834,052* | *11,349,116* | *12,496,138* | *14,665,362* |

* includes sales tax, franchise tax, motor vehicle tax, and others

** includes investment income, contributions and donations, and other revenues

**Exhibit 4: Doraville Fines and Forfeitures Revenue**
*Source: Doraville Comprehensive Annual Financial Reports*



19.     The decline in Fines and Forfeitures revenue, on a percentage basis since FY 2016, is driven by an increase in other revenue sources, particularly the City's Property Taxes. Property Tax revenues have grown from 28 percent of revenue in FY 2008 ($2.8 million) to 44 percent of revenue in FY 2019 ($6.4 million). Increases in property values and the City's mill rate (the amount of tax payable per dollar of the assessed value of a property) drove Property Tax growth (Exhibit 5).

20.     While the increase in property values is a positive economic trend, Doraville's mill rate is now at its legal maximum of 10 mills.[6] In the event of an economic

_____

[6] Doraville's City Charter limits the Property Tax rate to 10 mills. See *City of Doraville Comprehensive Annual Financial Report 2019*.

downturn it is possible property values could decline, placing financial stress on the City's primary General Fund revenue source. In this scenario, the City will have to turn to other sources of revenue to compensate for the decline in Property Tax revenue. Fines and Municipal Court fees are a ready alternative, as the City has more control over issuing citations than it does over property values.

**Exhibit 5: Doraville Property Tax Mill Rate**
*Source: Doraville Comprehensive Annual Financial Reports*



21.    Doraville's General Fund is similarly constrained by the City's lack of Local-Option Sales Tax ("LOST") revenues. LOST is a Special Sales Tax assessed at the County level; the revenue, collected by the Georgia Department of Revenue, is then distributed to counties and municipalities. Dekalb County, where Doraville is

located, has not received voter approval to levy a LOST and, consequently, municipalities like Doraville lack this significant revenue stream.[7]

*22.*   Cities in Georgia with similar populations and General Fund revenue to Doraville received between $1 million and $2.2 million in LOST revenue annually between FY 2016 and FY 2018.[8] LOST is a valuable revenue source and its absence means cities like Doraville must rely on other sources over which they have greater control, like Fines and Forfeitures, to fund their General Fund operations.

## IV.   DORAVILLE CITATION REVIEW

*23.*   Like most local governments, Doraville issues citations to individuals who violate a local law, code, or regulation. These citations carry specific Fines and Administrative Fees, such as the Municipal Court Cost fee – that, in the aggregate, constitute the Fines and Forfeitures revenue discussed in Section IV. In Doraville, most of these citations are issued by either the Police Department or the Code Enforcement Department.

---

[7] Dekalb County approved a special-purpose local-option sales tax ("SPLOST") in 2018, but the revenues from this tax must be used solely for capital outlays. Doraville will not be able to use the funds for general operating purposes.
[8] *Tax Expenditure Data Center for Georgia Local Governments*, University of Georgia. Comparison set is Vidalia, Loganville, Cordele, Holly Springs, and Fort Oglethorpe.

*24.*    The collection of the associated fines is supervised by the City's Municipal Court, which then remits payment of these fines to the City (among other political subdivisions, e.g., Dekalb County and State of Georgia). Between FY 2013 and FY 2019, Doraville issued 76,338 such citations, according to the data provided to the Plaintiffs. (Note: Doraville did not provide data prior to FY 2013, despite Plaintiff requests).[9] Exhibit 6 analyzes these citations by type, which have been categorized using the FBI's Uniform Crime Reporting standards, as well as professional judgment for offenses not tracked by the FBI. Also, I calculated the averages of fines per citation for the time period FY 2013 through FY 2019. During this period, Doraville collected $17,431,214 in total fines for the 76,338 citations issued. Therefore, the average fine per citation equals $228.34. Alternatively, only 58,162 citations resulted in a fine being paid. Therefore, the average fine collected equals $299.70.

---

[9] Doraville Citation Data. Note that the data for 2013 did not include citations for every month, and thus does not represent a complete Fiscal Year.

**Exhibit 6: Doraville Citations by Type**[10]
*Source: Doraville Citation Data*

| Offense Category | FY13 | FY14 | FY15 | FY16 | FY17 | FY18 | FY19 | Total |
|---|---|---|---|---|---|---|---|---|
| Traffic Related (Moving) | 4,164 | 10,891 | 6,352 | 7,668 | 7,890 | 5,424 | 4,488 | 46,877 |
| Traffic Related (Non-Moving) | 1,202 | 2,904 | 2,071 | 2,501 | 3,574 | 3,211 | 2,038 | 17,501 |
| Other Misdemeanors * | 509 | 1,081 | 987 | 1,360 | 1,119 | 1,006 | 903 | 6,965 |
| Failure to Appear | 81 | 186 | 256 | 350 | 240 | 178 | 132 | 1,423 |
| Building Code Violation | 86 | 63 | 136 | 483 | 231 | 197 | 181 | 1,377 |
| Theft / Trespassing | 55 | 91 | 132 | 172 | 110 | 102 | 88 | 750 |
| Business Regulations | 49 | 13 | 70 | 257 | 104 | 77 | 149 | 719 |
| Law Enforcement Related | 58 | 137 | 93 | 138 | 97 | 88 | 64 | 675 |
| Environmental Regulations | 1 | 5 | 11 | 14 | 6 | 1 | 6 | 44 |
| Weapon Related | 2 | 2 | 1 | 1 | - | - | - | 6 |
| Assault / Violence | - | 1 | - | - | - | - | - | 1 |
| *Totals* | *6,207* | *15,374* | *10,109* | *12,944* | *13,371* | *10,284* | *8,049* | *76,338* |

* includes public nuisance, health nuisance, lewd / indecent conduct, and other citations

25.    Most of Doraville's citations are related to traffic-related violations, either "moving" or "non-moving". Moving violations reflect offenses committed during the operation of a motor vehicle, such as speeding; non-moving violations are related to offenses involving stationary vehicles or licensing, such as having an expired driver license. These traffic-related citations constituted 84 percent of all citations between FY 2013 and FY 2019, representing 88 percent of the fines generated from citations over the same period.[11] Though serious and violent crimes constitute a small percentage of citations, national FBI statistics show that Doraville's violent and property crime rates are higher than the Georgia and national averages (Exhibits

---

[10] The data in Exhibits 6, 9, 10, and 14 and the text discussing that data have been updated from my February 5, 2020 report based on data the City of Doraville turned over in discovery regarding citations in Fiscal Year 2016.
[11] Doraville Citation Data.

7 and 8).[12] Violent crime consists of murder, manslaughter, rape, robbery, or assault; property crime includes offenses such as burglary, larceny, theft, and arson.[13] Despite having above-average violent and property crime rates, Doraville appears to focus on traffic-related and public nuisance citations. Citations related to Code Enforcement (e.g., building code violations, environmental and business regulations) experienced growth between FY 2013 and FY 2019.

**Exhibit 7: Violent Crime Rates in Doraville, Georgia, and the United States**

*Source: Uniform Crime Reporting Program, Federal Bureau of Investigation*



---

[12] Uniform Crime Reporting Program, Federal Bureau of Investigation.
[13] Ibid

**Exhibit 8: Property Crime Rates in Doraville, Georgia, and the United States**
*Source: Uniform Crime Reporting Program, Federal Bureau of Investigation*



26. Citations averaged 10,905 per year between FY 2013 and FY 2019. A comparison of the data provided by the Defendant with the citation data in the Statistical Section of Doraville's 2019 CAFR suggests incomplete data for the period from FY 2013 to FY2019. The 2019 CAFR data shows that 99,983 citations were issued between FY 2012 and FY 2019. In contrast, the data Doraville provided shows 76,338 citations were issued during the period FY 2013 to FY 2019, a difference of 23,645. Doraville's FY 2019 CAFR also demonstrates that citations averaged 12,498 per year, or 1,592 more than the average number of citations in the data provided by Doraville.

17

**Exhibit 9: Comparison of Doraville Citation Data Sources[14]**
*Source: Doraville Citation Data; Doraville Comprehensive Annual Financial Report 2019*

| Data Source | FY12 | FY13 * | FY14 | FY15 | FY16 | FY17 | FY18 | FY19 |
|---|---|---|---|---|---|---|---|---|
| Doraville Citation Data | n/a | 6,207 | 15,374 | 10,109 | 12,944 | 13,371 | 10,284 | 8,049 |
| Doraville 2019 CAFR | 11,637 | 14,343 | 17,480 | 12,106 | 12,726 | 12,801 | 10,727 | 8,163 |
| *Delta* | *n/a* | *n/a* | *2,106* | *1,997* | *-218* | *-570* | *443* | *114* |

*\* denotes incomplete data*

27.    While Doraville's total citations remain constant for most of the period reviewed before decreasing in FY 2018, citations related to Code Enforcement (e.g., building code violations, environmental and business regulations) experienced growth. Code Enforcement citations grew from 81 to 336 between FY 2014 and FY 2019, peaking in FY 2016 at 754, while citation fines and related fees grew from $6,270 to $117,323 over that same time period (Exhibit 10).[15] Between FY 2014 and FY 2019, Code Enforcement citations grew 315 percent, while Code Enforcement fines grew 1,771 percent.[16]

---

[14] "n/a" in the table reflects incomplete data. Doraville did not provide the Plaintiffs with citation data for FY12, so there is no basis for comparison, while the data provided for FY13 was incomplete.

[15] Doraville Citation Data.

[16] Note again that the citation data provided by Doraville was incomplete for 2013; that year is thus not used as the basis for the percentage change calculation.

**Exhibit 10: Doraville Code Enforcement Citations and Citation Fines**
*Source: Doraville Citation Data*



## V.   INSTITUTION OF COURT COST FEE[17]

*28.*   In FY 2014, Doraville's City Council voted to add a "Court Cost fee" of $25 to every citation issued by the City's Police and Code Enforcement departments.[18] Though City Council minutes show the fee was voted on in October 2013, the City did not provide the Plaintiffs with data on the fee prior to FY 2016. Data for FY 2016 is incomplete, reflecting information for only April and May of that Fiscal Year. The Court Cost fee generated between $152,395 and $204,005 in revenue for

---

[17] This fee is referred to as an administrative fee in Doraville's Municipal Court Remittance Reports; the City Council, during its discussion of the fee, referred to it as a Court Cost fee. They are one and the same.
[18] *Doraville City Council Minutes*, August 19, 2013.

the City between FY 2017 and FY 2019 (Exhibit 11), the years for which complete

data was provided.[19]

**Exhibit 11: Doraville Court Cost Fee Revenue**
*Source: Doraville Municipal Court Remittance Reports*



29.    In the past several years, cities around the country have begun adopting the

best practice of moving away from instituting court-related fees. For example, the

City of San Francisco eliminated its criminal justice administrative fee in 2018.[20]

Also, the City of Chicago reduced the fees it charges for violations, and made

payment of such fees easier, in 2019.[21] State governments have also moved to limit

---

[19] Doraville Municipal Court Remittance Reports.
[20] "SF Supes eliminate local fees that many people exiting jail were made to pay",
*San Francisco Chronicle*, May 22, 2018.
[21] "Chicago City Council Approves Ticket And Debt Collection Reforms", *NPR*,
September 19, 2019.

Fines and Forfeitures and how the revenue can be used. For example, the State of Missouri passed "Macks Creek Law", which limits the percentage of municipal operating revenue to be generated from Fines and Forfeitures to 20 percent.[22] The State of North Carolina's Constitution requires Fines and Forfeitures revenue to be remitted to the State and then directed exclusively towards public schools.[23]

*30.*    Doraville's City Council minutes provided to the Plaintiffs show that discussion of a Court Cost fee took place on August 19, 2013. These City Council meetings reflect the City's goal of creating a Court Cost fee to generate revenue to fund capital projects. At this meeting, during a discussion of the proposed fee, Shawn Gillen, (now former) City Manager of Doraville, supported the creation of the Court Cost fee as a means of generating "additional revenue to start knocking out… capital projects."[24]

*31.*    City Council meeting minutes also reflect that on October 7, 2013, Lisa Ferguson, (now former) Finance Director for Doraville, stated to the City Council "we're trying to come up with additional revenue sources so that we can do some of the things we need to do in the City."[25] In the same meeting, Lisa Ferguson stated to

---

[22] Missouri Senate Bill 572, 2016.
[23] North Carolina State Constitution, Article IX, Section 7.
[24] *Doraville City Council Minutes*, August 19, 2013.
[25] *Doraville City Council Minutes*, October 7, 2013.

the City Council that instituting the $25 fee, instead of increasing fines, was better for Doraville because "adding it as a processing fee guarantees it comes to the City."[26] Had the $25 been instituted in the form of higher fines, a percentage of the $25 would be claimed by the State of Georgia and Dekalb County. Councilmember Robert Patrick commented "…if you want development, if you want Doraville to turn around faster, [instituting the fee] is the first step to making that happen."[27]

*32.*    In review of Doraville's City Council minutes, the Council departed from the best practices created by GFOA to govern the creation of fees.[28] The discussion about instituting a fee did not include a proper cost analysis; the cost of operating the Municipal Court was mentioned but, shortly after, Lisa Ferguson acknowledged the purpose of the fee was the to generate revenue, not cover court costs.[29] The Finance Director also explicitly stated that the purpose was to support the City's Capital Improvement Plan, as quoted above. City finance leaders did not present a price analysis to the City Council. The original price for the fee was proposed at $37, without apparent evidence of analysis to justify that level.[30]

---

[26] Ibid.
[27] Ibid.
[28] *Establishing Government Charges and Fees,* Government Finance Officers Association.
[29] *Doraville City Council Minutes*, October 7, 2013.
[30] Ibid.

*33.*     Most governments treat Municipal Court Costs as Charges for Services Fees. Court costs are frequently automatically imposed and bear no relation to the offense committed.  Court costs typically cover the cost of the court criminal justice process, including court clerk and judiciary administrative costs, court system record management costs, and related administrative overhead.  Best practices in State and local financial management indicate that governments should first calculate the full cost of providing a service, and identify key factors affecting the pricing, before instituting a fee.[31]   GFOA also recommends that the revenues generated from collected fees exclusively go towards covering the cost of a specific and related service, rather than funding unrelated projects. The Georgia Municipal Association ("GMA") recommends that cities ensure fines and fees are at an appropriate level to fund services, emphasizing efficiency over maximizing revenue.[32] Lastly, there was no apparent period of public involvement in the setting of the Court Cost fee. GFOA considers the public input to be an important part of the fee-setting process, as it is an opportunity for citizen feedback, particularly when new fees are introduced.[33]

---

[31] *Best Practice: Establishing Government Charges and Fees,* Government Finance Officers Association.

[32] *A Budget Guide for Georgia's Municipalities*, Georgia Municipal Association, December 2003.

[33] *Best Practice: Establishing Government Charges and Fees,* Government Finance Officers Association.

*34.*    I could not find where the City had completed a detailed cost of service analysis for the new Municipal Court Cost fee or provided opportunity for citizen input on the establishment of the new fee prior to its adoption. Also, the monies to be generated from the new Court Cost fee seemed to be targeted to pay for capital projects versus covering the costs of the City's Municipal Court operations.

## VI.    DORAVILLE PEER COMPARISONS – REVENUE

*35.*    This analysis, in addition to reviewing Doraville's financial statements, also compared Doraville's Fines and Forfeitures revenue generation against United States Census Bureau data. This data, collected as part of the Census Bureau's Census of Governments program, is the largest and most comprehensive dataset on State and local finances in the United States. It collects data from 90,000 distinct government entities, surveying them on hundreds of financial metrics.[34] Given the breadth of data, it serves as an excellent benchmark to evaluate Doraville's General Fund revenue trends. The Census Bureau's data suggests that, while Doraville reduced its reliance on Fines and Forfeitures over the past few years, it remains comparatively dependent on them as a source of revenue. As described above, Doraville generated an average of 21.9 percent of annual revenue from Fines and Forfeitures between FY 2008 and FY 2019. In FY 2017, Doraville generated 17.4

---

[34] *2017 Census of Governments,* United States Census Bureau.

24

percent  of annual revenue from Fines and Forfeitures. In contrast for that year, comparable (or peer) cities in Georgia and in the United States generated 3.1 percent and 1.4 percent, respectively, of all revenue from Fines and Forfeitures, according to the 2017 Census of Governments (Exhibit 12).[35] Note that "comparable" is here defined as cities between 5,000 and 15,000 people, a more conservative range than those used by other expert parties conducting analysis on this subject.[36] In the State of Georgia, this comprises 67 cities; across the United States, 2,227. Doraville's percentage of Fines and Forfeitures revenues is nearly six times (6X) as much as comparable cities in Georgia, and 12 times comparable cities around the United States, as illustrated in Exhibit 12.

---

[35] Ibid.

[36] See, for example, the National League of Cities, which defines a "small City" as 50,000 people or less, https://www.nlc.org/focus-on-small-cities; and the Urban Institute's analysis of Ferguson, MO Fines and Forfeitures practices, https://www.urban.org/urban-wire/ferguson-city-finances-not-new-normal.

**Exhibit 12: Doraville Fines and Forfeitures Peer Revenue Comparison**
*Source: 2017 Census of Governments, United States Census Bureau; Doraville Comprehensive Annual Financial Reports*



36.    Doraville's FY 2017 Fines and Forfeitures per capita (the average amount of Fines and Forfeitures per resident of the City) was $185.54.[37] Comparable Georgia and United States cities from the 2017 Census of Governments show Fines and Forfeitures revenues of $46.64 and $20.25 per capita, respectively, for that same year (Exhibit 13).[38] Doraville's Fines and Forfeitures per capita were four times (4X) that of its peer cities in Georgia, and nine times (9X) that of its United States peers.

---

[37] Doraville Comprehensive Annual Financial Reports.
[38] *2017 Census of Governments,* United States Census Bureau.

**Exhibit 13: Doraville Fines and Forfeitures Revenue Peer Per Capita Comparison**
*Source: 2017 Census of Governments, United States Census Bureau; Doraville Comprehensive Annual Financial Reports*



## VII.  DORAVILLE'S CRIMINAL JUSTICE EXPENDITURES

*37.*    Doraville devotes significant resources to its criminal justice functional Departments. For the purposes of this report, these Departments are defined as the Police Department, the Code Enforcement Department, and the City's Municipal Court. The Police and Code Enforcement Departments are responsible for issuing citations. The Municipal Court is responsible for the judiciary process and the collection of Fines and Municipal Court fees. The funding allocated to these Departments, despite a decrease from FY 2010 to FY 2013, has grown steadily between FY 2013 and FY 2019, even as the number of citations issued by the City

has decreased over that same period (Exhibit 14). Doraville's Police Department expenditures averaged $5.4 million over the FY 2008 to FY 2019 period, ranging between $4.2 million and $7.1 million. Expenditures decreased between FY 2010 and FY 2013, dropping from $5.5 million to $4.2 million, but since then have increased, reaching $6.4 million in FY 2019 (Exhibit 15).[39] Police Department spending grew 52 percent between FY 2013 and FY 2019, and 67 percent between FY 2013 and FY 2017.

**Exhibit 14: Doraville Police Department Expenditures and Citation Count[40]**
*Source: Doraville Comprehensive Annual Financial Reports; Doraville Citation Data*



---

[39] Doraville Comprehensive Annual Financial Reports.
[40] Excludes Fiscal Years prior to FY13 due to lack of Doraville Citation Data prior to that year.

**Exhibit 15: Doraville Police Department Expenditures**
*Source: Doraville Comprehensive Annual Financial Reports*



38.      Police Department spending constitutes a major portion of Doraville's annual General Fund spending, ranging from 48 percent to 55 percent of General Fund expenditures between FY 2008 and FY 2019.[41] Doraville, like other municipal governments, operates various Departments to serve citizen needs, from Parks and Recreation to Economic Development.

---

[41] Ibid.

*39.*    As of its FY 2019 budget, Doraville had 19 different functional

Departments.[42] Analysis shows that of these 19 Departments, the Police Department

is the largest funding commitment from the General Fund (Exhibit 16).

**Exhibit 16: Doraville Police Expenditures as Percentage of All General Fund Expenditures**
*Source: Doraville Comprehensive Annual Financial Reports*



*40.*    General Fund expenditures for the Municipal Court show a similar trend to

Police Department expenditures, decreasing between FY 2008 and FY 2014, with

recent increases over the past several Fiscal Years (Exhibit 17).

---

[42] *Doraville FYE 2019 Adopted Budget.*

*41.*    The Municipal Court plays an important role in the Doraville's criminal justice process by rendering final judgment on citations issued by the City's Police and Code Enforcement Departments. The Municipal Court can, at its discretion, increase or decrease the amount owed by an individual. The Court also collects Fines and Forfeitures and remits fines and forfeitures revenue to the City. Between FY 2014 and FY 2019, Municipal Court expenditures grew 55 percent.

**Exhibit 17: Doraville Municipal Court Expenditures**
*Source: Doraville Comprehensive Annual Financial Reports*



*42.*    General Fund spending for the City's Code Enforcement Department reflected increased funding levels for the period of FY 2008 to FY 2019. Code Enforcement spending grew from approximately $206,000 to $463,000, an increase of 124 percent

over the 12-year period (Exhibit 18).[43] This percentage increase is more than three times (3X) larger than the percentage increase in expenditures generally over the same 12-year timeframe.[44]

**Exhibit 18: Doraville Code Enforcement Expenditures**
*Source: Doraville Comprehensive Annual Financial Reports*



---

[43] Doraville Budget Documents and Comprehensive Annual Financial Reports. Note that Doraville does not break out Code Enforcement in its FY 2013 – 2019 CAFRs. Budget document figures have been used as substitutes.
[44] Ibid.

## VIII.  DORAVILLE PEER COMPARISONS – EXPENDITURES

*43.*     The United States Census Bureau's Census of Governments data also offers useful comparisons in terms of municipal expenditures, for spending on Police and Municipal Judicial Systems (no data was available on Code Enforcement). According to the 2017 Census of Governments, comparable Georgia cities (again, those with populations between 5,000 and 15,000 residents) spent an average of 19.2 percent of their annual expenditures on their police department; comparable US cities spent 17.2 percent of their expenditures on police.[45]

*44.*     Doraville stands in contrast with these cities, spending 55.9 percent on its Police Department in FY 2017.[46] This is roughly three times (3X) the average of its peers (Exhibit 19). According to the Census data, Doraville spent more on its Police Department than any other comparable Georgia city in 2017, as a percent of total spending.[47]

---

[45] *2017 Census of Governments*, United States Census Bureau.
[46] Doraville Comprehensive Annual Financial Reports.
[47] *2017 Census of Governments*, United States Census Bureau.

33

**Exhibit 19: Doraville Police Expenditures Peer Comparison**
*Source: 2017 Census of Governments, United States Census Bureau; Doraville Comprehensive Annual Financial Reports*



45.     There was a similar contrast when comparing Doraville's Municipal Court expenditures against its peers. Doraville's Municipal Court accounted for 4.5 percent of annual General Fund expenditures in the City's 2017 Fiscal Year (Exhibit 20).[48] Per Census data, comparable Georgia municipal judicial systems represented 1.7

---

[48] Doraville Comprehensive Annual Financial Reports.

percent of total expenditures, while comparable US cities received 1.1 percent.[49]

Doraville's funding for the Municipal Court is almost three times (3X) as much as

its peers in the State of Georgia and over four times (4X) as much as its United States

peers.

**Exhibit 20: Doraville Municipal Court Expenditures Peer Comparison**
*Source: 2017 Census of Governments, United States Census Bureau; Doraville
Comprehensive Annual Financial Reports*



## IX.   INITIAL CONCLUSIONS

*46.*   In summary:

The City's General Fund is highly dependent on Fines and Forfeitures and has

limited alternatives for revenue generation.

---

[49] *2017 Census of Governments*, United States Census Bureau.

- Fines and Forfeitures are a common revenue source for many municipalities. However, analysis conducted on Doraville's financial statements and revenue generation methods illustrated that the City is more dependent on Fines and Forfeitures to fund its General Fund than its peers in Georgia and across the United States.

- The percentage of revenues dedicated to funding Doraville's criminal justice functions also exceeds spending for Georgia and national peers.

- The City relied on Fines and Forfeitures to generate an average of 21.9 percent of its annual General Fund revenues between FY 2008 to FY 2019.

- While Fines and Forfeitures revenue has decreased on a dollar value basis, particularly between FY2016 and FY2019, the decline as a percentage of General Fund revenues was driven largely by growth in other revenues, namely Property Taxes.

- Property Taxes are Doraville's primary source of General Fund revenues. It appears Doraville's Property Tax rate increases concurrently with the decline in Fines and Forfeitures revenue.

- The City's mill levy is currently capped at 10 mills, which limits its ability to increase revenues through Property Taxes in the future.

- Given these constraints, additional funding needs could make Doraville more dependent on Fines and Forfeitures to support the General Fund.

47.    The City's Police Department and Municipal Court expenditures are three to four times larger than Cities of its size. Funding for these Departments has grown in recent years, despite a gradual decline in the number of citations issued.

- While crime statistics for Doraville are above the State and national benchmarks, serious violent crimes reflect a small percentage of Doraville's citations.

- Citations related to Code Enforcement, while small in volume, have increased over the same period. The number of Code Enforcement citations grew by 315 percent, while Code Enforcement fines grew 1,771 percent

48.    The City approved a Municipal Court fee to support the General Fund and is not following best practices in establishing new Charges for Service fees (e.g., Municipal Court fee).

- Best practices in government finance demonstrate that Charges for Service Fees, similar to the Municipal Court Cost Fee instituted by Doraville in 2013, should be used to fund related services.

37

- Doraville's leaders instituted the Court Cost fee explicitly to raise revenue to fund capital improvement projects. This is not in line with best practices where the charge for service is based on the cost of providing the service. I could not find where the City had conducted any detailed cost of service analysis.

- To better align with best practices, Doraville should conduct an analysis to determine the appropriate funding sources for capital projects, while limiting reliance on Fines and Forfeitures.

- The City should also reevaluate the use of the Court Cost fee, to ensure that its use is related to the service for which it is assessed and provide constituents with an opportunity to review any new fees and a public forum to discuss and give feedback on these assessments.

## X.   ADDITIONALLY REVIEWED MATERIALS FOR REBUTTAL

*49.*   I have reviewed the Report submitted by Michael B. Brown (the "Brown Report") dated April 13, 2020 and the transcript of Michael B. Brown deposition (the "Brown Deposition") dated May 12, 2020. The remainder of this Declaration is based on my Rebuttal Report (Attachment B to this Declaration), which addressed issues raised in the Brown Report and the Brown Deposition relevant to my initial report.

*50.*   In addition to the information disclosed in my opening report in this case ("Zielke I"), in conducting my analyses and formulating my opinions, I relied upon the additional facts and data disclosed in Appendix A of the Rebuttal Report.

*51.*   I have formulated my opinions to a reasonable degree of professional certainty.

## XI.   SUMMARY OF REBUTTAL OPINIONS

*52.*   Mr. Brown's analysis and conclusion that Doraville's traffic volumes explains its Fine and Forfeiture revenue collections is incorrect.

*53.*   An analysis of Doraville's revenues and expenditures versus a peer city population of between 5,000 and 50,000 residents does not change my conclusion that Doraville is dependent on Fine and Forfeiture revenues.

*54.*   The City is limited in its ability to raise general purpose revenues to fund City operations because of its Property Tax mill rate cap and lack of general-purpose Local Option Sales Tax revenues; an added special tax district levy must be implemented for a specified use.

*55.*   An analysis of Doraville's "true peers," as identified by the Brown report, demonstrates that Doraville is dependent on Fine and Forfeiture revenues.

*56.*   It is a recommended national best practice to derive a court fee based on the cost of providing court services.

*57.*  Mr. Brown argues without support that Doraville's higher police expenditures are justified compared to peer cities.

*58.*  Mr. Brown makes several other incorrect claims, such as that I compared Doraville to Ferguson, MO and that I did not follow best practices while serving the City of Kansas City, Kansas.

## XII. MR. BROWN'S ANALYSIS INCORRECTLY CONCLUDES THAT HIGH TRAFFIC VOLUME EXPLAINS DORAVILLE'S HIGHER FINE AND FORFEITURE REVENUES.

### A. Although Doraville is in close proximity to Atlanta, the City is still dependent on Fine and Forfeiture revenues when compared to other highly trafficked cities.

*59.*  Mr. Brown's report asserts Doraville's fines and forfeitures revenues and criminal justice expenditures are in part due to Doraville's location "at the epicenter of traffic and traffic congestion in metro Atlanta."[50] To illustrate his point, Mr. Brown cites the American Transportation Research Institute (ATRI), which compiles an annual Top 100 list of worst freight bottlenecks.[51] Exhibit 1 below is the 2017 Top Ten worst freight bottlenecks according to ATRI.[52]

---

[50] Expert Report of Michael B. Brown, April 13, 2020, p. 53.

[51] Ibid., p. 59.

[52] American Transportation Research Institute, 2017 Top 100 Truck Bottleneck List.

**Exhibit 1a: ATRI Worst Freight Bottlenecks List - 2017**

| Rank | Location |
|---|---|
| 1 | Atlanta, GA: I-285 at I-85 (North) |
| 2 | Fort Lee, NJ: I-95 at SR 4 |
| 3 | Chicago, IL: I-290 at I-90/I-94 |
| 4 | Louisville, KY: I-65 at I-64/I-71 |
| 5 | Cincinnati, OH: I-71 at I-75 |
| 6 | Los Angeles, CA: SR 60 at SR 57 |
| 7 | Auburn, WA: SR 18 at SR 167 |
| 8 | Houston, TX: I-45 at US 59 |
| 9 | Atlanta, GA: I-75 at I-285 (North) |
| 10 | Seattle, WA: I-5 at I-90 |

60.     Even considering the other cities noted in the 2017 Top Ten worst freight bottlenecks list, Doraville is comparatively more dependent on Fines and Forfeitures as a source of revenue, as shown in Exhibit 2 below.[53]

**Exhibit 2a: Doraville and 2017 Top Ten Worst Freight Bottlenecks Fines and Forfeitures Revenue Comparison**

| City | Percent of Total Revenue | Doraville Compared to Each City | Per Capita | Doraville Compared to Each City |
|---|---|---|---|---|
| **Doraville, GA** | **17.4%** | **1.00** | **$185.54** | **1.00** |
| Chicago, IL | 3.9% | 4.47 | $118.11 | 1.57 |
| Fort Lee, NJ | 1.9% | 9.15 | $43.36 | 4.28 |
| Seattle, WA | 1.7% | 10.52 | $67.43 | 2.75 |
| Los Angeles, CA | 1.4% | 12.31 | $38.52 | 4.82 |
| Atlanta, GA | 1.3% | 13.38 | $52.55 | 3.53 |
| Auburn, WA | 0.7% | 23.59 | $13.92 | 13.33 |
| Houston, TX | 0.7% | 25.94 | $13.34 | 13.90 |
| Cincinnati, OH | 0.6% | 28.29 | $23.86 | 7.78 |
| Louisville, KY | 0.2% | 77.34 | $3.32 | 55.85 |

---

[53] Doraville Comprehensive Annual Financial Reports. *2017 Census of Governments*, United States Census Bureau.

**B.    Mr. Brown observed Doraville traffic counts ranging between 2.5 and 3.5 million, but the same analysis when including the range of traffic within the city limits of Doraville totals only 1.0 million.**

*61.*    Mr. Brown used the GDOT Traffic Analysis and Data Application (TADA) to measure Doraville's traffic volume in 2018.[54] According to GDOT, "TADA provides data collected from the Georgia Traffic Monitoring Program located on public roads."[55] Mr. Brown's report indicates that Doraville's 2018 average daily traffic volume totals 2.3 million.[56] In addition, Mr. Brown also notes that the average daily traffic volume for Doraville and the immediate vicinity totals 3.5 million.[57] However, I am unable to replicate Mr. Brown's findings. Further, Mr. Brown failed to provide the methodology and support used to determine the average daily traffic volumes noted in his report.

*62.*    In response to Mr. Brown's report, I performed an analysis of the annual traffic statistics provided by GDOT. Specifically, I reviewed the traffic monitoring stations located within the city limits of Doraville. As a result, I determined

---

[54] Expert Report of Michael B. Brown, April 13, 2020, pp. 62-67.
[55] Georgia Department of Transportation, Road & Traffic Data.
[56] Expert Report of Michael B. Brown, April 13, 2020, p. 64.
[57] Ibid., 65.

Doraville's 2018 average daily traffic volume totals approximately 1.0 million, which is significantly less than 2.3 million that Mr. Brown found.[58]

63.     Based on my analysis, it appears Mr. Brown's traffic volume calculations included additional traffic monitoring stations located outside the city limits of Doraville's. For example, Mr. Brown notes the intersection of I-285 and I-85 is located within the city limits of Doraville.[59] As previously mentioned, ATRI ranked the intersection of I-285 and I-85 (north) as the worst freight bottleneck in 2017.  In addition, a review of a Doraville city map indicates the intersection of I-285 and I-85 is located outside of the city limits, as shown in the following Exhibit 3. [60]

---

[58] Georgia Department of Transportation, Traffic Analysis and Data Application, 2018 All Station Annualized Statistics.
[59] Expert Report of Michael B. Brown, April 13, 2020, p. 60.
[60] Atlanta Regional Commission, ArcGIS Georgia Cities Shapefile.

**Exhibit 3a: City Limits of Doraville, GA**



*64.*    Mr. Brown's report also compared Doraville's daily traffic volume to the

following five cities within Georgia: 1. Cordele, 2. Fort Oglethorpe, 3. Holly

Springs, 4. Loganville, and 5. Vidalia.[61] As a result of his analysis, Mr. Brown asserts

my conclusions related to Doraville's Fines and Forfeitures revenues generation and

criminal justice expenditures are baseless since Doraville has significantly more

---

[61] Expert Report of Michael B. Brown, April 13, 2020, pp. 62-64.

traffic than its peers. Using the annual traffic statistics provided by GDOT, I reviewed the traffic monitoring stations located within the city limits of Doraville and the five cities noted in Mr. Brown's report. Again, I am unable to replicate Mr. Brown's findings, as shown in the following Exhibit 4.

**Exhibit 4a: A&M Traffic Counts vs. Mr. Brown's Traffic Counts**

| City | Mr. Brown | | A&M | |
| | Average Daily Traffic Volume | Compared to Doraville | Average Daily Traffic Volume | Compared to Doraville |
|---|---|---|---|---|
| **Doraville** | **2,330,740** | **1.00** | **1,003,780** | **1.00** |
| Cordele | 310,320 | 7.51 | 306,020 | 3.28 |
| Vidalia | 266,960 | 8.73 | 262,730 | 3.82 |
| Ft. Oglethorpe | 419,620 | 5.55 | 257,250 | 3.90 |
| Loganville | 222,690 | 10.47 | 210,320 | 4.77 |
| Holly Springs | 341,080 | 6.83 | 201,260 | 4.99 |
| **Median** | **325,700** | **7.16** | **259,990** | **3.86** |

65.    In response to Mr. Brown's report, I performed an analysis that compares Fines and Forfeitures revenues against average daily traffic volumes, as illustrated in Exhibit 5.[62] This analysis is based on data gathered from CAFRs related to 63 peer cities located in Georgia with populations ranging between 5,000 and 15,000 people.

---

[62] Georgia Department of Transportation, Traffic Analysis and Data Application, 2018 All Station Annualized Statistics. FY2018 Comprehensive Annual Financial Reports for 63 of the 67 peer cities with populations ranging between 5,000 and 15,000 people; unable to retrieve the CAFRs for the following cities located in Georgia: Cusseta, Lovejoy, Eastman, and Cedartown.

The average daily traffic volumes are based on GDOT traffic monitoring stations located within the city limits of the 63 peer cities.[63]

**Exhibit 5a: Doraville Average Daily Traffic v. Fines and Forfeiture Revenue Peer Comparison**



66.    In 2018, Doraville collected $2,051,582 million in fines and forfeitures revenues with average daily traffic volumes totaling 1.0 million vehicles/trucks.  In contrast, the average peer city, defined in my expert report from February 2020 as the 67 Georgia municipalities with a population of between 5,000 and 15,000 residents, generated $426,407 in fines and forfeitures revenues with average daily traffic volumes totaling 272,882. Doraville's fines and forfeitures revenues per

---

[63] Atlanta Regional Commission, ArcGIS Georgia Cities Shapefile.

traffic count totals $2.04, while the fines and forfeitures revenues per traffic count for the average peer city totals $1.56.

67.    In addition, Mr. Brown claims College Park is one of Doraville's "true" peers.[64] In 2018, College Park generated $711,594 in fines and forfeitures revenues with average daily traffic volumes totaling 2.3 million. Interestingly, Doraville's fine and forfeitures revenues are three times (3X) greater than College Park's, while its average daily traffic volume is two times (2X) less than College Park's. Further, College Park's fines and forfeitures revenues per traffic count totals $0.31, which is six times (6X) less than Doraville.

### XIII. MR. BROWN'S SUGGESTION TO INCLUDE MORE POPULOUS CITIES AS DORAVILLE'S "PEERS" DOES NOT IMPACT MY ORIGINAL CONCLUSION THAT DORAVILLE IS MORE DEPENDENT ON FINE AND FORFEITURE REVENUES THAN GEORGIA AND U.S. PEERS.

68.    Mr. Brown's report asserts my expert report submitted on February 5, 2020 inappropriately compares Doraville's Fines and Forfeitures revenues and criminal justice expenditures against cities with populations ranging between 5,000 and 15,000 people. Mr. Brown states, "The Zielke Report arbitrarily chooses to compare Georgia cities and U.S. cities with a population of 5,000 to 15,000—resulting in

---

[64] Expert Report of Michael B. Brown, April 13, 2020, pp. 33-37.

invalid conclusions about Doraville in comparison with other Georgia and U.S. cities."[65]

69.    The National League of Cities ("NLC") defines a small city as "one with 50,000 people or less".[66]  Urban clusters are defined by the Census Bureau as having "at least 2,500 people and less than 50,000 people."[67]  Doraville with a population of 10,526 as of 2018[68] is at the lower end of the range for both small cities and urban clusters.  Cities that are 10,000 in population can vary significantly from those nearly five times their size.  Outside of the part of Atlanta that is in DeKalb County, Dunwoody is the largest city and, with a population of 49,459, it is at the high end of the NLC range for small cities. Dunwoody is located ten miles north of Atlanta and is home to Perimeter Mall, the second largest mall in Georgia. Dunwoody provides police protection, courts, public works, and parks and recreation services to residents.[69]

---

[65] Expert Report of Michael B. Brown, April 13, 2020, p. 4.
[66] National League of Cities, Small Cities Council: https://www.nlc.org/small-cities-council
[67] 2010 Census Urban and Rural Classification and Urban Area Criteria: https://www.census.gov/programs-surveys/geography/guidance/geo-areas/urban-rural/2010-urban-rural.html
[68] United States Census Bureau
[69] Dunwoody Comprehensive Annual Financial Reports

70.     In comparison, Doraville provides E911, police, courts and public works directly to residents. Water and sewer services and fire protection services are provided to residential and commercial properties by DeKalb County via intergovernmental agreements in conjunction with the Service Delivery Strategy. Several of Doraville's peer cities are using similar structures to provide Fire services through county-wide arrangements.

   **A.     A comparison of Doraville's Fine and Forfeiture Collections versus a peer group range of between 5,000 and 50,000 does not impact my conclusion that the City is more dependent on Fine and Forfeiture revenues than other cities.**

71.     As discussed in detail above, my report used a range of 5,000 to 15,000 people which was a more conservative range of peers for a city with a population on the lower end of the spectrum. This range compares cities that provide a more similar range of services. Exhibit 6 below compares Doraville to cities with populations ranging between 5,000 and 50,000 people, as well as major metropolitan cities.[70]

---

[70] *2017 Census of Governments*, United States Census Bureau.

49

**Exhibit 6a: Doraville Comparison to Cities with Populations of 5,000 to 50,000 People**

| Category | FY2008-FY2019 Doraville (CAFR) | FY2018 Doraville (CAFR) | Top Metro Cities (400K-8.5M) | 5,000-15,000 (GA) | 5,000-15,000 (U.S.) | 5,000-50,000 (GA) | 5,000-50,000 (U.S.) |
|---|---|---|---|---|---|---|---|
| Fines and Forfeitures as a Percent of Revenue | 21.9% | 16.4% | 1.2% | 3.1% | 1.4% | 3.0% | 1.3% |
| Fines and Forfeitures Per Capita | $242.89 | $188.29 | $82.15 | $45.34 | $21.28 | $42.83 | $21.09 |
| Police Expenditure as a Percent of General Expenditure | 51.1% | 51.3% | 7.7% | 19.2% | 17.2% | 18.8% | 16.4% |
| Judicial Expenditure as a Percent of General Expenditure | 5.2% | 4.8% | 0.7% | 1.7% | 1.1% | 1.9% | 1.1% |

*72.*   In FY2018, Doraville generated 16.4 percent of annual revenue from Fines and Forfeitures. In contrast, cities with populations ranging between 5,000 and 50,000 people in Georgia and the United States generated 3.0 percent and 1.3 percent, respectively. Similarly, the average major metropolitan city generated 1.2 percent. Doraville's percentage of Fines and Forfeitures revenues are nearly 14 times (14X) greater than the average major metropolitan city.[71]

*73.*   In addition, Doraville's FY2018 Fines and Forfeitures per capita was $188.29. In contrast, cities with populations ranging between 5,000 and 50,000 people in Georgia and the United States show Fines and Forfeitures revenues of $42.83 and $21.09 per capita, respectively. The average major metropolitan city generated $82.15. Doraville's Fines and Forfeitures per capita were two times (2X) greater than the average major metropolitan city.

---

[71] The major metropolitan city subset includes the following six cities: (1) Atlanta, GA, (2) Chicago, IL, (3) Dallas, TX, (4) Houston, TX, (5) Los Angeles, CA, and (6) New York, NY.

*74.*    Doraville spent 51.3 percent of their annual expenditures on their police department in FY2018. This is three times (3X) greater than cities with populations ranging between 5,000 and 50,000 in Georgia and the United States and nearly seven times (7X) greater than the average major metropolitan city.

*75.*    Finally, Doraville spent 4.8 percent of their annual expenditures on their Municipal Court in FY2018, while cities with populations ranging between 5,000 and 50,000 in Georgia and the United States spent 1.9 percent and 1.1 percent, respectively. Doraville's percentage is seven times (7X) greater than the average major metropolitan city, which spent 0.7 percent of their annual expenditures on their Municipal Court.

*76.*    In summary, even when compared to cities with populations ranging between 5,000 and 50,000 people, as well as major metropolitan cities, my original conclusions are not impacted with the original analysis of cities of population of 5,000 to 15,000. Based on the analysis above, Doraville is more dependent on Fines and Forfeitures as a source of revenue and spends significantly more of their annual expenditures on their criminal justice departments.

## XIV.  MR. BROWN INCORRECTLY ARGUES THE CITY IS NOT LIMITED BY THE 10 MILL PROPERTY TAX CAP BECAUSE THE CITY IS LIMITED IN ITS ABILITY TO RAISE OWN-SOURCE GENERAL-PURPOSE TAX REVENUES.

*77.*   In my report dated February 5, 2020, I conclude that Doraville is limited in its fiscal capacity to raise General Purpose revenues through the primary revenue raising measures local governments can utilize to fund city service and operations. Because the City was limited in raising general purpose revenues through the major own-source tax revenue streams, the City disproportionately relied on Fine and Forfeiture revenues as a source of General Purpose revenues.

*78.*   In his report, Mr. Brown states, "The Zielke Report erroneously concludes that Doraville is unable to increase revenues from any source other than by increasing fines and fee revenues, since Doraville's charter imposes an absolute ten mill cap on its property tax rate." In his report, Mr. Brown argues that the state has other options to raise General Purpose revenues outside of the 10 mill Property Tax cap which can be used to fund general purposes, such as the special tax district ad valorem tax and the SPLOST.[72] These monies, however, cannot be used to fund general purposes.

---

[72] Expert Report of Michael B. Brown, April 13, 2020, pp. 85-88.

**A.    Doraville has a limited number of revenue streams that are unrestricted in use.**

*79.*    As a municipality, Doraville receives revenues from various own-source and intragovernmental revenues. The City's FY2020 Adopted Budget provides an overview of the revenues received and the purposes for which they can be used. The General Fund is the City's most robust tool to fund City operations. General Fund revenue streams include:

- Property Taxes and assessments

- Business and Occupation Taxes

- Licenses and permits

- Charges for Services

- Fines and Forfeitures

- Investment Income

*80.*    The City also receives intragovernmental transfers from the State and County which can also be used for general operations. The remainder of funds and revenue streams are specifically earmarked for a specific purpose per the FY2020 Adopted Budget as seen in below in Exhibit 7.

**Exhibit 7a: FY2020 Doraville Budget - Revenue Sources**[73]

| Fund Title | Major Revenue Sources | Major Services Provided |
|---|---|---|
| General | • Property taxes and assessments<br>• Business & occupation taxes<br>• Licenses & permits<br>• Charges for services<br>• Fines & Forfeitures<br>• Investment income | • Public Safety<br>• Public works<br>• Parks & recreation<br>• General government<br>• Community development<br>• Economic development |
| Confiscated Asset | • Forfeitures by criminals that are prosecuted for narcotics or vice activity | • Purchase of public safety equipment |
| Emergency 911 | • E911 Charges | • Maintenance and operation of E911 system |
| Tree Bank | • Donations | • Tree plantings |
| Hotel/Motel | • Hotel and motel tax | • Transfers to the DeKalb Convention & Visitors Bureau<br>• Transfers to the General fund for promotional activities, special events, and tourism |
| Rental Motor Vehicle Excise Tax | • Motor vehicle excise tax | • Transfers to the General Fund for promotional activities, special events, and tourism |
| Multiple Grants | • Federal, State, and Local Grants | • Various operating and capital projects |
| Capital Projects | • Transfer in from general fund | • Payments for long-lived capital assets |
| SPLOST | • Special purpose local option sales tax | • Payments for long-lived capital assets |
| DDA | • DDA fees | • Revitalize and Redevelop the City's central business district |
| Urban Redevelopment | • Proceeds from bonds and leases<br>• Transfers from other funds | • Redevelopment projects |
| Stormwater | • Stormwater charges | • Payments to operate stormwater utility and maintain stormwater infrastructure |
| Solid Waste | • Sanitation Fee | • Garbage collection |

---

[73] Doraville FY2020 Adopted Budget Document.

**B.**   **Property Tax revenues, a local government's most robust General Fund revenue stream, are capped by the City Charter's 10 mill cap.**

*81.*      The Property Tax is a City's most robust own-source revenue generating tool to fund general City operations[74], which Doraville is limited in collecting due to the local government tax millage ("mill") cap imposed by the City Charter. Property Tax collections are a function of the local mill rate multiplied by DeKalb County's assessed value of real and personal property. While the assessed value of property is linked to the current market value, Doraville sets the municipal mill rate which was last changed in 2018 to the maximum allowable of 10 mills. The increase in the mill rate subsequently increased the total percent of revenues derived by Property Taxes over time which simultaneously reduced Fine and Forfeiture collections, as seen in Exhibit 8 below.

---

[74] According to the Tax Policy Center, "Property taxes are the largest own-source of revenue for counties, cities, townships, school districts, and special districts…"

**Exhibit 8a: Comparison of General Fund Revenue Streams Against the Property Tax Mill Rate**



82.    In Doraville, Property Tax collections constituted approximately 43.8 percent of General Fund revenues in 2019, or 36.4 percent of total governmental revenues.[75] Despite the increase in collections, this is still below the average for Georgia's local governments. Property Taxes in Georgia generally constitute 67.2 percent of total tax-derived revenues[76]; in Doraville, FY2018 revenues equate to only 55.5 percent.

---

[75] Doraville Comprehensive Annual Financial Reports.
[76] Georgia State University Andrew Young School Fiscal Research Center, Georgia's Taxes: A Summary of Major State and Local Government Taxes, 2020.

Similarly, Sales Taxes constitute 21.5 percent of tax-derived revenues in Georgia, compared to Doraville's 5.9 percent.

### C. Special Tax District revenues are specified for a single use and are not fungible.

*83.*   Mr. Brown's report cites that the City is able to create a special tax district which allows the City to levy ad valorem taxes in addition to the Property Tax. Mr. Brown states that, "Doraville's elected officials, at their option and with their own authority, may establish special tax districts—including a tax district that contains all or part of the geographic area of the city—to perform any municipal function."[77]

*84.*   Mr. Brown asserts that the City is able to use these monies to fund general expenditures, however, special tax district revenues are collected to fund a specific program, purpose or project; it is not a fungible source of revenue that can be used to fund general City operations as needed. In his deposition taken on May 12, 2020, Mr. Brown states the following:

> Q. So is a special district -- is the money raised, I should say, using the special district limited to certain expenditures?
>
> A. Yes. But it could be any expenditure that the city chooses. [78]

---

[77] Expert Report of Michael B. Brown, April 13, 2020, pp. 85-86.
[78] Deposition of Michael B. Brown, May 12, 2020, p. 116.

85.    The City Council approved an ordinance to establish a special tax district to provide parking infrastructure services on May 15, 2017.[79] These special tax district revenues were collected for a specific purpose and, even if they flow back into the General Fund, are restricted use revenues that can only be used for the specified purpose. The purpose of General Fund revenues is to be flexible in use, however, these special tax district revenues cannot be repurposed to fund the City's operations in the event of an economic downturn or other revenue shortages because they can only be used for the predetermined purpose.

### D.    Special Purpose Local Option Sales Tax (SPLOST) revenues are restricted for capital projects and are accounted for outside of the General Fund.

86.    In my report dated February 2020, I cite the City's collection of SPLOST revenues as a source of revenue explicitly used to fund capital projects. Mr. Brown cites the following:

---

[79] City of Doraville Ordinance No. 2017-13:
http://cms.revize.com/revize/doraville/Ord.%20No.%202017-13%20Create%20Special%20Tax%20District%20(05-15-2017).pdf

> The Zielke Report erroneously concludes that Special Purpose Local Option Sales Taxes (SPLOST) usage by Doraville is limited to capital projects and may not be used for cities' general operating costs. This assertion is erroneous for the following reasons: (1) In Georgia, these revenues can be used for a wide range of fixed and non-fixed municipal goods and equipment for any city service. (2) For example, the police department can purchase police vehicles, light bars and sirens, radios, body cameras, weapons, flashlights, batons, handcuffs, uniforms, "leather," computers (including those in vehicles), office equipment, software, and building renovations. [80]

87.   Mr. Brown's assertion is incorrect, because Doraville indicates that SPLOST revenues are earmarked for specific capital projects that must be voter approved. The City's FY2019 Adopted Budget explicitly states that the City may not use funds for general operating expenditures:

> SPLOST was adopted in DeKalb County in the November 2017 state election. Funds are to be used for transportation capital projects. No more than safety 15% may be used for needed maintenance, primarily on public projects. These funds may not be used for operating expense.[81]

88.   Additionally, the City's FY2019 CAFR states, "The Special Purpose Local Option Sales Tax (SPLOST) fund accounts for the one-cent sales **tax that provides funding exclusively for capital projects** – roads, buildings, vehicles and major equipment, and other long-lived improvements."[82]

---

[80] Expert Report of Michael B. Brown, April 13, 2020, p. 88.
[81] Doraville FY2019 Adopted Budget Document.
[82] Doraville FY2019 Comprehensive Annual Financial Report.

89.     Therefore, Mr. Brown's assertion that the City can use these monies as a source of revenue to fund general operating expenditures when they are earmarked for a special capital project is incorrect.  Mr. Brown states the following in his deposition regarding my expert report dated February 2020: "But she says that that cannot be used for capital funding, and that's not really true. It can be used for – I think she believes it's only for things like buildings, but as a practical matter, that's simply not true in Georgia".[83]

90.     This statement is not correct; my report stated, "Dekalb County approved a special-purpose local-option sales tax ("SPLOST") in 2018, but the revenues from this tax must be used solely for capital outlays."[84]

91.     My reference to "capital outlays" refers to funding for capital improvements and/or outlays.  My report did state or conclude that SPLOST revenues were not available for defined capital projects or capital outlays.  For clarification, my report references "capital outlay" with the meaning that  expenses under the authorization of the approved SPLOST are for capital projects that include one-time spending needs for "transportation and traffic projects, sidewalk repair and replacement, and pavement management; public safety and related capital equipment projects, such as

---

[83] Deposition of Michael B. Brown, May 12, 2020, p. 134.
[84] Zielke Report, February 6, page 11

replacement police vehicles, and public safety building improvements, and municipal courthouse renovations; and repairs to capital outlay projects, such as library improvements, various citywide parks improvements, and citywide signage".[85]

92.    SPLOST revenues can only be used for "approved" capital outlay expenses and one-time expenditures for the City for designated spending purposes and not for re-occurring spending needs of the city for ongoing or reoccurring general purpose needs.

>    **E.    Homestead Option Sales Tax (HOST) revenues can only be used to fund capital projects and are accounted for outside of the General Fund.**

93.    Mr. Brown's argues that my report is incorrect in stating that the City does not receive benefit from the general purpose Local Option Sales Tax (LOST). Mr. Brown states that the City receives HOST revenues in lieu of LOST revenues:

>    The Zielke Report concludes that Doraville receives no Local Option Sales Tax (LOST) revenues—which the report posits are a substantial part of the revenues for other cities. Based on the intent of the Georgia Local Option Sales Tax statute, this assertion is erroneous for the following reasons: (1)  Counties have the option, with voter approval, to adopt a Homestead Option Sales Tax (HOST); 80% of the tax proceeds must be used by the County to reduce its general property taxes and the remainder must be distributed to the county and cities for capital projects. (2) This HOST tax relief is in lieu of LOST.[86]

---

[85] Doraville FY2019 Comprehensive Annual Financial Report
[86] Expert Report of Michael B. Brown, April 13, 2020, p. 87.

*94.*   Mr. Brown asserts that the City collects a specific LOST, the Homestead Option Sales Tax (HOST) which can only be levied by counties that do not implement the general LOST. While the City collects HOST revenues in lieu of LOST, these revenue streams are not identical and are used for explicitly different purposes. LOST revenues can be used to broadly fund general City expenditures. HOST revenues, on the contrary, can only be used to fund capital projects and are deposited into a segregated special purpose fund. These collections cannot be used to fund general City expenditures, and therefore are not a general revenue funding stream for the City. In addition, according to the FY2019 Adopted Budget, "The HOST revenue budget has been reduced to zero to reflect the elimination of HOST now that SPLOST has been adopted and is in effect."[87]

### F.   Mr. Brown incorrectly cites the unrealized and uncollected development area revenues as a source of General Fund revenue for the City.

*95.*   Mr. Brown sites the collection of future development revenues as a source of General Fund operating revenues. Mr. Brown states:

> The Zielke Report concludes that Doraville has few revenue options available other than by increasing fines and fees revenues. This conclusion is erroneous for the following reasons: (1) Notwithstanding another U.S. recession (now underway), Doraville is poised for very high value transit-oriented development. (2) The former GM Doraville plant site can sustain over $1 billion in new development, and some

---

[87] Doraville FY2019 Adopted Budget Document.

estimates are for over $3 billion in development. (3) Even a net increased taxable value of $500 million at the site would produce $5 million annually in new property tax revenues to the City. (4) The self-imposition of a flexible property tax rate cap is an attraction to major, long-term investors.[88]

96.    Mr. Brown is speculating on a series of revenue measures that have neither been implemented nor realized. He also concedes that these proposed development revenues may not be collectable in light of a recession. Mr. Brown admits the following in his deposition:

> Q. In a recession, for example, isn't it true that it would be less likely for people and businesses to fill that site?
>
> A. Of course, and they've already experienced the recession in 2008, but as soon as the country is going to be great again, and when that happens we can bet that this is going to get developed.[89]

97.    In addition, the FY2020 Adopted Budget states, "the City forecasts the 2019 total net tax digest to rise by approximately 4.42 percent  due to higher valuations and new developments. Note that with this growth, the City has realized increased service demands associated with new development."[90] While the City may collect additional revenues due to higher valuations and new developments, the City must also provide increased services; these additional services ultimately place budget

---

[88] Expert Report of Michael B. Brown, April 13, 2020, p. 88.
[89] Deposition of Michael B. Brown, May 12, 2020, p. 124.
[90] Doraville FY2020 Adopted Budget Document.

pressures on the City. New revenues from development would not likely reduce the overall burden on the general fund.

> ### G.   A more robust revenue base decreases reliance on Fine and Forfeiture revenues.

*98.*    Mr. Brown argues "city revenues can vary significantly depending on sources of revenue such as storm water fees, hotel/motel taxes, and business taxes. Higher collections from these sources lowers a city's share of police expenditures".[91] In particular, Mr. Brown states that stormwater revenues are included in the General Fund of some peer municipalities in my analysis, but not all, arguing it is artificially lowering the percent of fines and fees derived for those peer cities.

*99.*    Exhibit 9 analyzes fine and forfeiture revenues of the peer cities that I could definitively determine maintained a proprietary stormwater fund outside of the General Fund.

**Exhibit 9a: Doraville Stormwater Fund Peer Comparison**

| CAFR Data | FY2008-FY2019 Doraville | FY2018 Doraville | Georgia Peer Cities (5-50k residents) with separate Stormwater Fund |
|---|---|---|---|
| Fine and Forfeiture Revenues as a percent of General Fund Revenues | 21.9% | 16.4% | 6.2% |

*100.*   My analysis finds that Doraville's Fine and Forfeiture revenues as a percent of General Fund revenues are still higher than the peer cities with between 5,000 and

---

[91] Expert Report of Michael B. Brown, April 13, 2020, p. 51.

50,000 residents that account for stormwater revenues outside of the General Fund[92] demonstrating that Doraville is more dependent on Fine and Forfeiture revenues.

*101.*   Mr. Brown also cites that cities may collect higher hotel/motel taxes and business taxes thus reducing the proportion of Fine and Forfeiture revenues. Cities with higher collections from tax-derived, own source general revenues due to a strong commercial and economic base would not need to rely on Fine and Forfeiture revenues. Having a robust and diverse revenue stream[93] is the type of municipal fiscal best practice that would reduce reliance on unpredictable Fine and Forfeiture revenues and allow the City to prosper on own-source taxable revenues.

### H.   As Doraville's expenditures increased, fine and forfeiture revenues increased simultaneously to meet and maintain the City's budget.

*102.*   In his deposition dated May 12, 2020, Mr. Brown states the following:

---

[92] Peer cities included have a population between 5,000 and 50,000 residents and have a designated separate stormwater fund similar to Doraville.

[93] Government Finance Officers' Association Recommended Budget Practices recommends that local governments adopt a revenue diversification policy to "improve a government's ability to handle fluctuations in revenues and potentially help to better distribute the cost of providing services".

Q. If fines and fees -- or fines and forfeitures revenues disappeared from Doraville's general fund, would that have an effect on the city's finances?

A. Of course.

Q. What kind of effect would that have?

A. Whatever that amount of money is, it would be eliminated from their budget.

Q. Would Doraville have to balance its budget if those -- well, I guess "rebalance" is the word they use. Would Doraville have to rebalance its budget if those revenues disappeared?

A. Yeah, just as every other city would have to rebalance its budget if revenues disappeared.[94]

103.   Per Mr. Brown, the City's budget would not be able to be maintained without Fine and Forfeiture revenues. Doraville experienced an approximate 16% increase in expenditures in FY2009 and FY2010 from FY2008 levels. The City's non-fine and forfeiture revenues, however were not able to meet the increase in expenditures, as indicated by the blue arrow in Exhibit 10.

---

[94] Deposition of Michael B. Brown, May 12, 2020, pp. 153-154.

**Exhibit 10a: Doraville Uses Fine and Forfeiture Revenues to Meet Increase in Expenditures**



*104.* The City saw a dip in other General Fund revenue sources (non-fine and forfeiture revenues) in FY2009 and FY2010. However, ***as these revenues declined and the gap between revenues and expenditures grew, the City simultaneously increased collections of Fine and Forfeiture revenues***. Likewise, in 2018 and beyond, ***as the gap between revenues and expenditures narrowed, the city has decreased collections*** of Fine and Forfeiture revenues. The increase in these revenues as all other revenue sources fell, and the decrease in them as other sources

grew, demonstrates the City's use of Fine and Forfeiture revenues to fill budget gaps and its dependence on them as a reliable revenue source.

### XV. COLLEGE PARK AND HAPEVILLE, WHICH MR. BROWN IDENTIFIED AS DORAVILLE'S "TRUE PEERS", ARE NOT DEPENDENT ON FINE AND FORFEITURE REVENUES AS IS DORAVILLE.

*105.* Mr. Brown identifies College Park and Hapeville as Doraville's "true peers". Mr. Brown states, "Doraville is not a typical small city. College Park and Hapeville, both of which would qualify as true 'peer' cities to Doraville, are also struggling to cope with the growth of the Atlanta metro area."[95] In my analysis presented below in Exhibit 11, I compare the cities of Hapeville and College Park to Doraville on population, traffic and Fine and Forfeiture and General Fund revenue metrics.

**Exhibit 11a: Doraville Compared to Mr. Brown's "True" Peers**

| Category | FY2008-FY2019 Doraville | FY2018 Doraville | FY2018 Hapeville | FY2018 College Park |
|---|---|---|---|---|
| Population | 9,996 | 10,896 | 6,650 | 14,601 |
| AADT | - | 1,003,780 | 411,500 | 2,259,710 |
| Fines and Forfeitures | 2,384,020 | 2,051,582 | 209,066 | 711,594 |
| General Fund Revenues | 10,864,473 | 12,496,138 | 10,129,444 | 26,800,825 |
| Fines and Forfeitures as a Percent of GF Revenues | 21.94% | 16.40% | 2.10% | 2.70% |

---

[95] Expert Report of Michael B. Brown, April 13, 2020, p. 33.

### A. Doraville collects higher Fine and Forfeiture revenues and is more dependent on these revenues than its similarly situated "true peers."

*106.*   Mr. Brown argues that Hapeville and College Park are true peers of Doraville given the cities similarly accommodate the economy and traffic of the metro Atlanta area. Per the Georgia Department of Transportation's traffic data reporting, Doraville recorded a 2018 AADT measure of 1,003,780 vehicles which is higher than Hapeville's AADT of 411,500 but lower than College Park's AADT of 2,259,710. Despite College Park's higher traffic measure, Doraville collected nearly three times (3X) more Fine and Forfeiture revenues than College Park.[96]

*107.*   In response to my analysis reporting per capita metrics, Mr. Brown argues that my report dated February 5, 2020 "compares fines and fee revenues for traffic enforcement based solely on cities' population-- instead of comparing cities' fines and fee revenues based on the cities' traffic volumes". Exhibit 12 compares Doraville's Fine and Forfeiture revenues to Hapeville and College Park both on a per capita and per traffic count basis.

---

[96] Mr. Brown also cites the increase in "sex trafficking, illegal drugs and criminal offenses associated with travelers, the airport, and conventions" for cities like College Park and Hapeville that is not captured in the traffic count measure.

**Exhibit 12a: Doraville and Mr. Brown's "True" Peers Fines and Forfeiture Revenue Comparison**

| FY2018 CAFR | Doraville | Hapeville | College Park |
|---|---|---|---|
| Fines and Forfeitures per Capita | $188.28 | $31.43 | $48.73 |
| Fines and Forfeitures per Traffic Count | $2.04 | $0.51 | $0.31 |

*108.*   Doraville's Fine and Forfeiture revenues, when calculated on a per traffic count basis, are approximately 4x and 6x that of Hapeville and College Park, respectively.

**B.**   **Hapeville and College Park have more robust General Fund revenue collections from primary revenue sources than Doraville.**

*109.*   Doraville has higher Fine and Forfeitures per traffic count due to its reliance on these revenues to fund General Fund expenditures. As discussed in Section VI above, Doraville's limited revenue streams to fund general services and operations causes the City to rely on Fines and Forfeitures to fund General Fund expenditures. Exhibit 13 below compares the City's General Fund revenue streams versus Hapeville and College Park.

**Exhibit 13a: Doraville and Mr. Brown's "True" Peers Revenue Source Comparison**

| FY2018 CAFR | Doraville | % of GF Revenue | Hapeville | % of GF Revenue | College Park | % of GF Revenue |
|---|---|---|---|---|---|---|
| Property Taxes | 4,969,450 | 39.8% | 5,198,135 | 51.3% | 11,894,993 | 44.4% |
| Sales Taxes | 530,509 | 4.2% | 1,865,494 | 18.4% | 4,467,332 | 16.7% |
| Franchise Taxes | 973,210 | 7.8% | 665,196 | 6.6% | 2,324,037 | 8.7% |
| Business Taxes | 1,632,516 | 13.1% | 631,991 | 6.2% | | 0.0% |
| Other Taxes | 841,281 | 6.7% | 433,106 | 4.3% | 1,853,150 | 6.9% |
| Licenses and Permits | 1,262,976 | 10.1% | 519,926 | 5.1% | 4,043,351 | 15.1% |
| Intergovernmental | 34,977 | 0.3% | 22,340 | 0.2% | 20,000 | 0.1% |
| Fines and Forfeitures | 2,051,582 | 16.4% | 209,066 | 2.1% | 711,594 | 2.7% |
| Charges for Services | 115,037 | 0.9% | 384,080 | 3.8% | 579,625 | 2.2% |
| Investment Earnings | 1,218 | 0.0% | 781 | 0.0% | 338,199 | 1.3% |
| Contributions and Donations | 24,682 | 0.2% | 5,290 | 0.1% | - | 0.0% |
| Other Revenues | 58,700 | 0.5% | 194,039 | 1.9% | 568,544 | 2.1% |
| **Total** | **12,496,138** | | **10,129,444** | | **26,800,825** | |

*110.* In FY2018, 16.4 percent of Doraville's General Fund revenues were derived by Fine and Forfeiture revenues. In comparison, only 2.1 percent and 2.7 percent of General Fund revenues were derived by Fines and Forfeitures for Hapeville and College Park, respectively.

*111.* Both peer cities are more reliant on General Fund revenue streams in Property and Sales Taxes than Doraville.  While Hapeville's total General Funds revenues are nearly 20 percent lower than Doraville's, Hapeville collected 5 percent more in Property Taxes in FY2018 and 3.5 times (3.5X) more in Sales Taxes. Doraville

collected 39.8 percent of General Fund revenues from Property Taxes in FY2018, less than Hapeville's 51.3 percent and College Park's 44.4 percent. Similarly, Sales Tax revenues constitute only 4.2 percent of General Fund revenues in Doraville compared to 18.4 percent and 16.7 percent in Hapeville and College Park, respectively.

*112.*   Unlike Doraville, these "true peers," do not depend on Fine and Forfeiture revenues to fund general purpose expenditures. With similar juxtaposition to major interstates and high traffic flow, these peer cities do not collect as much revenue from fine and forfeitures on an absolute basis.

## XVI. MR. BROWN'S ARGUMENT THAT A MUNICIPAL COURT COST FEE BASED ON A COST ASSESSMENT IS IMPRACTICAL IS UNSUPPORTED.

*113.*   In my initial report, I identified that the municipal court cost fee was not determined using municipal best practices as the City arbitrarily selected a fee and did not perform a cost assessment to determine the fee. Furthermore, the City uses the administrative court fee collections to fund capital projects, and does not repurpose fee collections back into the justice system. A fee, such as the municipal court cost fee, should be determined by the cost of the service rendered and should be used to partially offset the cost of rendering the service.

*114.*   In his report, Mr. Brown asserts that, "…cost accounting and cost recovery for the services would be impracticable. For example, conducting cost analysis for recreation services is difficult, and achieving full cost recovery would be harmful to children and adults."[97] Furthermore, Mr. Brown states in his deposition dated May 12, 2020:

> So I just think it's impracticable to say that you're going to apply cost accounting to the operation of a court, and my guess is that a judge -- any judge you ask, they would say, "Don't do that." What you want to do is have court fees, which are used throughout all of the different systems in Georgia, and, as far as I know, elsewhere. And you just set fees, and that's what they are. You don't do cost accounting for them. I'm just saying, there should be a meter in the court, and then you pay according to how much of the meter you use. That's not right.[98]

*115.*   Mr. Brown's interpretation of the Zielke report is incorrect. I did ***not*** conclude that the court fee must be subject to a cost-of-service analysis because it is intended to be a full cost recovery of the court's operating costs. Instead, I concluded that it should help recover a pre-defined portion of the overhead and administrative, non-personnel costs to provide the court service.[99] A cost of service analysis is used precisely to determine the overhead and administrative, non-personnel costs. My conclusion accords with the guidance provided by the National Center For State

[97] Expert Report of Michael B. Brown, April 13, 2020, pp. 89.
[98] Deposition of Michael B. Brown, May 12, 2020, p. 143.
[99] Expert Report of Nancy L. Zielke, February 5, 2020, p. 17-18.

Courts' National Task Force on Fines, Fees and Bail Practices (the "Task Force"). The Task Force was established to provide guidance to municipal and state courts on fine and fee collection best practices. The Task Force's findings, outcomes and recommendations state the following:

> While situations occur where user fees and surcharges may be necessary, such fees and surcharges should always be minimized and *should never fund activities outside the justice system*. Fees and surcharges *should be established only for "administration of justice" purposes*. "Administration of justice" should be narrowly defined and in no case should the amount of such a fee or surcharge exceed the actual cost of providing the service. *The core functions of courts, such as personnel and salaries, should be funded by general tax revenues*.[100]

116.   Per the guidance of the National Center For State Courts Task Force, it is recommended best practice for municipalities to determine fee schedules based on the actual cost of delivering the service, in this case, court services. Additionally, the municipal court cost fee should be used to support court purposes, not fund capital projects of the City.

---

[100] National Center for State Courts, National Task Force on Fines, Fees and Bail Practices: Principles on Fines, Fees and Bail Practices:
https://www.ncsc.org/~/media/Files/PDF/Topics/Fines%20and%20Fees/Principles%201%2017%2019.ashx

## XVII. MR. BROWN'S DOES NOT ADEQUATELY JUSTIFY DORAVILLE'S HIGH POLICE EXPENDITURES .

### A.    Excluding Fire Department expenditures, police spending constitutes as higher percent of General Fund spending than peers.

*117.*    Mr. Brown argues that Doraville's police department expenditures looks artificially high versus peers as the City does not pay for fire department expenditures from General Fund expenditures. Doraville contracts with DeKalb County to provide fire protection services to the City which is common to several peer cities. Exhibit 14 below presents Doraville's police department expenditures as a percent of General Fund expenditures against Mr. Brown's "true peers" excluding fire department expenditures.

**Exhibit 14a: Doraville's Police Expenditures as a Percent of General Fund Revenues Net of Fire Expenditures Compared to Peers**

| Category | FY2008-FY2019 Doraville | FY2018 Doraville | FY2018 Hapeville | FY2018 College Park |
|---|---|---|---|---|
| Police Expenditures | 5,351,908 | 6,378,605 | 2,950,783 | 11,581,981 |
| General Fund Expenditures Net Fire Dept. Expenditures | 10,465,113 | 12,432,878 | 8,891,594 | 24,264,208 |
| Police Expenditures as a percent of GF Expenditures (net Fire Dept. Expenditures) | 51.1% | 51.3% | 33.2% | 47.7% |

*118.*    Even when excluding fire department expenditures, Doraville's police department expenditures are higher than that of peer cities. Doraville's police

expenditures were 51.3 percent of General Fund expenditures in FY2018 compared to the average of the 67 peer cities[101] of 31.6 percent.

119.   Additionally, Doraville's police department expenditures exceed that of its "true peers" as identified by Mr. Brown. Doraville's police expenditures are higher than Hapeville's 33.2 percent and College Park's 47.7 percent. In his report Mr. Brown states the following:

> According to the Zielke Report, it is not necessary to consider sex trafficking, illegal drugs and criminal offenses associated with travelers, the airport, and conventions. College Park law enforcement works with airport police, MARTA, and Atlanta and other cities' law enforcement agencies to combat these problems for the City of Atlanta, the Atlanta metro area, and the state. College Park Police must address traffic safety on the roads and streets. College Park has a 2 million average daily traffic volume in the portion of the College Park shown on the map above. College Park, with effectively no help from the Georgia state patrol, and with no help from any other agency, must ensure traffic safety in these areas.[102]

120.   Mr. Brown identifies that College Park has additional policing needs due to the presence of the airport. Even with these additional needs, Doraville exceeds College Park's police spending as a percent of General Fund revenues.

---

[101] Average of 49 out of 67 peer cities using FY2018 CAFR data where I was able to clearly identify the inclusion or exclusion of fire department expenditures; Public Safety and General Fund Expenditures were reduced by amount of fire department expenditures for those cities that include fire department expenditures in the general fund; the average includes Hapeville and College Park
[102] Expert Report of Michael B. Brown, April 13, 2020, p. 36.

**B.**    **Mr. Brown makes unsupported justifications that the City has a higher proportion of General Fund expenditures on police spending due to factors such as population density, diversity and traffic measures.**

*121.*   Mr. Brown's report indicates that the proportion of Doraville's General Fund expenditures spent on police is higher than its peers due to Doraville's population density.[103] According to the United States Census Bureau, Doraville's population density is 2,326 people per square mile, which ranks as one of the highest among Doraville's 67 peers with populations ranging between 5,000 and 15,000 people.[104] In response to Mr. Brown's report, I compared Doraville's population density and police expenditures against six major metropolitan cities, as shown in Exhibit 15 below. This analysis is based on data gathered from CAFRs related to Doraville and the six major metropolitan cities listed below.

---

[103] Ibid., p. 24.
[104] United States Census Bureau.

77

**Exhibit 15a: Doraville Population Per Square Mile Peer Comparison**

| City | Population Per Square Mile | Compared to Doraville | Percent of Total Expenditures | Compared to Doraville |
|---|---|---|---|---|
| **Doraville, GA** | **2,326** | **1.00** | **51.3%** | **1.00** |
| New York, NY | 27,013 | 0.09 | 6.8% | 7.55 |
| Chicago, IL | 11,842 | 0.20 | 42.1% | 1.22 |
| Los Angeles, CA | 8,092 | 0.29 | 30.6% | 1.68 |
| Dallas, TX | 3,518 | 0.66 | 37.3% | 1.38 |
| Houston, TX | 3,502 | 0.66 | 52.5% | 0.98 |
| Atlanta, GA | 3,154 | 0.74 | 32.1% | 1.60 |
| **Average** | **8,492** | **0.27** | **36.1%** | **1.42** |

*122.* As previously mentioned, Doraville's population density totals 2,326 people per square mile. However, in 2018, Doraville spent 51.3 percent of its annual expenditures on its police department. In contrast, the average major metropolitan city spent 36.1 percent with a population density of 8,492 people per square mile. Doraville's police expenditures as a percent of total expenditures are nearly one and a half times (1.5X) greater than the average major metropolitan city, while its population density is nearly four times (4X) less than the average major metropolitan city. Therefore, Doraville spends a disproportionate amount of its annual expenditures on police enforcement, even when compared to cities with significantly higher population densities.

*123.*   Additionally, Mr. Brown argues that the City's high traffic count is a reason for higher than average police expenditures. Mr. Brown states, that the City "Has more commuters and more dense employment commuting.   Exhibit 16 below compares Doraville to other cities with high traffic such as College Park, Covington and Douglas.

**Exhibit 16a: Doraville's Traffic and Police Expenditures Compared to High Traffic Area Peers**

| Category | FY2008-FY2019 Doraville | FY2018 Doraville | FY2018 College Park | FY2018 Covington | FY2018 Douglas |
|---|---|---|---|---|---|
| AADT | - | 1,003,780 | 2,259,710 | 681,130 | 577,130 |
| Police Expenditures | 5,351,908 | 6,378,605 | 11,581,981 | 6,850,387 | 3,553,396 |
| Police Expenditures as % of General Fund Revenues (net Fire) | 51.1% | 51.3% | 47.7% | 42.9% | 35.6% |

*124.*   Compared to other cities with high traffic counts with a similar population size, Doraville spends a higher portion of General Fund revenues on police expenditures.

*125.*   Further, Mr. Brown's report asserts Doraville's police expenditures are in part due to Doraville's location "at the epicenter of traffic and traffic congestion in metro Atlanta."[105] To illustrate his point, Mr. Brown cites ATRI, which compiles a Top 100 list of worst freight bottlenecks. As previously mentioned, Mr. Brown notes the

---

[105] Expert Report of Michael B. Brown, April 13, 2020 p. 53.

intersection of I-285 and I-85 is located within the city limits of Doraville. ATRI ranked the intersection of I-285 and I-85 (north) as the worst freight bottleneck in 2017. However, ATRI cites that the intersection is located within Atlanta, GA. In addition, a review of a Doraville city map indicates the intersection of I-285 and I-85 is located outside of the city limits. Nonetheless, even considering the other cities noted in the 2017 Top Ten worst freight bottlenecks list, Doraville spends a disproportionate amount of its annual expenditures on police enforcement, as shown in Exhibit 17 below.[106]

**Exhibit 17a: Doraville's Police Expenditures Compared to Top Ten Worst Freight Bottleneck Cities**

| City | Percent of Total Expenditures | Compared to Doraville |
|---|---|---|
| Atlanta, GA | 32.1% | 1.60 |
| Auburn, WA | 49.8% | 1.03 |
| Chicago, IL | 42.1% | 1.22 |
| Cincinnati, OH | 35.3% | 1.45 |
| **Doraville, GA** | **51.3%** | **1.00** |
| Fort Lee, NJ | 19.6% | 2.62 |
| Houston, TX | 52.5% | 0.98 |
| Los Angeles, CA | 30.6% | 1.68 |
| Louisville, KY | 28.9% | 1.77 |
| Seattle, WA | 25.5% | 2.01 |
| **Average** | **36.8%** | **1.40** |

---

[106] American Transportation Research Institute, 2017 Top 100 Truck Bottleneck List. Data gathered from CAFRs related to Doraville and the cities listed in the Top Ten worst freight bottlenecks list, except for Fort Lee, NJ. Data for Fort Lee, NJ was gathered from the *2017 Census of Governments*, United States Census Bureau.

### C. Mr. Brown does not provide justification or a reason why diversity is a contributing factor to the City's higher police expenditures.

*126.* Mr. Brown also makes the assertion that the City's diversity and ethnographic makeup should influence the level of police expenditures in the community.[107] Mr. Brown reference's the City's higher than average Latino population as a unique quality to the City that contributes to higher police department expenditures. However, this assertion is unsupported and irrelevant to justify the City's police expenditures. In his report Mr. Brown states the following:

> Q. …Doraville has a high number of persons per household reflective of the predominantly Latino
> population," why is that relevant to the conclusions in your report?
>
> A. Because every police officer needs to fully understand the population that they serve.[108]

*127.* Mr. Brown also adds the following:

> Q. And I understand that. What is the connection between the predominantly Latino population and density?
>
> A. Well, the census actually shows that the size of -- it's in the research, but there tends to be a little bit higher household.

---

[107] Expert Report of Michael B. Brown, April 13, 2020, p. 72.
[108] Deposition of Michael B. Brown, May 12, 2020, pp. 43-44.

*128.*   Mr. Brown does not explain why the size of a Latino household would ultimately justify higher police expenditures, nor does he provide a source upon which he based his own statement.

**D.      Mr. Brown incorrectly states that my analysis of police expenditures relied on a comparison to peer cities on a per capita basis although I never provided a comparison on a per capita basis.**

*129.*   Mr. Brown's report incorrectly asserts that my expert report submitted on February 5, 2020 compared Doraville's police expenditures to its peers on a per capita basis.[109] My report compared police department expenditures as a percent of total expenditures to Georgia and US peer cities with a similar population of between 5,000 and 15,000.

*130.*   Per capita metrics, however, are commonly used by government agencies, financial services organizations, universities and policy thought leaders as a directional indicator. Some of the leading research and data organizations commonly use per capita metrics including, but not limited to, FBI Uniform Crime Reporting Program in reporting crime, National Statistical Rating Organization in reporting debt metrics and, the Kaiser Family Foundation in reporting government health expenditures. These metrics provide a directional indication of crime frequency, debt load and spend on the average citizen.

---

[109] Ibid., p. 6.

*131.* As such, the Bureau of Justice Statistics (BJS) measures Georgia's local government police expenditures in the 2016 Justice Expenditure and Employment110 series, as seen in Exhibit 18 below.

**Exhibit 18a: Doraville's Police Expenditures versus Georgia Cities As Reported By BJS**

| Category | FY2008-FY2019 Doraville | FY2018 Doraville | Georgia: All Cities (BJS) *State and Local Cumulative* |
|---|---|---|---|
| Police expenditures as percent of government expenditures | 51.14% | 51.30% | 11.50% |
| Police expenditures per Capita | $538.90 | $585.41 | $263.80 |

*132.* Georgia's cumulative state and local government police expenditures constitute 11.5 percent of total expenditures. Doraville's Police Department expenditures, in comparison, are nearly five times (5X) that at 55.9 percent of General Fund expenditures in FY2019. Similarly, BJS measures Georgia's cumulative state and local government police expenditures per capita as $263.8 compared to Doraville's per capita expenditures of $696.2.

---

110 Bureau of Justice Statistics Justice Expenditure and Employment Extracts presents estimates of government expenditures and employment at the national, federal, state, and local levels for the following justice categories: police protection, all judicial and legal functions (including prosecution, courts, and public defense), and corrections.

## XVIII.   MR. BROWN MAKES ADDITIONAL ARGUMENTS THAT ARE INCORRECT AND UNSUPPORTED.

### A.   Mr. Brown incorrectly asserts that my report compared Doraville's budget and traffic flow to that of Ferguson, Missouri.

*133.*   In his report, Mr. Brown states, "the Zielke Report references Ferguson Missouri, clearly making a comparison between Ferguson and Doraville as it relates to police expenditures. However, Ferguson and Doraville are not comparable based on key measures of traffic volume (as well as numerous demographic and economic measures)."[111] My report cites an article titled "Ferguson City Finances: Not the New Normal."[112] The intent of this citation is to show a similar analysis performed for a larger municipality which was benchmarked against a larger peer range of between 5,000 and 50,000 inhabitants. The City of Ferguson, Missouri has a population of approximately 21,000 compared to Doraville's approximate 10,000. Doraville's peer range of between 5,000 and 15,000 was narrower than Ferguson's peer range of 5,000 to 50,000 to reflect a smaller population, economic base and city services. A comparison of fine collections or traffic flows to Ferguson, Missouri is not provided at any point in the body of my report.

---

[111] Expert Report of Michael B. Brown, April 13, 2020 p. 66.
[112] Urban Institute, Ferguson City Finances: Not the New Normal, April 2015: https://www.urban.org/urban-wire/ferguson-city-finances-not-new-normal

*134.* Mr. Brown also incorrectly compares Ferguson's traffic volume to Doraville's, a comparison which was never mentioned or alluded to in my expert report. Mr. Brown's report states the following:

> The highest daily traffic count near Ferguson is 148,222 vehicles which is at the intersection of I-270 and I-170 five miles from the center of Ferguson. Ferguson is not directly connected to this traffic and it is buffered from the I-270/I-70 intersection by the City of Kinloch, MO. Ferguson is on the periphery of St. Louis employment and population. The St. Louis metro area is half of the employment and one third of the population of the Atlanta MSA.[113]

*135.* I never said that Doraville and Ferguson have a similar city profile in my report. Despite this, Mr. Brown makes a comparison of traffic volumes.

## B.    Mr. Brown incorrectly references City of Kansas City, Kansas' traffic data.

*136.* Mr. Brown incorrectly cites that traffic volume of I-435 West is located in Kansas City, Kansas. The traffic count Mr. Brown provided is in Leawood, Kansas at  I-435 West near the Missouri border which is approximately 15 miles from the city of Kansas City, Kansas.  The location cited by the Brown Report is in Johnson County, Kansas (Leawood, Kansas) versus Kansas City, Kansas.  The highest daily volume of traffic along I-435 North/South in Kansas City, Kansas just north of the

---

[113] Expert Report of Michael B. Brown, April 13, 2020 p. 66.

I-70 and I-435 interchange is 67,900 according to the 2018 Kansas Department of

Transportation traffic maps.

**C.** **Mr. Brown denigrates, without any support, the professional integrity and creditability of Nancy Zielke and her former employer the City of Kansas City, Kansas.**

*137.* Mr. Brown, in his report and deposition, question my professional integrity

and creditability as the author of the Plaintiff's Expert Report dated February 5,

2020. The Brown Report cites the following:

> The Zielke Report admonishes Doraville for failing to follow "best practice" by not conducting cost accounting for the $25 fee. Yet, Ms. Zielke herself, followed "worst financial and environmental practice" during her 16-year tenure with the Unified Government and Utilities Board since the Unified Government continues to discharge storm water and sewage during minor and major rainfall amounts. This means that, during rain events, all materials and items that go into the sanitary sewer system are flushed into the streams and onto the shores of the communities' rivers and creeks.[114]

*138.* Additionally, Mr. Brown alleges that I did not follow "best practices" in

recommending a plan for the City of Kansas City, Kansas in its combined

stormwater and sewer challenges. In fact, Mr. Brown states that "Ms. Zielke herself,

followed 'worst financial and environmental practice' during her 16-year tenure with

the Unified Government and Utilities Board since the Unified Government continues

---

[114] Expert Report of Michael B. Brown, April 13, 2020 pp. 89-90.

to discharge storm water and sewage during minor and major rainfall amounts."[115] However, in his deposition, Mr. Brown cannot state what the standards for worst financial practices are or where they come from.[116]

139.   For clarification purposes, the City of Kansas City, Kansas' ("KCK") original sewer system was built over 100 years ago with much of the original system still in use today. Like many other urban communities across the US with aged sewer system infrastructure, heavy storm rainwater can occasionally filter into the sewer system through storm drains and cracks in the pipes resulting in sewer overflows, which release a mixture of rainwater and sewage into our environment.

140.   When I was employed with the KCK and later the Unified Government of Wyandotte County and Kansas City, Kansas, best practices in financial management were demonstrated and implemented. In fact, when I was employed with the then KCK various senior financial management and budget positions from 1984 to 1997,

---

[115] Ibid.

[116] Deposition of Michael B. Brown, May 12, 2020, pp. 145-147 ("Q. So just to nail down an answer on that, so there's no external like handbook on worst financial practices or environmental practices that you're referring to? A. Yes, it is because to the extent that we're still going to follow environmental laws in this country, since 1975 a worst environmental practice is to discharge combined storm water and sewage into the waters of the state. That is a worst practice anyone in the business would tell you that it is. I could take the quotes off. I could put them back on. That's a terrible, reprehensible don't go to the river's edge after a rainstorm. You may see some things you don't want to see. So I consider that, yes, to be a worst practice.").

I did present in the City's five-year Capital Maintenance and Improvement Plan ("CMIP") studies to begin planning for the storm water challenges. During my tenure as the Finance/Budget Director, the City's annual budget funded CMIP projects to begin working to eliminate these types of overflows through an aggressive Sewer Repair Program to repair and rehabilitate KCK's wastewater pipes.  A new wastewater treatment plant was also planned which would also significantly relieve our separate sewer system.

*141.*   The Brown Deposition[117] also failed to discuss the financial challenges of the KCK service area which is economically disadvantaged compared to the national population, including median household income, unemployment, and the portion of the population living below the poverty level. The Unified Government 2016 DRAFT ISO Plan stated that "Wyandotte County residents have the Integrated Overflow Control Plan lowest per capita income, highest rate of unemployment, and lowest overall health ranking compared to the remaining 104 Kansas counties". The financial reality of the KCK service area "creates substantial challenges to fund the utility adequately while maintaining tolerable rate burden".[118]

---

[117] Deposition of Michael B. Brown, May 12, 2020, pp. 145-150.
[118] DRAFT Integrated Overflow Control Plan (IOCP) Unified Government of Wyandotte County and Kansas City,
Kansas Integrated Overflow Control Program September 30, 2016

*142.*   City and Unified Governments financial statements and budgets will show that due to financial limitations of the economically disadvantaged City ratepaying community, initial investments will target continued repair and renewal of the existing sewer system and the construction of critically important early action projects. Such projects will preserve existing assets and are expected to deliver the greatest possible benefits from these critical early program dollars.

*143.*   In 2013, sixteen years after my departure, the Unified Government entered a Partial Consent Decree ("PCD") with the United States Environmental Protection Agency to develop and Integrated Overflow Control Plan ("IOCP"). The IOCP focused on repairing KCK's aging pipes and facilities to reduce sewer overflows and improve the reliability of the government's sewer system. Like other US cities, the completion of the overall IOCP will require several decades to implement and must feature an iterative and adaptive process to ensure that it reflects the most affordable, cost-effective, and beneficial approaches.  Former City of KCK City Council's and the current Unified Governments have stated that:

> Once the existing system is renewed to a more sustainable condition and the early action projects are completed, the UG will reevaluate the community's financial capability, the benefits that have been achieved, and the identified goals and priorities to achieve additional sewer overflow reduction and water quality improvements.[119]

---

[119] Ibid.

*144.*   Mr. Brown failed to mention or summarize in his report, as the 2013 Consent Decree Agreement recognized, during my employment with KCK the City obtained the required NPDES permits before discharging stormwater to local waterways: *"The existing stormwater management program at issue in this settlement was drafted by the Unified Government and made part of the stormwater discharge permit issued by the State of Kansas in 2001 and reissued in 2007."*[120]

## XIX.  REBUTTAL CONCLUSIONS

*145.*   In conclusion, Mr. Brown's report makes erroneous assertions about Doraville's dependence on Fine and Forfeiture revenues.  Mr. Brown's arguments regarding traffic data are invalid because he incorrectly included traffic outside of Doraville's boundaries. Additionally, the assertion he makes that Doraville's traffic volume explains its high Fine and Forfeiture revenues is not supported by the data. In fact, a city he identifies as a "true peer" generates less than half of the Fine and Forfeiture revenue than Doraville does, despite having almost double the amount of traffic volume. Even when compared to a larger peer group of cities with a resident population of between 5,000 and 50,000, Doraville is comparatively more dependent on Fine and Forfeiture revenues. This is primarily due to the City's limitation to raise

---

[120] DRAFT Integrated Overflow Control Plan (IOCP) Unified Government of Wyandotte County and Kansas City,
Kansas Integrated Overflow Control Program September 30, 2016

general purpose revenues from primary Georgia local government revenue sources such as the Property and Sales Tax. Doraville's Property Tax mill cap and lack of LOST revenue collections, both general revenue sources, hinders its ability to raise general purpose revenues. The "options" that Mr. Brown cites – the option to create a Special Tax District and the SPLOST/HOST revenues, are limited options. The Special Tax District must be created with a special purpose / project. Similarly, SPLOST/HOST revenues are dedicated toward capital projects. These limitations lead to the City's comparative dependence on Fine and Forfeiture revenues as a source of general fund revenues to fund City operations.

Pursuant to 28 U.S.C. § 1746(2) I declare under penalty of perjury that the foregoing is true and correct.

Executed on July 23, 2020.

_____
Nancy L. Zielke

# ATTACHMENT A



Alvarez & Marsal
Public Sector Services, LLC
655 15th Street, NW
Suite 600
Washington, D.C. 20005
Phone: +1 202 729 2100
Fax: +1 202 729 2101

# Expert Report of

Nancy L. Zielke
Alvarez & Marsal Public Sector Services, LLC

February 5, 2020

# Table of Contents

I.      OVERVIEW OF ASSIGNMENT ......................................................................... 3

II.     SUMMARY OF OPINIONS.............................................................................. 3

III.    QUALIFICATIONS AND COMPENSATION.............................................. 4

IV.     DORAVILLE'S RELIANCE ON FINES AND FORFEITURES FOR REVENUE ....... 7

V.      DORAVILLE CITATION REVIEW ........................................................... 12

VI.     INSTITUTION OF COURT COST FEE .................................................... 16

VII.    DORAVILLE PEER COMPARISONS – REVENUE ................................. 19

VIII.   DORAVILLE'S CRIMINAL JUSTICE EXPENDITURES ......................... 22

IX.     DORAVILLE PEER COMPARISONS – EXPENDITURES ....................... 27

X.      CONCLUSION ........................................................................................... 29

XI.     ACKNOWLEDGEMENT............................................................................ 31

APPENDIX A: CURRICULUM VITAE ................................................................. 33

APPENDIX B: LIST OF REVIEWED MATERIALS............................................... 45

## I.      OVERVIEW OF ASSIGNMENT

The Institute for Justice on behalf of Hilda Brucker et al. ("Plaintiffs") hired Alvarez & Marsal Public Sector Services, LLC, ("A&M") to perform various analyses of the Defendant, the City of Doraville, Georgia, ("Doraville" or the "City") related to Civil Action No. 1:18-CV-02375-RWS, and to serve as a consulting expert in connection with the Action. Plaintiffs also tasked A&M with preparation of a financial analysis and expert report inclusive of the following:

- Analysis of the City of Doraville financial statements, fiscal practices, and financial conditions.
- Analysis of the Defendant's history of citations, including frequency of citations, enforcement outcomes, fines collected, incarceration consequences, and all related enforcement expenses, such as municipal court and police costs (pending on the availability of usable and relevant information).
- Best and leading practice review of financial management for local government as established by relevant and independent authorities.

## II.      SUMMARY OF OPINION

The analysis of Doraville's financial statements and revenue generation practices, yields the following observations:

- The City's General Fund is highly dependent on Fines and Forfeitures revenue ("Fines and Forfeitures"), which is inclusive of Municipal Court fees, and has limited alternatives for revenue generation[1].
- The City relied on Fines and Forfeitures to generate an average of 21.9 percent of its annual General Fund revenue between Fiscal Years ("FY") 2008 and 2019.
- The City's Police Department and Municipal Court expenditures are three to four times (3X to 4X) larger than Cities of its size. Funding for the Police and Code Enforcement

---

[1] Fines and Forfeitures revenue is also inclusive of bond forfeitures (i.e., bond payments forfeited when a defendant does not appear in court as required), but not of asset forfeitures (i.e., police seizure of a vehicle).

Departments, and the Municipal Court, has grown in recent years despite a gradual decline in the number of citations issued.

- The City approved a Municipal Court fee to raise General Fund revenues and did not follow best practices in establishing Charges for Service for this fee.

## III.    EXPERT QUALIFICATIONS AND COMPENSATION

I, Nancy Zielke, am a Senior Director in A&M's Public Sector Services practice.

As the principal author of this report, my professional background includes serving as a financial advisor and consultant to a wide range of public sector organizations. As part of my consulting work, I have advised municipalities, school districts, State governments, and public utilities on a variety of issues including financial analyses, pro forma budgets, deficit elimination plans, long-term revenue and expense projections, internal controls, and operational and efficiency improvement studies.

Most recently, the United States District Court of the Southern District of New York appointed me as an "Independent Consultant" to the Town of Ramapo, New York, to review and recommend improvements to the financial reporting procedures and controls of the Town of Ramapo and the Ramapo Local Department Corporation.

Prior to joining A&M, I spent over 20 years working within several City, County, and State government entities in key financial administrative positions, including: Finance/Budget Director for the City of Kansas City, Kansas; Assistant General Manager of Finance for the Kansas City, Kansas Board of Public Utilities; and the Assistant Vice Chancellor for Finance with the University of Missouri-Kansas City. I also served as the national President of the Government Finance Officers Association[2] ("GFOA") of the United States and Canada.

---

[2] GFOA is the professional association for Federal, State, and local government officials in the United States and Canada, as well as associated professional services firms, committed to advancing excellence in public finance.

I earned a Master's degree in Public Administration from the University of Kansas and a Bachelor of Arts in Business Administration with an academic focus on economics and marketing from Adrian College. I hold an Emergency Manager certificate from Michigan State University, which enables me to support management of government entities in crisis in the State of Michigan.

I continue to be an active member of GFOA, serving as an Advisor to the Standing Committee on Governmental Budgeting and Fiscal Policy and a past Budget Reviewer for the Distinguished Budget Awards Program. I am a frequent presenter at regional and national GFOA conferences on best practices in budgeting and financial management and have authored several articles on improving financial performance in local government. A copy of my curriculum vitae is attached as Appendix A.

Founded in 1983, A&M has 55 offices across the United States and 24 countries, with 4,500 professionals providing consulting services to public and private sector clients. A&M offers financial and operational restructuring, agency modernization, project turnaround, performance improvement, crisis management, large-scale program management, asset management, real estate analysis, financial management, supply chain management, and IT strategy solutions to our clients.

A&M is renowned for large restructuring projects, including interim management of Lehman Brothers post-bankruptcy declaration, the largest bankruptcy in the world. In addition to high-profile assignments for public and private corporations, A&M has served the public sector since 2003. We became the first traditional corporate restructuring firm to restructure a public entity, St. Louis Public Schools, which was on the brink of bankruptcy. We have since led other high-profile financial and operational restructuring and operational efficiency engagements for government organizations.

Our professionals have experience working with large government organizations, such as New York, New York; New Orleans, Louisiana; Detroit, Michigan, Ramapo, New York; the Detroit Public Schools; North Bay Village, Florida; Harrisburg, Pennsylvania; Mammoth Lakes, California; Jefferson County, Alabama; and Nassau County, New York, among many others.

A&M has consistently built on its reputation for improving the operational and financial performance of both private sector companies and public sector organizations.

A&M will be compensated for my work in this matter at an hourly rate. I have supervised other A&M employees in conducting research and production of this expert report and they will be compensated for their work. A&M's fees for this engagement range from $300 to $475 per hour with an estimated blended rate of $340. Since our assignment is not complete and may entail testimony at deposition, or at the submission of this report, it is not possible to determine the total compensation to be paid to Alvarez & Marsal Public Sector Services for this engagement.

My opinions are based upon information available as of the date of this report. I respectfully reserve the right to supplement or amend the report, or submit a rebuttal report, should additional relevant information become available to me subsequent to its submission. My report may also be updated in the future based on further discovery documents provided by the City or additional deposition testimony. I have formulated my opinions to a reasonable degree of professional certainty.

## IV.    DORAVILLE'S RELIANCE ON FINES AND FORFEITURES FOR REVENUE

The General Fund is a municipality's primary fund appropriation used to pay for day-to-day operations. From FY 2008 to FY 2019, General Fund revenues accounted for 88.9 percent of Doraville's total revenues (Exhibit 1). The City's General Fund is the primary focus of analysis for this report.

**Exhibit 1: Doraville's General Fund Revenues Compared to Total Revenues**
*Source: Doraville Comprehensive Annual Finance Reports*



Fines and Forfeitures constitute a significant percentage of Doraville's annual General Fund revenues. Between FY 2008 and FY 2019, the percentage of the City's annual General Fund revenue based on Fines and Forfeitures ranged from 11.6 to 33.8 percent, with an average of 21.9 percent (Exhibit 2).[3]

---

[3] Doraville Comprehensive Annual Financial Reports.

**Exhibit 2: Doraville Fines and Forfeitures as a Percentage of General Fund Revenue**
*Source: Doraville Comprehensive Annual Finance Reports*



Municipal governments such as Doraville's typically fund their operations with a combination of Property Taxes, Sales Taxes, Charges for Service (e.g., Parks and Recreation), Business Licenses and Permits, Fines and Forfeitures, and other Miscellaneous Taxes and Revenues (e.g., taxes on businesses or specific occupations). Much of the information on Doraville's Fines and Forfeitures was obtained from their Comprehensive Annual Financial Reports ("CAFRs"). Doraville, like other State and local governments, issues an annual CAFR, which includes independently audited financial statements that comply with the accounting requirements of the Governmental Accounting Standards Board ("GASB"). Each CAFR also includes a Management Discussion and Analysis of the City's finances, as well as demographic and statistical information.

While Doraville's Fines and Forfeitures are declining as a percentage of actual General Fund revenues, the dollar amount of Fines and Forfeitures collected each year has ranged between $1.7 million and $3.2 million, with an average of $2.4 million (Exhibits 3 and 4).[4] In FY 2010, the City collected more Fines and Forfeitures than the period average ($3.2 million versus $2.4 million), with Fines and Forfeitures revenue exceeding the budget by 75 percent.[5]

---

[4] Doraville Comprehensive Annual Financial Reports.
[5] Ibid.

## Exhibit 3: Doraville General Fund Revenues by Source
*Source: Doraville Comprehensive Annual Financial Reports*

| Revenue Source | FY08 | FY09 | FY10 | FY11 | FY12 | FY13 |
|---|---|---|---|---|---|---|
| Property Tax | $2,775,432 | $2,956,653 | $2,493,512 | $2,597,723 | $2,794,696 | $2,973,126 |
| Fines/Forfeitures | 1,914,795 | 2,996,019 | 3,182,231 | 2,836,348 | 2,210,209 | 2,164,279 |
| Business Tax | 2,119,759 | 2,233,856 | 1,398,641 | 1,690,098 | 2,059,015 | 2,254,385 |
| Licenses and Permits | 541,069 | 283,955 | 230,896 | 289,897 | 274,933 | 282,476 |
| Charges for Service | 292,425 | 340,123 | 336,800 | 291,084 | 202,323 | 96,039 |
| Intergovernmental | 67,443 | 41,354 | 124,702 | 1,229,070 | 177,196 | 96,009 |
| All Other Taxes * | 1,734,158 | 1,646,385 | 1,295,421 | 1,342,386 | 1,253,385 | 1,199,520 |
| All Other Revenues ** | 532,256 | 439,322 | 348,619 | 241,207 | 183,096 | 125,017 |
| *Total Revenue* | 9,977,337 | 10,937,667 | 9,410,822 | 10,517,813 | 9,154,853 | 9,190,851 |

*\* includes sales tax, franchise tax, motor vehicle tax, and others*

*\*\* includes investment income, contributions and donations, and other revenues*

| Revenue Source | FY14 | FY15 | FY16 | FY17 | FY18 | FY19 |
|---|---|---|---|---|---|---|
| Property Tax | $3,272,093 | $3,279,172 | $4,284,115 | $4,296,393 | $4,969,450 | $6,426,369 |
| Fines/Forfeitures | 2,622,863 | 2,771,989 | 2,180,262 | 1,976,042 | 2,051,582 | 1,701,616 |
| Business Tax | 1,753,718 | 2,189,812 | 1,583,323 | 1,493,516 | 1,632,516 | 1,883,019 |
| Licenses and Permits | 302,234 | 678,161 | 1,709,969 | 908,912 | 1,262,976 | 1,138,754 |
| Charges for Service | 109,976 | 129,130 | 141,151 | 99,402 | 115,037 | 108,811 |
| Intergovernmental | 60,172 | 67,158 | 80,802 | 89,887 | 34,977 | 80,041 |
| All Other Taxes * | 1,241,896 | 1,406,603 | 1,735,954 | 1,930,313 | 2,345,000 | 3,205,622 |
| All Other Revenues ** | 635,472 | 319,214 | 118,476 | 554,651 | 84,600 | 121,130 |
| *Total Revenue* | 9,998,424 | 10,841,239 | 11,834,052 | 11,349,116 | 12,496,138 | 14,665,362 |

*\* includes sales tax, franchise tax, motor vehicle tax, and others*

*\*\* includes investment income, contributions and donations, and other revenues*

## Exhibit 4: Doraville Fines and Forfeitures Revenue
*Source: Doraville Comprehensive Annual Financial Reports*



Expert Report of Nancy L. Zielke, *Brucker v. City of Doraville*
*Page 9*

The decline in Fines and Forfeitures revenue on a percentage basis since FY 2016, is driven by an increase in other revenue sources, particularly the City's Property Taxes. Property Tax revenues have grown from 28 percent of revenue in FY 2008 ($2.8 million) to 44 percent of revenue in FY 2019 ($6.4 million). Increases in property values and the City's mill rate (the amount of tax payable per dollar of the assessed value of a property) drove Property Tax growth (Exhibit 5).

While the increase in property values is a positive economic trend, Doraville's mill rate is now at its legal maximum of 10 mills.[6] In the event of an economic downturn, it is possible property values could decline, placing financial stress on the City's primary General Fund revenue source. In this scenario, the City will have to turn to other sources of revenue to compensate for the decline in Property Tax revenue. Fines and Municipal Court fees are a ready alternative, as the City has more control over issuing citations than it does over property values.

**Exhibit 5: Doraville Property Tax Mill Rate**
*Source: Doraville Comprehensive Annual Financial Reports*



Doraville's General Fund is similarly constrained by the City's lack of Local-Option Sales Tax ("LOST") revenues. LOST is a Special Sales Tax assessed at the County level; the revenue,

---

[6] Doraville's City Charter limits the Property Tax rate to 10 mills. See *City of Doraville Comprehensive Annual Financial Report 2019*.

collected by the Georgia Department of Revenue, is then distributed to counties and municipalities. Dekalb County, where Doraville is located, has not received voter approval to levy a LOST and, consequently, municipalities like Doraville lack this significant revenue stream.[7]

Cities in Georgia with similar populations and General Fund revenue to Doraville received between $1 million and $2.2 million in LOST revenue annually between FY 2016 and FY 2018.[8] LOST is a valuable revenue source and its absence means cities like Doraville must rely on other sources over which they have greater control, like Fines and Forfeitures, to fund their General Fund operations.

---

[7] Dekalb County approved a special-purpose local-option sales tax ("SPLOST") in 2018, but the revenues from this tax must be used solely for capital outlays. Doraville will not be able to use the funds for general operating purposes.
[8] *Tax Expenditure Data Center for Georgia Local Governments*, University of Georgia. Comparison set is Vidalia, Loganville, Cordele, Holly Springs, and Fort Oglethorpe.

## V.    DORAVILLE CITATION REVIEW

Like most local governments, Doraville issues citations to individuals who violate a local law, code, or regulation. These citations carry specific fines and administrative fees, such as the Municipal Court Cost fee – that, in the aggregate, constitute the Fines and Forfeitures revenue discussed in Section IV. In Doraville, most of these citations are issued by either the Police Department or the Code Enforcement Department.

The collection of the associated fines is supervised by the City's Municipal Court, which then remits payment of these fines to the City (among other political subdivisions, e.g., Dekalb County and State of Georgia). Between FY 2013 and FY 2019, Doraville issued 63,720 such citations, according to the data provided to the Plaintiffs. (Note: Doraville did not provide data prior to FY 2013, despite Plaintiff requests).[9] Exhibit 6 analyzes these citations by type, which have been categorized using the FBI's Uniform Crime Reporting standards, as well as professional judgment for offenses not tracked by the FBI.

## Exhibit 6: Doraville Citations by Type
*Source: Doraville Citation Data*

| Offense Category | FY13 | FY14 | FY15 | FY16 | FY17 | FY18 | FY19 | Total |
|---|---|---|---|---|---|---|---|---|
| Traffic Related (Moving) | 4,164 | 10,891 | 6,342 | 620 | 6,880 | 5,386 | 4,466 | 38,749 |
| Traffic Related (Non-Moving) | 1,202 | 2,904 | 2,062 | 457 | 3,115 | 3,178 | 2,021 | 14,939 |
| Other Misdemeanors * | 509 | 1,081 | 970 | 595 | 857 | 981 | 885 | 5,878 |
| Failure to Appear | 81 | 186 | 245 | 183 | 212 | 175 | 131 | 1,213 |
| Building Code Violation | 86 | 63 | 134 | 261 | 195 | 195 | 179 | 1,113 |
| Theft / Trespassing | 55 | 91 | 130 | 99 | 80 | 99 | 86 | 640 |
| Law Enforcement Related | 58 | 137 | 92 | 67 | 71 | 87 | 64 | 576 |
| Business Regulations | 49 | 13 | 70 | 130 | 86 | 75 | 148 | 571 |
| Environmental Regulations | 1 | 5 | 10 | 7 | 5 | 1 | 6 | 35 |
| Weapon Related | 2 | 2 | 1 | 0 | 0 | 0 | 0 | 5 |
| Assault / Violence | 0 | 1 | 0 | 0 | 0 | 0 | 0 | 1 |
| *Totals* | *6,207* | *15,374* | *10,056* | *2,419* | *11,501* | *10,177* | *7,986* | *63,720* |

*\* includes public nuisance, health nuisance, lewd / indecent conduct, and other citations*

---

[9] Doraville Citation Data. Note that the data for 2013 did not include citations for every month, and thus does not represent a complete Fiscal Year.

Most of Doraville's citations are traffic-related violations, either "moving" or "non-moving". Moving violations reflect offenses committed during the operation of a motor vehicle, such as speeding; non-moving violations are related to offenses involving stationary vehicles or licensing, such as having an expired driver license. These traffic-related citations constituted 84 percent of all citations between FY 2013 and FY 2019, representing 87 percent of the fines generated from citations over the same period.[10] Though serious and violent crimes constitute a small percentage of citations, national FBI statistics show that Doraville's violent and property crime rates are higher than the Georgia and national averages (Exhibits 7 and 8).[11] Violent crime consists of murder, manslaughter, rape, robbery, or assault; property crime includes offenses such as burglary, larceny, theft, and arson.[12] Despite having above-average violent and property crime rates, Doraville appears to focus on traffic-related and public nuisance citations. Citations related to Code Enforcement (e.g., building code violations, environmental and business regulations) experienced growth between FY 2013 and FY 2019.

**Exhibit 7: Violent Crime Rates in Doraville, Georgia, and the United States**
*Source: Uniform Crime Reporting Program, Federal Bureau of Investigation*



[10] Doraville Citation Data.
[11] Uniform Crime Reporting Program, Federal Bureau of Investigation.
[12] Ibid

**Exhibit 8: Property Crime Rates in Doraville, Georgia, and the United States**
*Source: Uniform Crime Reporting Program, Federal Bureau of Investigation*



Citations averaged 9,103 per year between FY 2013 and FY 2019. Citations in FY 2016 decreased to 2,419 from 10,056 the year prior, before increasing to 11,501 in FY 2017. This decline, followed by an increase in FY 2017, suggests incomplete data for FY 2016. A comparison of the data provided by the Defendant with the citation data in the Statistical Section of Doraville's 2019 CAFR also suggests this is the case. The 2019 CAFR data shows that 99,983 citations were issued between FY 2012 and FY 2019. In contrast, the data Doraville provided shows 63,720 citations were issued during the same period, a difference of 36,263. Doraville's FY 2019 CAFR also demonstrates that citations averaged 12,498 per year over this timeframe, 3,395 more than the average number of citations in the data provided by Doraville. In addition to these discrepancies, the dramatic decrease in FY 2016 citations in the data provided by the Defendant does not occur in the data from the City's 2019 CAFR (Exhibit 9).

**Exhibit 9: Comparison of Doraville Citation Data Sources**[13]

*Source: Doraville Citation Data; Doraville Comprehensive Annual Financial Report 2019*

| Data Source | FY12 | FY13 * | FY14 | FY15 | FY16 * | FY17 | FY18 | FY19 |
|---|---|---|---|---|---|---|---|---|
| Doraville Citation Data | n/a | 6,207 | 15,374 | 10,056 | 2,419 | 11,501 | 10,177 | 7,986 |
| Doraville 2019 CAFR | 11,637 | 14,343 | 17,480 | 12,106 | 12,726 | 12,801 | 10,727 | 8,163 |
| *Delta* | *n/a* | *n/a* | *2,106* | *2,050* | *10,307* | *1,300* | *550* | *177* |

    * *denotes incomplete data*

While Doraville's total citations remain constant for most of the period reviewed before decreasing in FY 2018, citations related to Code Enforcement (e.g., building code violations, environmental and business regulations) experienced growth. Code Enforcement citations grew from 81 to 333 between FY 2014 and FY 2019, peaking in FY 2016 at just over 400, while citation fines and related fees grew from $6,270 to $116,423 over that same time period (Exhibit 10).[14] Between FY 2014 and FY 2019, Code Enforcement citations grew 311 percent, while Code Enforcement fines grew 1,757 percent.[15]

**Exhibit 10: Doraville Code Enforcement Citations and Citation Fines**

*Source: Doraville Citation Data*



---

[13] "n/a" in the table reflects incomplete data. Doraville did not provide the Plaintiffs with citation data for FY12, so there is no basis for comparison, while the data provided for FY13 was incomplete.

[14] Doraville Citation Data.

[15] Note again that the citation data provided by Doraville was incomplete for 2013; that year is thus not used as the basis for the percentage change calculation.

## VI.  INSTITUTION OF COURT COST FEE[16]

In FY 2014, Doraville's City Council voted to add a "Court Cost fee" of $25 to every citation issued by the City's Police and Code Enforcement departments.[17] Though City Council minutes show the fee was voted on in October 2013, the City did not provide the Plaintiffs with data on the fee prior to FY 2016. Data for FY 2016 is incomplete, reflecting information for only April and May of that Fiscal Year. The Court Cost fee generated between $152,395 and $204,005 in annual revenue for the City between FY 2017 and FY 2019 (Exhibit 11), the years for which complete data was provided.[18]

**Exhibit 11: Doraville Court Cost Fee Revenue**
*Source: Doraville Municipal Court Remittance Reports*



In the past several years, cities around the country have begun adopting the best practice of moving away from instituting court-related fees. For example, the City of San Francisco eliminated its criminal justice administrative fee in 2018.[19] Also, the City of Chicago reduced the fees it charges for violations and made payment of such fees easier in 2019.[20] State governments have also moved

---

[16] This fee is referred to as an administrative fee in Doraville's Municipal Court Remittance Reports; the City Council, during its discussion of the fee, referred to it as a Court Cost fee. They are one and the same.
[17] *Doraville City Council Minutes*, August 19, 2013.
[18] Doraville Municipal Court Remittance Reports.
[19] "SF Supes eliminate local fees that many people exiting jail were made to pay", *San Francisco Chronicle*, May 22, 2018.
[20] "Chicago City Council Approves Ticket And Debt Collection Reforms", *NPR*, September 19, 2019.

to limit Fines and Forfeitures and how the revenue can be used. For example, the State of Missouri passed "Macks Creek Law", which limits the percentage of municipal operating revenue to be generated from Fines and Forfeitures to 20 percent.[21] The State of North Carolina's Constitution requires Fines and Forfeitures revenue to be remitted to the State and then directed exclusively towards public schools.[22]

Doraville's City Council minutes provided to the Plaintiffs show that discussion of a Court Cost fee took place on August 19, 2013. These City Council meetings reflect the City's goal of creating a Court Cost fee to generate revenue to fund capital projects. At this meeting, during a discussion of the proposed fee, Shawn Gillen, (now former) City Manager of Doraville, supported the creation of the Court Cost fee as a means of generating "additional revenue to start knocking out… capital projects."[23]

City Council meeting minutes also reflect that on October 7, 2013, Lisa Ferguson, (now former) Finance Director for Doraville, stated to the City Council "we're trying to come up with additional revenue sources so that we can do some of the things we need to do in the City."[24] In the same meeting, Lisa Ferguson stated to the City Council that instituting the $25 fee, instead of increasing fines, was better for Doraville because "adding it as a processing fee guarantees it comes to the City."[25] Had the $25 been instituted in the form of higher fines, a percentage of the $25 would be claimed by the State of Georgia and Dekalb County. Councilmember Robert Patrick commented "…if you want development, if you want Doraville to turn around faster, [instituting the fee] is the first step to making that happen."[26]

In review of Doraville's City Council minutes, the Council departed from the best practices created by GFOA to govern the creation of fees.[27] The discussion about instituting a fee did not include a proper cost analysis; the cost of operating the Municipal Court was mentioned but, shortly after,

---

[21] Missouri Senate Bill 572, 2016.
[22] North Carolina State Constitution, Article IX, Section 7.
[23] *Doraville City Council Minutes*, August 19, 2013.
[24] *Doraville City Council Minutes*, October 7, 2013.
[25] Ibid.
[26] Ibid.
[27] *Establishing Government Charges and Fees,* Government Finance Officers Association.

Lisa Ferguson acknowledged the purpose of the fee was the to generate revenue, not cover court costs.[28] The Finance Director also explicitly stated that the purpose of the fee was to support the City's Capital Improvement Plan, as quoted above. City finance leaders did not present a price analysis to the City Council. The original price for the fee was proposed at $37, without apparent evidence of analysis to justify that level.[29]

Most governments treat Municipal Court Costs as Charges for Services Fees. Court costs are frequently automatically imposed and bear no relation to the offense committed. Court costs typically cover the cost of the court criminal justice process, including court clerk and judiciary administrative costs, court system record management costs, and related administrative overhead. Best practices in State and local financial management indicate that governments should first calculate the full cost of providing a service, and identify key factors affecting the pricing, before instituting a fee.[30]   GFOA also recommends that the revenues generated from collected fees exclusively go towards covering the cost of a specific and related service, rather than funding unrelated projects. The Georgia Municipal Association ("GMA") recommends that cities ensure fines and fees are at an appropriate level to fund services, emphasizing efficiency over maximizing revenue.[31] Lastly, there was no apparent period of public involvement in the setting of the Court Cost fee. GFOA considers the public input to be an important part of the fee-setting process, as it is an opportunity for citizen feedback, particularly when new fees are introduced.[32]

I could not find where the City had completed a detailed cost of service analysis for the new Municipal Court Cost fee or provided opportunity for citizen input on the establishment of the new fee prior to its adoption. Also, the monies to be generated from the new Court Cost fee seemed to be targeted to pay for capital projects versus covering the costs of the City's Municipal Court operations.

---

[28] *Doraville City Council Minutes*, October 7, 2013.
[29] Ibid.
[30] *Best Practice: Establishing Government Charges and Fees,* Government Finance Officers Association.
[31] *A Budget Guide for Georgia's Municipalities*, Georgia Municipal Association, December 2003.
[32] *Best Practice: Establishing Government Charges and Fees,* Government Finance Officers Association.

## VII.    DORAVILLE PEER COMPARISONS – REVENUE

This analysis, in addition to reviewing Doraville's financial statements, also compared Doraville's Fines and Forfeitures revenue generation against United States Census Bureau data. This data, collected as part of the Census Bureau's Census of Governments program, is the largest and most comprehensive dataset on State and local finances in the United States. It collects data from 90,000 distinct government entities, surveying them on hundreds of financial metrics.[33] Given the breadth of data, it serves as an excellent benchmark to evaluate Doraville's General Fund revenue trends. The Census Bureau's data suggests that, while Doraville reduced its reliance on Fines and Forfeitures over the past few years, it remains comparatively dependent on them as a source of revenue.

As described above, Doraville generated an average of 21.9 percent of annual revenue from Fines and Forfeitures between FY 2008 and FY 2019. In FY 2017, Doraville generated 17.4 percent of annual revenue from Fines and Forfeitures. In contrast for that year, comparable (or peer) cities in Georgia and in the United States generated 3.1 percent and 1.4 percent, respectively, of all revenue from Fines and Forfeitures, according to the 2017 Census of Governments (Exhibit 12).[34] Note that "comparable" is here defined as cities between 5,000 and 15,000 people, a more conservative range than those used by other expert parties conducting analysis on this subject.[35] In the State of Georgia, this comprises 67 cities; across the United States, 2,227. Doraville's percentage of Fines and Forfeitures revenues is nearly six times (6X) as much as comparable cities in Georgia, and 12 times comparable cities around the United States, as illustrated in Exhibit 12.

---

[33] *2017 Census of Governments,* United States Census Bureau.
[34] Ibid.
[35] See, for example, the National League of Cities, which defines a "small City" as 50,000 people or less, https://www.nlc.org/focus-on-small-cities; and the Urban Institute's analysis of Ferguson, MO Fines and Forfeitures practices, https://www.urban.org/urban-wire/ferguson-city-finances-not-new-normal.

**Exhibit 12: Doraville Fines and Forfeitures Peer Revenue Comparison**
*Source: 2017 Census of Governments, United States Census Bureau; Doraville Comprehensive Annual Financial Reports*



Doraville's FY 2017 Fines and Forfeitures per capita (the average amount of Fines and Forfeitures per resident of the City) was $185.54.[36] Comparable Georgia and United States cities from the 2017 Census of Governments show Fines and Forfeitures revenues of $46.64 and $20.25 per capita, respectively, for that same year (Exhibit 13).[37] Doraville's Fines and Forfeitures per capita were four times (4X) that of its peer cities in Georgia, and nine times (9X) that of its United States peers.

---

[36] Doraville Comprehensive Annual Financial Reports.
[37] *2017 Census of Governments,* United States Census Bureau.

**Exhibit 13: Doraville Fines and Forfeitures Revenue Peer Per Capita Comparison**
*Source: 2017 Census of Governments, United States Census Bureau; Doraville Comprehensive Annual Financial Reports*



## VIII.   DORAVILLE'S CRIMINAL JUSTICE EXPENDITURES

Doraville devotes significant resources to its criminal justice functions. For the purposes of this report, these Departments are defined as the Police Department, the Code Enforcement Department, and the City's Municipal Court. The Police and Code Enforcement Departments are responsible for issuing citations. The Municipal Court is responsible for the judiciary process and the collection of Fines and Municipal Court fees. The funding allocated to these Departments, despite a decrease from FY 2010 to FY 2013, has grown steadily between FY 2013 and FY 2019, even as the number of citations issued by the City has decreased over that same period (Exhibit 14).

**Exhibit 14: Doraville Police Department Expenditures and Citation Count[38]**
*Source: Doraville Comprehensive Annual Financial Reports; Doraville Citation Data*



Doraville's Police Department expenditures averaged $5.4 million over the FY 2008 to FY 2019 period, ranging between $4.2 million and $7.1 million. Expenditures decreased between FY 2010 and FY 2013, dropping from $5.5 million to $4.2 million, but since then have increased, reaching

---

[38] Excludes Fiscal Years prior to FY13 due to lack of Doraville Citation Data prior to that year.

$6.4 million in FY 2019 (Exhibit 15).[39] Police Department spending grew 52 percent between FY 2013 and FY 2019, and 67 percent between FY 2013 and FY 2017.

**Exhibit 15: Doraville Police Department Expenditures**
*Source: Doraville Comprehensive Annual Financial Reports*



Police Department spending constitutes a major portion of Doraville's annual General Fund spending, ranging from 48 percent to 55 percent of General Fund expenditures between FY 2008 and FY 2019.[40] Doraville, like other municipal governments, operates various Departments to serve citizen needs, from Parks and Recreation to Economic Development.  As of its FY 2019 budget, Doraville had 19 different functional Departments.[41] Analysis shows that of these 19 Departments, the Police Department is the largest funding commitment from the General Fund (Exhibit 16).

---

[39] Doraville Comprehensive Annual Financial Reports.
[40] Ibid.
[41] *Doraville FYE 2019 Adopted Budget.*

**Exhibit 16: Doraville Police Expenditures as Percentage of All General Fund Expenditures**
*Source: Doraville Comprehensive Annual Financial Reports*



General Fund expenditures for the Municipal Court show a similar trend to Police Department expenditures, decreasing between FY 2008 and FY 2014, with recent increases over the past several Fiscal Years (Exhibit 17).

The Municipal Court plays an important role in the Doraville's criminal justice process by rendering final judgment on citations issued by the City's Police and Code Enforcement Departments. The Municipal Court can, at its discretion, increase or decrease the amount owed by an individual. The Court also collects Fines and Forfeitures and remits fines and forfeitures revenue to the City. Between FY 2014 and FY 2019, Municipal Court expenditures grew 55 percent.

**Exhibit 17: Doraville Municipal Court Expenditures**
*Source: Doraville Comprehensive Annual Financial Reports*



General Fund spending for the City's Code Enforcement Department reflected increased funding levels for the period of FY 2008 to FY 2019. Code Enforcement spending grew from approximately $206,000 to $463,000, an increase of 124 percent over the 12-year period (Exhibit 18).[42] This percentage increase is more than three times (3X) larger than the percentage increase in expenditures generally over the same 12-year timeframe.[43]

---

[42] Doraville Budget Documents and Comprehensive Annual Financial Reports. Note that Doraville does not break out Code Enforcement in its FY 2013 – 2019 CAFRs. Budget document figures have been used as substitutes.
[43] Ibid.

**Exhibit 18: Doraville Code Enforcement Expenditures**
*Source: Doraville Comprehensive Annual Financial Reports*



## IX.   DORAVILLE PEER COMPARISONS – EXPENDITURES

The United States Census Bureau's Census of Governments data also offers useful comparisons in terms of municipal expenditures, for spending on Police and Municipal Judicial Systems (no data was available on Code Enforcement). According to the 2017 Census of Governments, comparable Georgia cities (again, those with populations between 5,000 and 15,000 residents) spent an average of 19.2 percent of their annual expenditures on their police department; comparable US cities spent 17.2 percent of their expenditures on police.[44]

Doraville stands in contrast with these cities, spending 55.9 percent on its Police Department in FY 2017.[45] This is roughly three times (3X) the average of its peers (Exhibit 19). According to the Census data, Doraville spent more on its Police Department than any other comparable Georgia city in 2017, as a percent of total spending.[46]

**Exhibit 19: Doraville Police Expenditures Peer Comparison**
*Source: 2017 Census of Governments, United States Census Bureau; Doraville Comprehensive Annual Financial Reports*



---

[44] *2017 Census of Governments*, United States Census Bureau.
[45] Doraville Comprehensive Annual Financial Reports.
[46] *2017 Census of Governments*, United States Census Bureau.

There was a similar contrast when comparing Doraville's Municipal Court expenditures against its peers. Doraville's Municipal Court accounted for 4.5 percent of annual General Fund expenditures in the City's 2017 Fiscal Year (Exhibit 20).[47] Per Census data, comparable Georgia municipal judicial systems represented 1.7 percent of total expenditures, while comparable US cities received 1.1 percent.[48] Doraville's funding for the Municipal Court is almost three times (3X) as much as its peers in the State of Georgia and over four times (4X) as much as its United States peers.

**Exhibit 20: Doraville Municipal Court Expenditures Peer Comparison**
*Source: 2017 Census of Governments, United States Census Bureau; Doraville Comprehensive Annual Financial Reports*



---

[47] Doraville Comprehensive Annual Financial Reports.
[48] *2017 Census of Governments*, United States Census Bureau.

## X.    CONCLUSION

In summary:

The City's General Fund is highly dependent on Fines and Forfeitures and has limited alternatives for revenue generation.

- Fines and Forfeitures are a common revenue source for many municipalities. However, analysis conducted on Doraville's financial statements and revenue generation methods illustrated that the City is more dependent on Fines and Forfeitures to fund its General Fund than its peers in Georgia and across the United States.

- The percentage of revenues dedicated to funding Doraville's criminal justice functions also exceeds spending for Georgia and national peers.

- The City relied on Fines and Forfeitures to generate an average of 21.9 percent of its annual General Fund revenues between FY 2008 to FY 2019.

- While Fines and Forfeitures revenue has decreased on a dollar value basis, particularly between FY2016 and FY2019, the decline as a percentage of General Fund revenues was driven largely by growth in other revenues, namely Property Taxes.

- Property Taxes are Doraville's primary source of General Fund revenues. It appears Doraville's Property Tax rate increases concurrently with the decline in Fines and Forfeitures revenue.

- The City's mill levy is currently capped at 10 mills, which limits its ability to increase revenues through Property Taxes in the future.

- Given these constraints, additional funding needs could make Doraville more dependent on Fines and Forfeitures to support the General Fund.

The City's Police Department and Municipal Court expenditures are three to four times larger than Cities of its size. Funding for these Departments has grown in recent years, despite a gradual decline in the number of citations issued.

- While crime statistics for Doraville are above the State and national benchmarks, serious violent crimes reflect a small percentage of Doraville's citations.

- Citations related to Code Enforcement, while small in volume, have increased over the same period. The number of Code Enforcement citations grew by 311 percent, while Code Enforcement fines grew 1,757 percent.

The City approved a Municipal Court fee to support the General Fund and is not following best practices in establishing new Charges for Service fees (e.g., Municipal Court fee).

- Best practices in government finance demonstrate that Charges for Service Fees, similar to the Municipal Court Cost Fee instituted by Doraville in 2013, should be used to fund related services.

- Doraville's leaders instituted the Court Cost fee explicitly to raise revenue to fund capital improvement projects. This is not in line with best practices where the charge for service is based on the cost of providing the service. I could not find where the City had conducted any detailed cost of service analysis.

- To better align with best practices, Doraville should conduct an analysis to determine the appropriate funding sources for capital projects, while limiting reliance on Fines and Forfeitures.

- The City should also reevaluate the use of the Court Cost fee, to ensure that its use is related to the service for which it is assessed and provide constituents with an opportunity to review any new fees and a public forum to discuss and give feedback on these assessments.

# XI.    ACKNOWLEDGEMENT

This report is based on analyses, assumptions, and information gathered from our research related to the City of Doraville's current and prior year budgets, CAFRs, industry best practices and documents provided during discovery. The sources of information and bases for the expert opinions are stated herein.

Doraville did not provide the Plaintiffs with a complete set of requested documents, and therefore acceptable substitutes have been used where appropriate. For example, Doraville did not provide financial statements showing actual revenues and expenditures for FY 2008 through FY 2011, FY 2014, FY 2018, and FY 2019. The City's CAFRs were instead used as the basis for analysis for these years. For certain kinds of analysis, such as the review of Doraville's citation data, no real substitute was available.

While the sources of information reviewed appear reasonable and reliable, Alvarez & Marsal Public Sector Services, has not, as part of this engagement, performed an audit or review of any of the financial information used and therefore does not express an opinion or any other form of assurance on the accuracy of such information. Appendix B lists documents used in the preparation of this report.

Since my observations and conclusions are based on data provided by the City that are inherently subject to uncertainty and variation depending on evolving events, I do not represent them as results that will or will not be achieved. Some assumptions inevitably will not materialize while unanticipated events and circumstances will occur; therefore, the actual results achieved may vary materially from the examples and conclusions herein. The terms of our engagement do not provide for reporting on events and transactions that occurred subsequent to our research completed on February 5, 2020.

Respectfully submitted,

Nancy L. Zielke, Senior Director

Alvarez & Marsal Public Sector Services, LLC

February 5, 2020

# APPENDIX A: CURRICULUM VITAE

## Professional Bio and Experience Overview

Nancy L. Zielke is an experienced government finance professional with extensive expertise in state and local government budgeting, financial improvement and innovation strategies, and implementation of organizational improvements to drive operational efficiency.  With over 35 years of governments finance experience, Nancy has demonstrated experience and a proven track record leading state and local governments to improve financial and operational results and navigating through fiscal uncertainty.

As a current Senior Director with Alvarez & Marsal Public Sector Services, Ms. Zielke has been the executive leader on various advisory service projects improving the financial health of governments and successful implementation of strategic initiatives to achieve financial sustainability.   Her primary professional consulting services have focused on:

- Budget and Revenue Allocation Strategies
- Operational and Organizational Assessments
- Revenue Forecasting and Spend Plan Analysis
- Cost and Efficiency Improvement Studies
- Internal Control Risk Assessments
- CFO Advisory Services
- Financial Transformation Plans
- Performance Dashboards
- Economic and Fiscal Impact Analysis
- Deficit Reduction Plans
- Shared Service and Consolidation Plans
- Interim CFO Staffing Assignments

Nancy has served in interim CFO and Budget Officer roles with Detroit Public Schools and the South Carolina Department of Health & Human Services addressing operating deficits, cash flow requirements, financial forecasting, internal controls and organizational improvement strategies. She currently working with the City of Seattle providing CFO advisory services to various Departments.  She has provided CFO and general public finance consulting services to more than 50 governments and creditor organizations.

Prior to joining Alvarez & Marsal, Ms. Zielke worked in state and local government for more than 20 years where she served in executive financial and budget officer positions (University of Missouri-Kansas City; Unified Government of Wyandotte County/City of Kansas City, KS; Kansas City Board of Public Utilities; and the State of Kansas).

Nancy's hands-on operating experience is showcased by her successful contribution in leading state and local government financial transformation efforts including fiscal accountability plans, revenue forecasting and budget planning, ERP implementations, lean six sigma process improvements, annexation and consolidation of government services, and complex debt financing restructurings. These efforts achieved the GFOA's Certification of Achievement in Financial Reporting, the Distinguished Budget Awards Program, and the Awards for both Excellence for Financial Planning and Management Service.

She is 35-year member of the Government Finance Officers Association (GFOA) including serving on the Executive Board for six years and the National President of GFOA.  She has chaired the Woman's Finance Network, past member of various Standing Committees, former instructor for GFOA Training programs and past reviewer for both the Distinguished Budget Award and Award in Excellence programs.  She is currently an advisor to the Governmental Budgeting and Fiscal Policy Standing Committee and member of the Strategic Planning Committee for the Woman's Network.

Ms. Zielke has served on various community planning and government policy oversight committees including being an appointed member to the City of Kansas City, MO process improvement review task force studying the City's Occupational Business License program function and the City of KCMO Wet Weather Storm Water Master Plan Committee.  Ms. Zielke was also appointed by the Mayor/CEO of Wyandotte County/Kansas City, KS to serve on the Prairie-Delaware Master Plan Committee.  She was a member of the City of Kansas City, KS/Wyandotte County government consolidation implementation team.

Ms. Zielke received an undergraduate degree in business administration, with concentrations in economics and marketing, from Adrian College and a master's degree in public administration from the University of Kansas. She holds a certificate as an Emergency Manager from Michigan State University.

She is a member of GFOA, Women in Public Finance, Alpha Kappa Psi, Kansas University City Management in Training Association and the Junior League of Wyandotte and Johnson Counties in Kansas. As an author and speaker, she has made numerous presentations on a wide variety of topics, including strategies for business process improvement, leadership, and best practices in budgeting and resource allocation strategies.

The following pages provides a more detailed narrative of Ms. Zielke' s significant state and local government experience and professional accomplishments.

## Public Sector Consulting Experience

### *Alvarez & Marsal Public Sector Services (May 2007 to Current)*

Senior Director based in Kansas City, MO providing financial advisory consultant services to municipal and state governments public utilities, and public education institutions.  Primary areas of concentration include CFO advisory services , government efficiency assessments, budget redesign and revenue enhancement studies, deficit reduction plans, operational and organizational assessment, budget improvement strategies, shared service studies, and economic fiscal impact local and state governments, public school systems, municipal utilities, and institutions of higher education.

Representative illustrations of public sector consulting engagements include:

- *Government Efficiency Management Assessments*
  Key project leader for numerous state and local governments in the evaluation of service and process improvement initiatives to drive financial and operational efficiencies.

Identified significant statewide General Fund operational savings (Ranges from $1.2 billion to $2.5 billion over a five-year period) and local governments ($10 to $100 million).   Examples of government efficiency management work projects include:

- Revenue Policy and Tax Reform Initiatives and Modeling
- New Budgeting and Spending Accountability Processes
- Shared Service Models for Procurement, Fleet, Facilities and other core Back Office Business Processes
- Cost Recovery and Rate Pricing Analysis
- Operational and Organizational Assessments
- Facility Management and Energy Utilization Assessments
- Monetization of Underutilized Assets
- Information Technology Effectiveness Assessments
- Utility Customer Service Billing and Accounting
- Revenue Recovery and Financial Management Improvement Plans

Example of Government Efficiency Assessment clients have included the States of Alaska, Kansas, Louisiana, Oklahoma, South Carolina and Wyoming.  Local government efficiency reviews have included Cities of North Bay Village, FL, East Point, GA, Ramapo, NY, Tuxedo, NY, and Seattle, WA – five department assessments

- ***Economic Development Financial Advisory Services***
  Completion of retail sales tax studies related to Tax Increment Finance, Transportation Development Districts and STAR Bond financings.  Findings of economic impact studies and revenue analysis have been presented to governing bodies, rating agencies, and official statement documents.  Economic fiscal impact studies include Project manager financial and operating impacts to state and local governments, revenue projections, and retail market analysis for several major tourism and retails development projects. Approach to the fiscal impact studies included:

    - Revenue forecasts for major economic development initiatives (sales, income, property, hotel occupancy, attraction attendance and  related project revenues)
    - Fiscal and economic impact of the proposed development to the local economy and similar developments
    - Economic impact of the proposed development on the local economy (includes direct /indirect /induced expenditures, and direct job creation) through the application of IMPLAN® modeling applications
    - Jobs and  related employment impact analysis to the state and regions

  Representative economic development advisory services organizations have included: Leawood KS., Lees' Summit, MO, Olathe, KS, Riverside, MO,  Tuxedo, NY, Kansas City, KS, Sunflower Redevelopment Inc., Kansas Unified Development Inc., and several other confidential private development assessments.

- ***Internal Control and Financial/Operational Risk Assessments***
  Completion and execution of numerous financial and internal controls review and risk assessments including review of financial management business practices, segregation of duties, security risks provisions, and compliance with local policies and procedures, state statues and government accounting standards/procurements.

Nancy's internal control and operational risk consulting engagements have included Huntsville, TX, Grand County, CO, Tuxedo, NY, North Bay Village, FL, East Point, GA, and Ramapo, NY.

- ***Public Education Financial Advisory/Consulting Services***
  Financial and organization improvement consulting experience with primary, secondary, state education systems and higher education systems to improve both efficiency and effectiveness of education environments.   Examples of major project work included:
    - Development of multi-year financial plan to curtail significant operating deficits
    - Creation and execution of deficit elimination plan
    - Cost savings strategies including the privatization of various business support services
    - Deployment of a school costing models
    - Development of new budget models, financial policies and key performance metrics
    - School capacity growth analysis
    - Operational and organizational assessments
    - Shared services and strategy spend plan analysis
    - Interim CFO/Budget advisory

  Example of Nancy's public and private education clients have included: Detroit, MI, Humble, TX, Pittsburg, PA, Los Angeles, CA, Maricopa County Community College System, and Private "Confidential" Law School

- ***Distressed Government Financial Restructurings***
  Nancy has served as project leader and advisor to various distressed municipality financial receivership and bankruptcy projects  providing financial and operating solutions and revenue strategies to both governments and major creditors. Tasks included providing financial and operational assessment of the government debt recovery plans, development of financial and operational forecasts, cash flow analysis, mediation proposals, debt restructurings, and other confidential operational and pension plan analysis.

  Major distressed client work has included:  Stockton CA (Creditor representation), City of Harrisburg PA (City and Creditor representation), Jefferson County AL (Creditor representation), City of Detroit MI (Creditor representation), and Puerto Rico (Territory representation)

- ***Municipal Utilities Financial and Operations Advisory Services***
  Assisted several municipal utilities in detailed financial and organizational assessment how the municipal operations could achieve optimal efficiency while improving service delivery and internal controls.  Examples of major work projects included:
    - Examined current state key business practices and benchmarking them to national standards to ensure the application of best in class practices and policies
    - Improved enterprise budgeting, revenue forecasting and rate setting practices
    - Consolidation of warehouse/inventory management

- Operational and organizational performance, financial reporting and cash management practices
- Evaluation of utility operation expansion including utility broadband and cable telecommunications
- RFP requirements for automated metering information (AMI) system
- Cost of Service rating hearing support and community rate presentation
- Analysis of cost of distribution systems franchise fee/franchise tax matter to the value of municipal rights of way, incremental costs of maintaining the rights of way, budget and Property Tax analyses
- Utility billing and customer accounting process improvement plans for Customer Care Billing applications
- Utility financial management operational improvement plans

Public utilities consultant experience includes engagements with the Kansas City Board of Public Utilities, City of Paola, KS, and City of Seattle Public Utilities.

- ***State Medicaid Financial Advisory Services***
  Executive leader assisting the two state Health & Human Services to improve internal financial and operational processes.  Nancy provide CFO advisory services providing financial and organizational re-engineering and interim staffing services to improve its financial forecasting and budgeting processes.  She created a performance-driven resource allocation budgeting approach based on measurement, data, analytics, and modeling and reorganization plan creating a new Office of Planning and Budget and related Finance Department programs and served as interim CFO/Budget Advisory services while executing new budget and rate forecasting models.

  State Medicaid CFO client engagements included the State of South Carolina Department of Health & Human Services and State of Pennsylvania Department of Health Services.

- ***Disaster Recovery Advisory Services***
  Key project director assisting several Houston area local governments with the FEMA public assistance and insurance claim recovery efforts related to Hurricane Ike. Reviewed and recommend refined operating policy and procedures related to both financial and operating needs in preparing for the event of future natural or man-made disaster

  Provided FEMA recovery assistances to Humble, TX Schools, San Jacinto TX Community College, and the City of Seabrook, TX.

- ***Business Valuation/Financial Advisory Services*** 2011.  Project consultant for cost of service analysis related to use of public right of ways related to the Kragnes, et al, v. City of Des Moines in the Iowa State Court in Des Moines related to the class of rate payers affected by an increase in franchise fees. The fees were related to electric and gas services that the City of Des Moines claimed were necessary to regulate these utilities in the right-of-way.

The 2011 case had state-wide impacts on municipalities and taxpayers as to what constitutes a tax, right-of-way valuation and cost of administering utilities in the right-of-way.   Alvarez & Marsal testified for Plaintiffs in this class action franchise fee/franchise tax matter to the value of municipal rights of way, incremental City costs of maintaining the rights of way, City budget analyses and Property Tax analyses.

In 2016, Nancy also provided a preliminary financial analysis of the financial health of Van Buren Township, MI on behalf of Visteon Corporation (Defendant) in Wayne County, MI.

### State and Local Government CFO and Budget Experience

*University of Missouri - Kansas City (June 2001 to May 2007)*

Assistant Vice Chancellor for Fiscal Operations at the University of Missouri- Kansas City responsible for fiscal service operations of the 14,000 urban student campus with direct oversight of fiscal services, (budget, accounting, financial reporting, accounts payable, accounts receivable cashier/bursar, student loans, and procurement), long term capital planning, revenue forecasting, coordination of internal audit reporting and other key administrative service functions.   Major accomplishments and professional experiences include:

- *Higher Education Budgeting and Capital Planning*.  Oversight in the development, administration and execution of operating ($350 million) and capital budgets ($650 million) including tuition, ancillary student fees, rate and auxiliary support service pricing models.  Developed appropriation requests and monthly/quarterly financial management reports.  Worked with campus facilities management in the development of the multi-year capital construction appropriation requests and financing plans.

- *Responsibility Center Management and Budgeting.*   Campus project leader for the Budgeting for Excellence initiative which designed a new budget process for strategic allocation of resources to achieve excellence and supports the vision and values of the Institution based on a Responsibility Center Management budgeting process.  Model and planning approach received the 2003 GFOA Awards for Excellence in Management Services

- *Outsourcing Business/Shared Services Process Implementations.* Implemented outsourcing business models for student loan billing and collections. Analyzed enterprise outsourcing opportunities of printing services, housing, and bookstore operations and business support services "shared service" business model opportunities.

- *Certification of Internal Controls.* Developed financial certification process for all major department and academic schools.   Documented campus business policies and deployment of fiscal officer training and yearend financial statement/internal control certification program.

- ***Performance Management (Balanced Scorecard) Systems.***  Deployed "Balanced Scorecard" for administrative and financial service program areas linking operating performance to customer expectations and resource allocation decision making. Project was awarded 2006 GFOA Award for Excellence in Management Services.

- ***Enterprise Resource Planning and Financial Reporting Applications***.  Project Leader for campus implementation of PeopleSoft Financial and Student System Applications. Worked on intra-campus and System Office initiative for integrated (student, financial, and academic) reporting resulting in the creation of a data warehousing solution (Congas).

- ***Business Process Improvement Strategic Planning***.   Implemented business processes and redesign improvement initiatives to support key critical business functions, including accounts payable, accounts receivable, cashiers, student loans, procurement, payroll, fixed assets, student one card, and central financial administration. Approach and methodology were awarded the 2004 GFOA Award for Excellence.

- ***Trustee Endowment Financial Accounting***.  Served as the appointed assistant treasurer for the financial reporting and investment oversight of Trustee related endowment and gift funds.   Experienced in the selection of fund managers and SAS-70 internal control reviews.

- ***Professional Associations.***  Former active member of the National Association of College and University Business Officers and the Central NACUBO organization. She authored articles for the Business Officer on business process improvements and budgeting strategies on UMKC financial transformation efforts.

## Kansas City, Kansas Board of Public Utilities  (November 1997 to June 2001)

Assistant General Manager- Finance/Chief Financial Officer for the Kansas City Board of Public Utilities (KCBPU) responsible for the financial operations including all fiscal, customer service, information technology, business and management support services.   Work responsibilities included oversight of cost of service studies, strategic planning, performance benchmarking, and debt financing initiatives. Major accomplishments and professional experiences include:

- ***Annual Operating and Capital Budgeting***.  Oversight of an operating ($330 million) and capital ($600 million) budgets including multi-year financing plans for combined electric and water utility enterprise operation.  Budget document received the GFOA Distinguished Budget Award.

- ***Tax Exempt Revenue Financing and Debt Management***.  Deployed utility enterprise revenue debt policies and financing plans for major capital construction and equipment needs, investment strategies, complex debt restructurings, and ongoing investor relationships.  Fostered successful working relationships with all three rating agencies in presenting financial, economic and community profile information to improve utilities ratings.

- ***Comprehensive Annual Financial Report.*** Coordinated annual CAFR report and internal control action plans.  Performed financial risk assessments of utility operations.  CAFR received the GFOA award of financial reporting.

- ***Utility Expansion Studies (Steam and Gas Utility Operations).*** Conducted financial due diligence and evaluation of potential utility operation expansions including steam and gas utilities.

- ***Enterprise Resource Planning Systems***.  Completed strategic plan for business technology needs for the combined utility system that identified system application and major software priorities.  Implementation of utility billing system applications including the development of request for proposal, selection, contract negotiations, implementation plan.   Identified opportunities and efficiencies of automated meter reading technology.

- ***Cash Management and Investment***.  Revised combined utilities cash management policies and procedures, competitive bidding of banking services, and lockbox operations.  Ensured calculation of arbitrage rebate policy and enforcement provisions on an annual basis.

- ***Financial and Economic Impact Analyses and Studies***.  Completed financial analyses and efficiency studies including cost of service rate studies, administrative overhead cost allocation, outsourcing modeling, economic impact on development proposals, labor negotiations and arbitrations impact analysis, and business process reviews.

- ***Corporate Financial Reporting and Accounting***.  Developed user friendly financial reporting and performance benchmarks for the combined Utility reporting system.  Implemented a new chart of accounts that reflected cross reporting purposes for FERC and GAAP financial reporting needs.   Annual comprehensive financial report received the GFOA Certificate of Achievement Award.

- ***Professional Associations.*** Former active member of the American Public Power Association.  Served as the Vice Chairperson of the Business and Finance Section on General Accounting, Finance and Auditing.

***City of Kansas City, Kansas (Unified Government of Wyandotte County/Kansas City, Kansas) (October 1984 to November 1997)***

Served as the Finance/Budget Director for the City of Kansas City, KS and the Unified Government of Wyandotte County with administrative oversight of financial management service functions including long debt management, budget and capital planning, payroll, purchasing, accounting, treasury, business licenses, weights and measures, risk management, intergovernmental affairs, and city clerk programs. Major accomplishments and professional experiences include:

- ***Annual Operating and Capital Budgeting.***  Oversight of the local government operating budget ($250  million)  and five-year capital maintenance and improvement plan ($300 million).  Worked with Citizens' Advisory Council in developing capital improvement

and neighborhood priorities for master plans.   Coordinated the federal reporting requirements for Community Development Block Grant and FEMA grants.  Budget documents received the GFOA Distinguished Budget Award.

- ***Annual Comprehensive Annual Report.***  Managed implementation of annual CAFR and internal control memorandum action plans.

- ***Revenue Forecasting and Modeling***.  Developed multi-year revenue models for local government revenues including general operating fund, special highway and park funds, and enterprise funds (sewer and Business Park, and golf course enterprise system) funds.

- ***Economic Development and Fiscal Impact Statements***.   Prepared fiscal impact analyses related to tax exempt, tax increment, housing, and industrial revenue bond financing proposals.  Provided fiscal impact and market studies on the economic and community impact of major retail, residential, commercial, and tourism related development projects.

- ***Consolidation of Government Services***. Member of the Executive Transition Committee for the Consolidation of Government.  Developed and implemented shared service centers, transactional and process reviews, and consolidated financial reporting and systems.

- ***Enterprise Resources Planning Systems***. Project Administrator for implementation of new integrated financial management and budget planning information system applications.   Process included development of request for information/proposal, contract negotiations, lease financing analyses, and project implementation.

- ***Privatization/Sale of Utility Enterprise Operations***. Key project member of financial review team in the potential sale of combined electric and water utility operation.

- ***Legislative Affairs and Expert Witness***. Expert witness to state and federal legislative and regulatory agencies.   Provided legislative liaison support for governmental entities monitoring and testifying to state legislation committees.

- ***Professional Associations.***  Active member of GFOA and the Kansas GFOA chapter. Also, former member of the International City-County Management Association (ICMA) and the American Society for Public Administration (ASPA).

### *Other State and Local Government Experience*

- Government Finance Officers Association – 1987 to Current
  - President (2004 – 2005) and Member of the Executive Board (2001 to 2006) representing GFOA 18,000 local governments across the United States and Canada
  - Member and Advisor to  GFOA Standing Committees
  - Keynote speaker at more than 30 state GFOA Association meetings on GFOA's strategic initiatives and policy issues

- ▪ Traveled internationally to speaking to various state and local government strategic financial issues and best practices
- ▪ Reviewer for GFOA Awards for Excellence program and Distinguished Budget Awards Program
- ▪ Frequent author for the Government Finance Review and speaker at the National GFOA Annual Conference

- State of Kansas (Governor's Office/Department of Transportation: Policy Analyst/Governor's Fellow  (1982 - 1984)
- City of Coon Rapids, Minnesota:  Management Analyst (1981 - 1982)
- University of Kansas Office of Business Affairs:  Graduate Research Assistants (1980 - 1981)
- City of Adrian, MI:  Department of Housing and Community Development Intern (1979 - 1980)
- Berrien County, MI:  Extension Office 4-H Program Intern (1978-1979)

## Education and Certifications

- Master's in Public Administration from the University of Kansas (1982)
- Bachelor of Arts in Business Administration from Adrian College (1980)
- Emergency Manager Certification from Michigan State University (2011)

## Publications, Awards, and Professional Presentations

### *Author of Selected Publications*

- "Navigating Turbulent Times: Approaches and Strategies", Government Finance, Review, October 2013
- "Taking the Fiscal Pulse of Local Government", American Bankruptcy Institute Advisors Committee Newsletter, May 2013
- "Stepping Up: Finance Officers and the Leadership Imperative", Government Finance Review, August 2004
- "Revamping Businesses:  Cutting Red Tape", National Association of College and University Business Officers NACUBO Business Officer, July 2004
- "Finding Opportunities Budgeting for Excellence:  How the University of Missouri-Kansas City Transformed Its Budget Process Using the NACSLB Standards", Government Finance Review, February 2004
- "Year 2000 Technology Update - Review Roundup", Government Finance Review, October 1999
- "Priorities for Government Finance Officers:  Highlights of Newly Elected Executive Board Members", Government Finance Review, August 1999

*Professional Awards and Appointments*

- GFOA Award for Excellence in Management and Service Delivery and Budgeting & Financial Planning
  - 2006 - "Our Accountabilities Plan:  A Five Star Plan for Excellence"
  - 2004 -  "A-B-C's in Redefining Business Processes:  Accountability in Financial Management"
  - 2003 - "Budgeting for Excellence:  New Standards for Higher Education Financial Management"
- GFOA Distinguished Budget Awards – City of Kansas City, Kansas and Kansas City Board of Public Utilities
- GFOA Certificate of Achievement for Financial Reporting – Kansas City Board of Public Utilities
- City of Kansas City, MO Process Improvement Review Task Force -  Occupational Business License
- City of Kansas City, MO Wet Weather Storm Water Master Plan Committee
- Unified Government of Wyandotte County/Kansas City, KS Prairie-Delaware Master Plan Committee
- U.S. District Court of the Southern District of New York – Appointed Independent Financial Consultant for the Town of Ramapo, NY

*Professional Presentations*

- "Budgeting for Excellence:  New Standards for Higher Education Financial Management"
  - American Society for Public Administration Conference, 2004
  - National Association of College and University Business Officers Conference, 2004 and 2005
  - National Consortium for Continuous Improvement in Higher Educations, 2005

- Government Finance Officers Association (GFOA) Conference and Training Seminar Presentations
  - Best Practices in Local Government Financial Statement Presentations, 1991
  - Revenue Alternatives for Cities and States (Gaming Issues), 1992
  - Organizing Your Budget Office, 1993
  - Distinguished Budget Awards Program Criteria, 1994
  - Performance Based Budgeting, Baltimore, Maryland, 1995
  - Lease Purchasing and Financing Alternatives, 1996
  - Distinguished Awards Program Mandatory Criteria, 1997
  - Emerging Issues of Electronic Commerce, 1998
  - E-Government Strategies and Challenges, 2001
  - Emergency Disaster Recovery Planning, 2002
  - Leadership for the Future, 2004
  - Expanding the Frontiers of Government Finance, 2005
  - Finance Officer Leadership May 2006
  - Redesigning Business Process, May 2006
  - Use of Performance Measurements in Budgeting Applications, 1994
  - Planning the Sale of Municipal Bonds, 1997 – 2004

- Finance Officers and the Leadership Imperative Leadership for the Future, 2004
- Advanced Government Institute, 2004
- Leadership for the Future, Annual Conference President's Address, 2005
- Accountability in Changing Organizational Cultures, 2008
- Predicting the Future: Using the Most Appropriate Forecasting Methods, 2009
- Effective IT Governance Structures, 2012
- Financial Analysis of Distress Municipalities, 2013
- Navigating through Financial Times,  2014
- Sharing Economies in Government, 2015
- Using Consultants in the Finance Office, 2017
- Life After the CFO Office, 2019

- Other Regional and National Public Finance Presentations
  - Fraud and Early Detection Practices, 1996
  - Developing Capital Plans, 1998
  - Emerging Issues of Technology and E-Commerce, 1998
  - E-Commerce and How It Changes How Governments Do Business, 1999
  - GFOA Standing Committee – How to Become Involved in GFOA, 2001
  - Finance as a Catalyst in Re-engineering the Organization, 2003
  - Business Process Reviews, Streamlining Organizations and P-Cards, 2007
  - Best Practices in Budgeting, 2008
  - The Other Side of Economic Development, 2008
  - Predicting the Future:  Forecasting Strategies and Appropriate Approaches, 2010
  - Navigating Through Financial Difficulties, 2011
  - Navigating Turbulent Times: Approaches and Strategies, 2013
  - Municipal Benchmarks Developments and Best Practices, 2020

## Testimony, Expert Witness and Trial Experience
- City of Stockton, CA – Expert Report, December 2012; February 2013 Report Deposition
- Miami County, Kansas District Court – Represented Defendant (City of Louisburg, Kansas), 2011
- State of Kansas Legislative Committees on Taxation, Appropriations, Ways and Means, Local Government, and Transportation and Utilities, 1982 to 2001
- State of Kansas District Court - Labor Mediations Fact Finding Labor/Collective Proceedings, 1994 - 2007
- United States Department of the Internal Revenue Service - Arbitrage Compliance, 1993 - 1995
- United States Federal Court, Kansas City, KS – Expert Government Witness, 1994

## APPENDIX B: LIST OF REVIEWED MATERIALS

1. Doraville Budget Documents, FY 2008 – FY 2019

2. Doraville Comprehensive Annual Financial Statements, FY 2008 – FY 2019

3. *Tax Expenditure Data Center for Local Governments*, University of Georgia, https://ted.cviog.uga.edu/

4. Uniform Crime Reporting Program, Federal Bureau of Investigation, https://ucr.fbi.gov/crime-in-the-u.s/2016/crime-in-the-u.s.-2016/topic-pages/offenses-known-to-law-enforcement

5. Doraville Citation Data, January 2013 to December 2019

6. Doraville City Council Minutes, for August 19, 2013, and October 7, 2013

7. Doraville Municipal Court Remittance Reports, January 2016 to June 2019

8. "SF Supes eliminate local fees that many people exiting jail were made to pay", *San Francisco Chronicle*, May 22, 2018, https://www.sfchronicle.com/bayarea/article/SF-Supes-eliminate-local-fees-that-many-people-12935372.php

9. "Chicago City Council Approves Ticket And Debt Collection Reforms", *NPR*, September 19, 2019, https://www.npr.org/local/309/2019/09/19/762057985/chicago-city-council-approves-ticket-and-debt-collection-reforms

10. Missouri Senate Bill 572, 2016

11. North Carolina State Constitution, Article IX, Section 7

12. *Best Practice: Establishing Government Charges and Fees,* Government Finance Officers Association, https://www.gfoa.org/print/433

13. *A Budget Guide for Georgia's Municipalities*, Georgia Municipal Association, December 2003

14. *2017 Census of Governments,* United States Census Bureau, accessed via the Willamette University Government Finance Database, https://willamette.edu/mba/research-impact/public-datasets/

15. *Focus on Small Cities*, National League of Cities, https://www.nlc.org/focus-on-small-cities

16. "Ferguson city finances: not the new normal", *Urban Wire*, The Urban Institute, April 7, 2015, https://www.urban.org/urban-wire/ferguson-city-finances-not-new-normal

# ATTACHMENT B



**Alvarez & Marsal**
**Public Sector Services, LLC**
655 15th Street, NW
Suite 600
Washington, D.C. 20005
Phone: +1 202 729 2100
Fax: +1 202 729 2101

# Expert Rebuttal Report of

Nancy L. Zielke
Alvarez & Marsal Public Sector Services, LLC

June 5, 2020

# Table of Contents

1.  INTRODUCTION ...................................................................................................3

2.  REVIEWED MATERIALS.....................................................................................3

3.  SUMMARY OF OPINIONS ..................................................................................3

4.  MR. BROWN'S ANALYSIS INCORRECTLY CONCLUDES THAT HIGH TRAFFIC
    VOLUME EXPLAINS DORAVILLE'S HIGHER FINE AND FORFEITURE
    REVENUES ............................................................................................................4

5.  MR. BROWN'S SUGGESTION TO INCLUDE MORE POPULOUS CITIES AS
    DORAVILLE'S "PEERS" DOES NOT IMPACT MY ORIGINAL CONCLUSION
    THAT DORAVILLE IS MORE DEPENDENT ON FINE AND FORFEITURE
    REVENUES THAN GEORGIA AND U.S. PEERS...........................................10

6.  MR. BROWN INCORRECTLY ARGUES THE CITY IS NOT LIMITED BY THE 10
    MILL PROPERTY TAX CAP BECAUSE THE CITY IS LIMITED IN ITS ABILITY
    TO RAISE OWN-SOURCE GENERAL-PURPOSE TAX REVENUES. ......................12

7.  COLLEGE PARK AND HAPEVILLE, WHICH MR. BROWN IDENTIFIED AS
    DORAVILLE'S "TRUE PEERS", ARE NOT DEPENDENT ON FINE AND
    FORFEITURE REVENUES AS IS DORAVILLE. ...........................................23

8.  MR. BROWN'S ARGUMENT THAT A MUNICIPAL COURT COST FEE BASED
    ON A COST ASSESSMENT IS IMPRACTICAL IS UNSUPPORTED. .......................26

9.  MR. BROWN'S DOES NOT ADEQUATELY JUSTIFY DORAVILLE'S HIGH
    POLICE EXPENDITURES . ...............................................................................27

10. MR. BROWN MAKES ADDITIONAL ARGUMENTS THAT ARE INCORRECT
    AND UNSUPPORTED. .......................................................................................33

11. OVERALL CONCLUSION ................................................................................37

12. ACKNOWELEDGEMENT ................................................................................38

13. APPENDIX………………………………………………………………….40

1.      **INTRODUCTION**

I, Nancy L. Zielke, am a Senior Director in A&M's Public Sector Services practice. On February 5, 2020, I submitted an initial report in this matter ("Zielke I"). Since that date, I have reviewed the Report submitted by Michael B. Brown (the "Brown Report") dated April 13, 2020 and the transcript of Michael B. Brown deposition (the "Brown Deposition") dated May 12, 2020. This Rebuttal Report addresses issues raised in the Brown Report and the Brown Deposition relevant to my initial report.

2.      **REVIEWED MATERIALS**

In addition to the information disclosed in Zielke I, in conducting my analyses and formulating my opinions, I relied upon the additional facts and data disclosed in Appendix A to this report.

My opinions are based upon information available as of the date of this report. I respectfully reserve the right to supplement or amend the report, or submit an amended rebuttal report, should additional relevant information become available to me subsequent to its submission. My report may also be updated in the future based on further discovery documents provided by the City or additional deposition testimony. I have formulated my opinions to a reasonable degree of professional certainty.

3.      **SUMMARY OF OPINIONS**
         <u>**My analysis of Michael B. Brown's Expert Report dated April 13, 2020 and of the relevant financial and operating disclosures of Doraville and related peer cities yields the following observations:**</u>

1. Mr. Brown's analysis and conclusion that Doraville's traffic volumes explains its Fine and Forfeiture revenue collections is incorrect.

2. An analysis of Doraville's revenues and expenditures versus a peer city population of between 5,000 and 50,000 residents does not change my conclusion that Doraville is dependent on Fine and Forfeiture revenues.

3. The City is limited in its ability to raise general purpose revenues to fund City operations because of its Property Tax mill rate cap and lack of general-purpose Local Option Sales Tax revenues; an added special tax district levy must be implemented for a specified use.

4. An analysis of Doraville's "true peers," as identified by the Brown report, demonstrates that Doraville is dependent on Fine and Forfeiture revenues.

5. It is a recommended national best practice to derive a court fee based on the cost of providing court services.

6. Mr. Brown argues without support that Doraville's higher police expenditures are justified compared to peer cities.

7. Mr. Brown makes several other incorrect claims, such as that I compared Doraville to Ferguson, MO and that I did not follow best practices while serving the City of Kansas City, Kansas.

## 4. MR. BROWN'S ANALYSIS INCORRECTLY CONCLUDES THAT HIGH TRAFFIC VOLUME EXPLAINS DORAVILLE'S HIGHER FINE AND FORFEITURE REVENUES

**Although Doraville is in close proximity to Atlanta, the City is still dependent on Fine and Forfeiture revenues when compared to other highly trafficked cities.**

Mr. Brown's report asserts Doraville's fines and forfeitures revenues and criminal justice expenditures are in part due to Doraville's location "at the epicenter of traffic and traffic congestion in metro Atlanta."[1] To illustrate his point, Mr. Brown cites the American Transportation Research Institute (ATRI), which compiles an annual Top 100 list of worst freight bottlenecks.[2] Exhibit 1 below is the 2017 Top Ten worst freight bottlenecks according to ATRI.[3]

---

[1] Expert Report of Michael B. Brown, April 13, 2020, p. 53.
[2] Ibid., p. 59.
[3] American Transportation Research Institute, 2017 Top 100 Truck Bottleneck List.

**Exhibit 1: ATRI Worst Freight Bottlenecks List - 2017**

| Rank | Location |
|------|----------|
| 1 | Atlanta, GA: I-285 at I-85 (North) |
| 2 | Fort Lee, NJ: I-95 at SR 4 |
| 3 | Chicago, IL: I-290 at I-90/I-94 |
| 4 | Louisville, KY: I-65 at I-64/I-71 |
| 5 | Cincinnati, OH: I-71 at I-75 |
| 6 | Los Angeles, CA: SR 60 at SR 57 |
| 7 | Auburn, WA: SR 18 at SR 167 |
| 8 | Houston, TX: I-45 at US 59 |
| 9 | Atlanta, GA: I-75 at I-285 (North) |
| 10 | Seattle, WA: I-5 at I-90 |

Even considering the other cities noted in the 2017 Top Ten worst freight bottlenecks list, Doraville is comparatively more dependent on Fines and Forfeitures as a source of revenue, as shown in Exhibit 2 below.[4]

**Exhibit 2: Doraville and 2017 Top Ten Worst Freight Bottlenecks Fines and Forfeitures Revenue Comparison**

| City | Percent of Total Revenue | Doraville Compared to Each City | Per Capita | Doraville Compared to Each City |
|------|--------------------------|----------------------------------|------------|----------------------------------|
| **Doraville, GA** | **17.4%** | **1.00** | **$185.54** | **1.00** |
| Chicago, IL | 3.9% | 4.47 | $118.11 | 1.57 |
| Fort Lee, NJ | 1.9% | 9.15 | $43.36 | 4.28 |
| Seattle, WA | 1.7% | 10.52 | $67.43 | 2.75 |
| Los Angeles, CA | 1.4% | 12.31 | $38.52 | 4.82 |
| Atlanta, GA | 1.3% | 13.38 | $52.55 | 3.53 |
| Auburn, WA | 0.7% | 23.59 | $13.92 | 13.33 |
| Houston, TX | 0.7% | 25.94 | $13.34 | 13.90 |
| Cincinnati, OH | 0.6% | 28.29 | $23.86 | 7.78 |
| Louisville, KY | 0.2% | 77.34 | $3.32 | 55.85 |

<u>**Mr. Brown observed Doraville traffic counts ranging between 2.5 and 3.5 million, but the same analysis when including the range of traffic within the city limits of Doraville totals only 1.0 million.**</u>

---

[4] Doraville Comprehensive Annual Financial Reports. *2017 Census of Governments*, United States Census Bureau.

Mr. Brown used the GDOT Traffic Analysis and Data Application (TADA) to measure Doraville's traffic volume in 2018.[5] According to GDOT, "TADA provides data collected from the Georgia Traffic Monitoring Program located on public roads."[6] Mr. Brown's report indicates that Doraville's 2018 average daily traffic volume totals 2.3 million.[7] In addition, Mr. Brown also notes that the average daily traffic volume for Doraville and the immediate vicinity totals 3.5 million.[8] However, I am unable to replicate Mr. Brown's findings. Further, Mr. Brown failed to provide the methodology and support used to determine the average daily traffic volumes noted in his report.

In response to Mr. Brown's report, I performed an analysis of the annual traffic statistics provided by GDOT. Specifically, I reviewed the traffic monitoring stations located within the city limits of Doraville. As a result, I determined Doraville's 2018 average daily traffic volume totals approximately 1.0 million, which is significantly less than 2.3 million that Mr. Brown found.[9]

Based on my analysis, it appears Mr. Brown's traffic volume calculations included additional traffic monitoring stations located outside the city limits of Doraville's. For example, Mr. Brown notes the intersection of I-285 and I-85 is located within the city limits of Doraville.[10] As previously mentioned, ATRI ranked the intersection of I-285 and I-85 (north) as the worst freight bottleneck in 2017.  In addition, a review of a Doraville city map indicates the intersection of I-285 and I-85 is located outside of the city limits, as shown in the following Exhibit 3. [11]

---

[5] Expert Report of Michael B. Brown, April 13, 2020, pp. 62-67.
[6] Georgia Department of Transportation, Road & Traffic Data.
[7] Expert Report of Michael B. Brown, April 13, 2020, p. 64.
[8] Ibid., 65.
[9] Georgia Department of Transportation, Traffic Analysis and Data Application, 2018 All Station Annualized Statistics.
[10] Expert Report of Michael B. Brown, April 13, 2020, p. 60.
[11] Atlanta Regional Commission, ArcGIS Georgia Cities Shapefile.

**Exhibit 3: City Limits of Doraville, GA**



Mr. Brown's report also compared Doraville's daily traffic volume to the following five cities within Georgia: 1. Cordele, 2. Fort Oglethorpe, 3. Holly Springs, 4. Loganville, and 5. Vidalia.[12] As a result of his analysis, Mr. Brown asserts my conclusions related to Doraville's Fines and Forfeitures revenues generation and criminal justice expenditures are baseless since Doraville has significantly more traffic than its peers. Using the annual traffic statistics provided by GDOT, I reviewed the traffic monitoring stations located within the city limits of Doraville and the five cities noted in Mr. Brown's report. Again, I am unable to replicate Mr. Brown's findings, as shown in the following Exhibit 4.

---

[12] Expert Report of Michael B. Brown, April 13, 2020, pp. 62-64.

**Exhibit 4: A&M Traffic Counts vs. Mr. Brown's Traffic Counts**

| City | Mr. Brown | | A&M | |
| --- | --- | --- | --- | --- |
| | Average Daily Traffic Volume | Compared to Doraville | Average Daily Traffic Volume | Compared to Doraville |
| **Doraville** | **2,330,740** | **1.00** | **1,003,780** | **1.00** |
| Cordele | 310,320 | 7.51 | 306,020 | 3.28 |
| Vidalia | 266,960 | 8.73 | 262,730 | 3.82 |
| Ft. Oglethorpe | 419,620 | 5.55 | 257,250 | 3.90 |
| Loganville | 222,690 | 10.47 | 210,320 | 4.77 |
| Holly Springs | 341,080 | 6.83 | 201,260 | 4.99 |
| **Median** | **325,700** | **7.16** | **259,990** | **3.86** |

In response to Mr. Brown's report, I performed an analysis that compares Fines and Forfeitures revenues against average daily traffic volumes, as illustrated in Exhibit 5.[13] This analysis is based on data gathered from CAFRs related to 63 peer cities located in Georgia with populations ranging between 5,000 and 15,000 people. The average daily traffic volumes are based on GDOT traffic monitoring stations located within the city limits of the 63 peer cities.[14]

---

[13] Georgia Department of Transportation, Traffic Analysis and Data Application, 2018 All Station Annualized Statistics. FY2018 Comprehensive Annual Financial Reports for 63 of the 67 peer cities with populations ranging between 5,000 and 15,000 people; unable to retrieve the CAFRs for the following cities located in Georgia: Cusseta, Lovejoy, Eastman, and Cedartown.

[14] Atlanta Regional Commission, ArcGIS Georgia Cities Shapefile.

**Exhibit 5: Doraville Average Daily Traffic v. Fines and Forfeiture Revenue Peer Comparison**



In 2018, Doraville collected $2,051,582 million in fines and forfeitures revenues with average daily traffic volumes totaling 1.0 million vehicles/trucks.  In contrast, the average peer city, defined in my expert report from February 2020 as the 67 Georgia municipalities with a population of between 5,000 and 15,000 residents, generated $426,407 in fines and forfeitures revenues with average daily traffic volumes totaling 272,882. Doraville's fines and forfeitures revenues per traffic count totals $2.04, while the fines and forfeitures revenues per traffic count for the average peer city totals $1.56.

In addition, Mr. Brown claims College Park is one of Doraville's "true" peers.[15] In 2018, College Park generated $711,594 in fines and forfeitures revenues with average daily traffic volumes totaling 2.3 million. Interestingly, Doraville's fine and forfeitures revenues are three times (3X) greater than College Park's, while its average daily traffic volume is two times (2X) less than College Park's. Further, College Park's fines and forfeitures revenues per traffic count totals $0.31, which is six times (6X) less than Doraville.

---

[15] Expert Report of Michael B. Brown, April 13, 2020, pp. 33-37.

5. **MR. BROWN'S SUGGESTION TO INCLUDE MORE POPULOUS CITIES AS DORAVILLE'S "PEERS" DOES NOT IMPACT MY ORIGINAL CONCLUSION THAT DORAVILLE IS MORE DEPENDENT ON FINE AND FORFEITURE REVENUES THAN GEORGIA AND U.S. PEERS.**

Mr. Brown's report asserts my expert report submitted on February 5, 2020 inappropriately compares Doraville's Fines and Forfeitures revenues and criminal justice expenditures against cities with populations ranging between 5,000 and 15,000 people. Mr. Brown states, "The Zielke Report arbitrarily chooses to compare Georgia cities and U.S. cities with a population of 5,000 to 15,000—resulting in invalid conclusions about Doraville in comparison with other Georgia and U.S. cities."[16]

The National League of Cities ("NLC") defines a small city as "one with 50,000 people or less".[17] Urban clusters are defined by the Census Bureau as having "at least 2,500 people and less than 50,000 people."[18]  Doraville with a population of 10,526 as of 2018[19] is at the lower end of the range for both small cities and urban clusters.  Cities that are 10,000 in population can vary significantly from those nearly five times their size.  Outside of the part of Atlanta that is in DeKalb County, Dunwoody is the largest city and, with a population of 49,459, it is at the high end of the NLC range for small cities. Dunwoody is located ten miles north of Atlanta and is home to Perimeter Mall, the second largest mall in Georgia. Dunwoody provides police protection, courts, public works, and parks and recreation services to residents.[20]

In comparison, Doraville provides E911, police, courts and public works directly to residents. Water and sewer services and fire protection services are provided to residential and commercial properties by DeKalb County via intergovernmental agreements in conjunction with the Service Delivery Strategy. Several of Doraville's peer cities are using similar structures to provide Fire services through county-wide arrangements.

---

[16] Expert Report of Michael B. Brown, April 13, 2020, p. 4.
[17] National League of Cities, Small Cities Council: https://www.nlc.org/small-cities-council
[18] 2010 Census Urban and Rural Classification and Urban Area Criteria: https://www.census.gov/programs-surveys/geography/guidance/geo-areas/urban-rural/2010-urban-rural.html
[19] United States Census Bureau
[20] Dunwoody Comprehensive Annual Financial Reports

**A comparison of Doraville's Fine and Forfeiture Collections versus a peer group range of between 5,000 and 50,000 does not impact my conclusion that the City is more dependent on Fine and Forfeiture revenues than other cities.**

As discussed in detail above, my report used a range of 5,000 to 15,000 people which was a more conservative range of peers for a city with a population on the lower end of the spectrum. This range compares cities that provide a more similar range of services. Exhibit 6 below compares Doraville to cities with populations ranging between 5,000 and 50,000 people, as well as major metropolitan cities.[21]

**Exhibit 6: Doraville Comparison to Cities with Populations of 5,000 to 50,000 People**

| Category | FY2008-FY2019 Doraville (CAFR) | FY2018 Doraville (CAFR) | Top Metro Cities (400K-8.5M) | 5,000-15,000 (GA) | 5,000-15,000 (U.S.) | 5,000-50,000 (GA) | 5,000-50,000 (U.S.) |
|---|---|---|---|---|---|---|---|
| Fines and Forfeitures as a Percent of Revenue | 21.9% | 16.4% | 1.2% | 3.1% | 1.4% | 3.0% | 1.3% |
| Fines and Forfeitures Per Capita | $242.89 | $188.29 | $82.15 | $45.34 | $21.28 | $42.83 | $21.09 |
| Police Expenditure as a Percent of General Expenditure | 51.1% | 51.3% | 7.7% | 19.2% | 17.2% | 18.8% | 16.4% |
| Judicial Expenditure as a Percent of General Expenditure | 5.2% | 4.8% | 0.7% | 1.7% | 1.1% | 1.9% | 1.1% |

In FY2018, Doraville generated 16.4 percent of annual revenue from Fines and Forfeitures. In contrast, cities with populations ranging between 5,000 and 50,000 people in Georgia and the United States generated 3.0 percent and 1.3 percent, respectively. Similarly, the average major metropolitan city generated 1.2 percent. Doraville's percentage of Fines and Forfeitures revenues are nearly 14 times (14X) greater than the average major metropolitan city.[22]

In addition, Doraville's FY2018 Fines and Forfeitures per capita was $188.29. In contrast, cities with populations ranging between 5,000 and 50,000 people in Georgia and the United States show Fines and Forfeitures revenues of $42.83 and $21.09 per capita, respectively. The average major metropolitan city generated $82.15. Doraville's Fines and Forfeitures per capita were two times (2X) greater than the average major metropolitan city.

Doraville spent 51.3 percent of their annual expenditures on their police department in FY2018. This is three times (3X) greater than cities with populations ranging between 5,000 and 50,000 in

---

[21] *2017 Census of Governments*, United States Census Bureau.
[22] The major metropolitan city subset includes the following six cities: (1) Atlanta, GA, (2) Chicago, IL, (3) Dallas, TX, (4) Houston, TX, (5) Los Angeles, CA, and (6) New York, NY.

Georgia and the United States and nearly seven times (7X) greater than the average major metropolitan city.

Finally, Doraville spent 4.8 percent of their annual expenditures on their Municipal Court in FY2018, while cities with populations ranging between 5,000 and 50,000 in Georgia and the United States spent 1.9 percent and 1.1 percent, respectively. Doraville's percentage is seven times (7X) greater than the average major metropolitan city, which spent 0.7 percent of their annual expenditures on their Municipal Court.

In summary, even when compared to cities with populations ranging between 5,000 and 50,000 people, as well as major metropolitan cities, my original conclusions are not impacted with the original analysis of cities of population of 5,000 to 15,000. Based on the analysis above, Doraville is more dependent on Fines and Forfeitures as a source of revenue and spends significantly more of their annual expenditures on their criminal justice departments.

6.     **MR. BROWN INCORRECTLY ARGUES THE CITY IS NOT LIMITED BY THE 10 MILL PROPERTY TAX CAP BECAUSE THE CITY IS LIMITED IN ITS ABILITY TO RAISE OWN-SOURCE GENERAL-PURPOSE TAX REVENUES.**

In my report dated February 5, 2020, I conclude that Doraville is limited in its fiscal capacity to raise General Purpose revenues through the primary revenue raising measures local governments can utilize to fund city service and operations. Because the City was limited in raising general purpose revenues through the major own-source tax revenue streams, the City disproportionately relied on Fine and Forfeiture revenues as a source of General Purpose revenues.

In his report, Mr. Brown states, "The Zielke Report erroneously concludes that Doraville is unable to increase revenues from any source other than by increasing fines and fee revenues, since Doraville's charter imposes an absolute ten mill cap on its property tax rate." In his report, Mr. Brown argues that the state has other options to raise General Purpose revenues outside of the 10 mill Property Tax cap which can be used to fund general purposes, such as the special tax district

ad valorem tax and the SPLOST.[23] These monies, however, cannot be used to fund general purposes.

## **Doraville has a limited number of revenue streams that are unrestricted in use.**

As a municipality, Doraville receives revenues from various own-source and intragovernmental revenues. The City's FY2020 Adopted Budget provides an overview of the revenues received and the purposes for which they can be used. The General Fund is the City's most robust tool to fund City operations. General Fund revenue streams include:

- Property Taxes and assessments
- Business and Occupation Taxes
- Licenses and permits
- Charges for Services
- Fines and Forfeitures
- Investment Income

The City also receives intragovernmental transfers from the State and County which can also be used for general operations. The remainder of funds and revenue streams are specifically earmarked for a specific purpose per the FY2020 Adopted Budget as seen in below in Exhibit 7.

---

[23] Expert Report of Michael B. Brown, April 13, 2020, pp. 85-88.

**Exhibit 7: FY2020 Doraville Budget – Revenue Sources**[24]

| Fund Title | Major Revenue Sources | Major Services Provided |
|---|---|---|
| General | <ul><li>Property taxes and assessments</li><li>Business & occupation taxes</li><li>Licenses & permits</li><li>Charges for services</li><li>Fines & Forfeitures</li><li>Investment income</li></ul> | <ul><li>Public Safety</li><li>Public works</li><li>Parks & recreation</li><li>General government</li><li>Community development</li><li>Economic development</li></ul> |
| Confiscated Asset | <ul><li>Forfeitures by criminals that are prosecuted for narcotics or vice activity</li></ul> | <ul><li>Purchase of public safety equipment</li></ul> |
| Emergency 911 | <ul><li>E911 Charges</li></ul> | <ul><li>Maintenance and operation of E911 system</li></ul> |
| Tree Bank | <ul><li>Donations</li></ul> | <ul><li>Tree plantings</li></ul> |
| Hotel/Motel | <ul><li>Hotel and motel tax</li></ul> | <ul><li>Transfers to the DeKalb Convention & Visitors Bureau</li><li>Transfers to the General fund for promotional activities, special events, and tourism</li></ul> |
| Rental Motor Vehicle Excise Tax | <ul><li>Motor vehicle excise tax</li></ul> | <ul><li>Transfers to the General Fund for promotional activities, special events, and tourism</li></ul> |
| Multiple Grants | <ul><li>Federal, State, and Local Grants</li></ul> | <ul><li>Various operating and capital projects</li></ul> |
| Capital Projects | <ul><li>Transfer in from general fund</li></ul> | <ul><li>Payments for long-lived capital assets</li></ul> |
| SPLOST | <ul><li>Special purpose local option sales tax</li></ul> | <ul><li>Payments for long-lived capital assets</li></ul> |
| DDA | <ul><li>DDA fees</li></ul> | <ul><li>Revitalize and Redevelop the City's central business district</li></ul> |
| Urban Redevelopment | <ul><li>Proceeds from bonds and leases</li><li>Transfers from other funds</li></ul> | <ul><li>Redevelopment projects</li></ul> |
| Stormwater | <ul><li>Stormwater charges</li></ul> | <ul><li>Payments to operate stormwater utility and maintain stormwater infrastructure</li></ul> |
| Solid Waste | <ul><li>Sanitation Fee</li></ul> | <ul><li>Garbage collection</li></ul> |

---

[24] Doraville FY2020 Adopted Budget Document.

**Property Tax revenues, a local government's most robust General Fund revenue stream, are capped by the City Charter's 10 mill cap.**

The Property Tax is a City's most robust own-source revenue generating tool to fund general City operations[25], which Doraville is limited in collecting due to the local government tax millage ("mill") cap imposed by the City Charter. Property Tax collections are a function of the local mill rate multiplied by DeKalb County's assessed value of real and personal property. While the assessed value of property is linked to the current market value, Doraville sets the municipal mill rate which was last changed in 2018 to the maximum allowable of 10 mills. The increase in the mill rate subsequently increased the total percent of revenues derived by Property Taxes over time which simultaneously reduced Fine and Forfeiture collections, as seen in Exhibit 8 below.

**Exhibit 8: Comparison of General Fund Revenue Streams Against the Property Tax Mill Rate**



In Doraville, Property Tax collections constituted approximately 43.8 percent of General Fund revenues in 2019, or 36.4 percent of total governmental revenues.[26] Despite the increase in

---

[25] According to the Tax Policy Center, "Property taxes are the largest own-source of revenue for counties, cities, townships, school districts, and special districts…"
[26] Doraville Comprehensive Annual Financial Reports.

collections, this is still below the average for Georgia's local governments. Property Taxes in Georgia generally constitute 67.2 percent of total tax-derived revenues[27]; in Doraville, FY2018 revenues equate to only 55.5 percent. Similarly, Sales Taxes constitute 21.5 percent of tax-derived revenues in Georgia, compared to Doraville's 5.9 percent.

**Special Tax District revenues are specified for a single use and are not fungible.**

Mr. Brown's report cites that the City is able to create a special tax district which allows the City to levy ad valorem taxes in addition to the Property Tax. Mr. Brown states that, "Doraville's elected officials, at their option and with their own authority, may establish special tax districts—including a tax district that contains all or part of the geographic area of the city—to perform any municipal function."[28]

Mr. Brown asserts that the City is able to use these monies to fund general expenditures, however, special tax district revenues are collected to fund a specific program, purpose or project; it is not a fungible source of revenue that can be used to fund general City operations as needed. In his deposition taken on May 12, 2020, Mr. Brown states the following:

> *"Q. So is a special district -- is the money raised, I should say, using the special district limited to certain expenditures?*
>
> *A. Yes. But it could be any expenditure that the city chooses."* [29]

The City Council approved an ordinance to establish a special tax district to provide parking infrastructure services on May 15, 2017.[30] These special tax district revenues were collected for a specific purpose and, even if they flow back into the General Fund, are restricted use revenues that can only be used for the specified purpose. The purpose of General Fund revenues is to be flexible in use, however, these special tax district revenues cannot be repurposed to fund the City's

---

[27] Georgia State University Andrew Young School Fiscal Research Center, Georgia's Taxes: A Summary of Major State and Local Government Taxes, 2020.
[28] Expert Report of Michael B. Brown, April 13, 2020, pp. 85-86.
[29] Deposition of Michael B. Brown, May 12, 2020, p. 116.
[30] City of Doraville Ordinance No. 2017-13: http://cms.revize.com/revize/doraville/Ord.%20No.%202017-13%20Create%20Special%20Tax%20District%20(05-15-2017).pdf

operations in the event of an economic downturn or other revenue shortages because they can only be used for the predetermined purpose.

**Special Purpose Local Option Sales Tax (SPLOST) revenues are restricted for capital projects and are accounted for outside of the General Fund.**

In my report dated February 2020, I cite the City's collection of SPLOST revenues as a source of revenue explicitly used to fund capital projects. Mr. Brown cites the following:

> *"The Zielke Report erroneously concludes that Special Purpose Local Option Sales Taxes (SPLOST) usage by Doraville is limited to capital projects and may not be used for cities' general operating costs. This assertion is erroneous for the following reasons: (1) In Georgia, these revenues can be used for a wide range of fixed and non-fixed municipal goods and equipment for any city service.*
> *(2) For example, the police department can purchase police vehicles, light bars and sirens, radios, body cameras, weapons, flashlights, batons, handcuffs, uniforms, "leather," computers (including those in vehicles), office equipment, software, and building renovations."* [31]

Mr. Brown's assertion is incorrect, because Doraville indicates that SPLOST revenues are earmarked for specific capital projects that must be voter approved. The City's FY2019 Adopted Budget explicitly states that the City may not use funds for general operating expenditures: *"SPLOST was adopted in DeKalb County in the November 2017 state election. Funds are to be used for transportation capital projects. No more than safety 15% may be used for needed maintenance, primarily on public projects. **These funds may not be used for operating expense.**"* [32]

Additionally, the City's FY2019 CAFR states, *"The Special Purpose Local Option Sales Tax (SPLOST) fund accounts for the one-cent sales **tax that provides funding exclusively for capital projects** – roads, buildings, vehicles and major equipment, and other long-lived improvements."* [33]

---

[31] Expert Report of Michael B. Brown, April 13, 2020, p. 88.
[32] Doraville FY2019 Adopted Budget Document.
[33] Doraville FY2019 Comprehensive Annual Financial Report.

Therefore, Mr. Brown's assertion that the City can use these monies as a source of revenue to fund general operating expenditures when they are earmarked for a special capital project is incorrect. Mr. Brown states the following in his deposition regarding my expert report dated February 2020:

> *"But she says that that cannot be used for capital funding, and that's not really true. It can be used for – I think she believes it's only for things like buildings, but as a practical matter, that's simply not true in Georgia".[34]*

This statement is not correct; my report stated that:

> *"Dekalb County approved a special-purpose local-option sales tax ("SPLOST") in 2018, but the revenues from this tax must be used solely for capital outlays".[35]*

My reference to "capital outlays" refers to funding for capital improvements and/or outlays.  My report did state or conclude that SPLOST revenues were not available for defined capital projects or capital outlays.  For clarification, my report references "capital outlay" with the meaning that expenses under the authorization of the approved SPLOST are for capital projects that include one-time spending needs for "transportation and traffic projects, sidewalk repair and replacement, and pavement management; public safety and related capital equipment projects, such as replacement police vehicles, and public safety building improvements, and municipal courthouse renovations; and repairs to capital outlay projects, such as library improvements, various citywide parks improvements, and citywide signage".[36]

SPLOST revenues can only be used for "approved" capital outlay expenses and one-time expenditures for the City for designated spending purposes and not for re-occurring spending needs of the city for ongoing or reoccurring general purpose needs.

## Homestead Option Sales Tax (HOST) revenues can only be used to fund capital projects and are accounted for outside of the General Fund.

Mr. Brown's argues that my report is incorrect in stating that the City does not receive benefit from the general purpose Local Option Sales Tax (LOST). Mr. Brown states that the City receives HOST revenues in lieu of LOST revenues:

---

[34] Deposition of Michael B. Brown, May 12, 2020, p. 134.
[35] Zielke Report, February 6, page 11
[36] Doraville FY2019 Comprehensive Annual Financial Report

> *"The Zielke Report concludes that Doraville receives no Local Option Sales Tax (LOST) revenues—which the report posits are a substantial part of the revenues for other cities. Based on the intent of the Georgia Local Option Sales Tax statute, this assertion is erroneous for the following reasons: (1)  Counties have the option, with voter approval, to adopt a Homestead Option Sales Tax (HOST); 80% of the tax proceeds must be used by the County to reduce its general property taxes and the remainder must be distributed to the county and cities for capital projects. (2) This HOST tax relief is in lieu of LOST."*[37]

Mr. Brown asserts that the City collects a specific LOST, the Homestead Option Sales Tax (HOST) which can only be levied by counties that do not implement the general LOST. While the City collects HOST revenues in lieu of LOST, these revenue streams are not identical and are used for explicitly different purposes. LOST revenues can be used to broadly fund general City expenditures. HOST revenues, on the contrary, can only be used to fund capital projects and are deposited into a segregated special purpose fund. These collections cannot be used to fund general City expenditures, and therefore are not a general revenue funding stream for the City. In addition, according to the FY2019 Adopted Budget, *"The HOST revenue budget has been reduced to zero to reflect the elimination of HOST now that SPLOST has been adopted and is in effect."*[38]

## **Mr. Brown incorrectly cites the unrealized and uncollected development area revenues as a source of General Fund revenue for the City.**

Mr. Brown sites the collection of future development revenues as a source of General Fund operating revenues. Mr. Brown states:

> *"The Zielke Report concludes that Doraville has few revenue options available other than by increasing fines and fees revenues. This conclusion is erroneous for the following reasons: (1) Notwithstanding another U.S. recession (now underway), Doraville is poised for very high value transit-oriented development. (2) The former GM Doraville plant site can sustain over $1 billion in new development, and some estimates are for over $3 billion in development. (3) Even a net increased taxable value of $500 million at the site would produce $5 million annually in new property tax revenues to the City. (4) The self-imposition of a flexible property tax rate cap is an attraction to major, long-term investors."*[39]

---

[37] Expert Report of Michael B. Brown, April 13, 2020, p. 87.
[38] Doraville FY2019 Adopted Budget Document.
[39] Expert Report of Michael B. Brown, April 13, 2020, p. 88.

Mr. Brown is speculating on a series of revenue measures that have neither been implemented nor realized. He also concedes that these proposed development revenues may not be collectable in light of a recession. Mr. Brown admits the following in his deposition:

> *Q. In a recession, for example, isn't it true that it would be less likely for people and businesses to fill that site?*
>
> *A. Of course, and they've already experienced the recession in 2008, but as soon as the country is going to be great again, and when that happens we can bet that this is going to get developed.*[40]

In addition, the FY2020 Adopted Budget states, "the City forecasts the 2019 total net tax digest to rise by approximately 4.42% due to higher valuations and new developments. Note that with this growth, the City has realized increased service demands associated with new development."[41] While the City may collect additional revenues due to higher valuations and new developments, the City must also provide increased services; these additional services ultimately place budget pressures on the City. New revenues from development would not likely reduce the overall burden on the general fund.

### A more robust revenue base decreases reliance on Fine and Forfeiture revenues.

Mr. Brown argues "city revenues can vary significantly depending on sources of revenue such as storm water fees, hotel/motel taxes, and business taxes. Higher collections from these sources lowers a city's share of police expenditures".[42] In particular, Mr. Brown states that stormwater revenues are included in the General Fund of some peer municipalities in my analysis, but not all, arguing it is artificially lowering the percent of fines and fees derived for those peer cities.

Exhibit 9 analyzes fine and forfeiture revenues of the peer cities that I could definitively determine maintained a proprietary stormwater fund outside of the General Fund.

---

[40] Deposition of Michael B. Brown, May 12, 2020, p. 124.
[41] Doraville FY2020 Adopted Budget Document.
[42] Expert Report of Michael B. Brown, April 13, 2020, p. 51.

**Exhibit 9: Doraville Stormwater Fund Peer Comparison**

| CAFR Data | FY2008-FY2019 Doraville | FY2018 Doraville | Georgia Peer Cities (5-50k residents) with separate Stormwater Fund |
|---|---|---|---|
| Fine and Forfeiture Revenues as a percent of General Fund Revenues | 21.9% | 16.4% | 6.2% |

My analysis finds that Doraville's Fine and Forfeiture revenues as a percent of General Fund revenues are still higher than the peer cities with between 5,000 and 50,000 residents that account for stormwater revenues outside of the General Fund[43] demonstrating that Doraville is more dependent on Fine and Forfeiture revenues.

Mr. Brown also cites that cities may collect higher hotel/motel taxes and business taxes thus reducing the proportion of Fine and Forfeiture revenues. Cities with higher collections from tax-derived, own source general revenues due to a strong commercial and economic base would not need to rely on Fine and Forfeiture revenues. Having a robust and diverse revenue stream[44] is the type of municipal fiscal best practice that would reduce reliance on unpredictable Fine and Forfeiture revenues and allow the City to prosper on own-source taxable revenues.

**As Doraville's expenditures increased, fine and forfeiture revenues increased simultaneously to meet and maintain the City's budget.**

In his deposition dated May 12, 2020, Mr. Brown states the following:

> Q. If fines and fees -- or fines and forfeitures revenues disappeared from Doraville's general fund, would that have an effect on the city's finances?
>
> A. Of course.
>
> Q. What kind of effect would that have?
>
> A. Whatever that amount of money is, it would be eliminated from their budget.

---

[43] Peer cities included have a population between 5,000 and 50,000 residents and have a designated separate stormwater fund similar to Doraville.

[44] Government Finance Officers' Association Recommended Budget Practices recommends that local governments adopt a revenue diversification policy to "improve a government's ability to handle fluctuations in revenues and potentially help to better distribute the cost of providing services".

*Q. Would Doraville have to balance its budget if those -- well, I guess "rebalance" is the word they use. Would Doraville have to rebalance its budget if those revenues disappeared?*

*A. Yeah, just as every other city would have to rebalance its budget if revenues disappeared.[45]*

Per Mr. Brown, the City's budget would not be able to be maintained without Fine and Forfeiture revenues. Doraville experienced an approximate 16% increase in expenditures in FY2009 and FY2010 from FY2008 levels. The City's non-fine and forfeiture revenues, however were not able to meet the increase in expenditures, as indicated by the blue arrow in Exhibit 10.

**Exhibit 10: Doraville Uses Fine and Forfeiture Revenues to Meet Increase in Expenditures**



The City saw a dip in other General Fund revenue sources (non-fine and forfeiture revenues) in FY2009 and FY2010. However, **as these revenues declined and the gap between revenues and expenditures grew, the City simultaneously increased collections of Fine and Forfeiture**

---

[45] Deposition of Michael B. Brown, May 12, 2020, pp. 153-154.

**revenues**. Likewise, in 2018 and beyond, as <u>the gap between revenues and expenditures narrowed,</u> the city has decreased collections of Fine and Forfeiture revenues. The increase in these revenues as all other revenue sources fell, and the decrease in them as other sources grew, demonstrates the City's use of Fine and Forfeiture revenues to fill budget gaps and its dependence on them as a reliable revenue source.

7.   **COLLEGE PARK AND HAPEVILLE, WHICH MR. BROWN IDENTIFIED AS DORAVILLE'S "TRUE PEERS", ARE NOT DEPENDENT ON FINE AND FORFEITURE REVENUES AS IS DORAVILLE.**

Mr. Brown identifies College Park and Hapeville as Doraville's "true peers". Mr. Brown states, "Doraville is not a typical small city. College Park and Hapeville, both of which would qualify as true 'peer' cities to Doraville, are also struggling to cope with the growth of the Atlanta metro area."[46] In my analysis presented below in Exhibit 11, I compare the cities of Hapeville and College Park to Doraville on population, traffic and Fine and Forfeiture and General Fund revenue metrics.

**Exhibit 11: Doraville Compared to Mr. Brown's "True" Peers**

| Category | FY2008-FY2019 Doraville | FY2018 Doraville | FY2018 Hapeville | FY2018 College Park |
|---|---|---|---|---|
| Population | 9,996 | 10,896 | 6,650 | 14,601 |
| AADT | - | 1,003,780 | 411,500 | 2,259,710 |
| Fines and Forfeitures | 2,384,020 | 2,051,582 | 209,066 | 711,594 |
| General Fund Revenues | 10,864,473 | 12,496,138 | 10,129,444 | 26,800,825 |
| Fines and Forfeitures as a Percent of GF Revenues | 21.94% | 16.40% | 2.10% | 2.70% |

<u>**Doraville collects higher Fine and Forfeiture revenues and is more dependent on these revenues than its similarly situated "true peers."**</u>

Mr. Brown argues that Hapeville and College Park are true peers of Doraville given the cities similarly accommodate the economy and traffic of the metro Atlanta area. Per the Georgia

---

[46] Expert Report of Michael B. Brown, April 13, 2020, p. 33.

Department of Transportation's traffic data reporting, Doraville recorded a 2018 AADT measure of 1,003,780 vehicles which is higher than Hapeville's AADT of 411,500 but lower than College Park's AADT of 2,259,710. Despite College Park's higher traffic measure, Doraville collected nearly three times (3X) more Fine and Forfeiture revenues than College Park.[47]

In response to my analysis reporting per capita metrics, Mr. Brown argues that my report dated February 5, 2020 "compares fines and fee revenues for traffic enforcement based solely on cities' population-- instead of comparing cities' fines and fee revenues based on the cities' traffic volumes". Exhibit 12 compares Doraville's Fine and Forfeiture revenues to Hapeville and College Park both on a per capita and per traffic count basis.

**Exhibit 12: Doraville and Mr. Brown's "True" Peers Fines and Forfeiture Revenue Comparison**

| FY2018 CAFR | Doraville | Hapeville | College Park |
|---|---|---|---|
| Fines and Forfeitures per Capita | $188.28 | $31.43 | $48.73 |
| Fines and Forfeitures per Traffic Count | $2.04 | $0.51 | $0.31 |

Doraville's Fine and Forfeiture revenues, when calculated on a per traffic count basis, are approximately 4x and 6x that of Hapeville and College Park, respectively.

**Hapeville and College Park have more robust General Fund revenue collections from primary revenue sources than Doraville.**

Doraville has higher Fine and Forfeitures per traffic count due to its reliance on these revenues to fund General Fund expenditures. As discussed in Section VI above, Doraville's limited revenue streams to fund general services and operations causes the City to rely on Fines and Forfeitures to fund General Fund expenditures. Exhibit 13 below compares the City's General Fund revenue streams versus Hapeville and College Park.

---

[47] Mr. Brown also cites the increase in "sex trafficking, illegal drugs and criminal offenses associated with travelers, the airport, and conventions" for cities like College Park and Hapeville that is not captured in the traffic count measure.

**Exhibit 13: Doraville and Mr. Brown's "True" Peers Revenue Source Comparison**

| FY2018 CAFR | Doraville | % of GF Revenue | Hapeville | % of GF Revenue | College Park | % of GF Revenue |
|---|---|---|---|---|---|---|
| Property Taxes | 4,969,450 | 39.8% | 5,198,135 | 51.3% | 11,894,993 | 44.4% |
| Sales Taxes | 530,509 | 4.2% | 1,865,494 | 18.4% | 4,467,332 | 16.7% |
| Franchise Taxes | 973,210 | 7.8% | 665,196 | 6.6% | 2,324,037 | 8.7% |
| Business Taxes | 1,632,516 | 13.1% | 631,991 | 6.2% | - | 0.0% |
| Other Taxes | 841,281 | 6.7% | 433,106 | 4.3% | 1,853,150 | 6.9% |
| Licenses and Permits | 1,262,976 | 10.1% | 519,926 | 5.1% | 4,043,351 | 15.1% |
| Intergovernmental | 34,977 | 0.3% | 22,340 | 0.2% | 20,000 | 0.1% |
| Fines and Forfeitures | 2,051,582 | 16.4% | 209,066 | 2.1% | 711,594 | 2.7% |
| Charges for Services | 115,037 | 0.9% | 384,080 | 3.8% | 579,625 | 2.2% |
| Investment Earnings | 1,218 | 0.0% | 781 | 0.0% | 338,199 | 1.3% |
| Contributions and Donations | 24,682 | 0.2% | 5,290 | 0.1% | - | 0.0% |
| Other Revenues | 58,700 | 0.5% | 194,039 | 1.9% | 568,544 | 2.1% |
| **Total** | **12,496,138** | | **10,129,444** | | **26,800,825** | |

In FY2018, 16.4 percent of Doraville's General Fund revenues were derived by Fine and Forfeiture revenues. In comparison, only 2.1 percent and 2.7 percent of General Fund revenues were derived by Fines and Forfeitures for Hapeville and College Park, respectively.

Both peer cities are more reliant on General Fund revenue streams in Property and Sales Taxes than Doraville.  While Hapeville's total General Funds revenues are nearly 20 percent lower than Doraville's, Hapeville collected 5 percent more in Property Taxes in FY2018 and 3.5 times (3.5X) more in Sales Taxes. Doraville collected 39.8 percent of General Fund revenues from Property Taxes in FY2018, less than Hapeville's 51.3 percent and College Park's 44.4 percent. Similarly, Sales Tax revenues constitute only 4.2 percent of General Fund revenues in Doraville compared to 18.4 percent and 16.7 percent in Hapeville and College Park, respectively.

Unlike Doraville, these "true peers," do not depend on Fine and Forfeiture revenues to fund general purpose expenditures. With similar juxtaposition to major interstates and high traffic flow, these peer cities do not collect as much revenue from fine and forfeitures on an absolute basis.

8.    **MR. BROWN'S ARGUMENT THAT A MUNICIPAL COURT COST FEE BASED ON A COST ASSESSMENT IS IMPRACTICAL IS UNSUPPORTED.**

In my initial report, I identified that the municipal court cost fee was not determined using municipal best practices as the City arbitrarily selected a fee and did not perform a cost assessment to determine the fee. Furthermore, the City uses the fee collections to fund capital projects, and does not repurpose fee collections back into the justice system. A fee, such as the municipal court cost fee, should be determined by the cost of the service rendered and should be used to partially offset the cost of rendering the service.

In his report, Mr. Brown asserts that, "...cost accounting and cost recovery for the services would be impracticable. For example, conducting cost analysis for recreation services is difficult, and achieving full cost recovery would be harmful to children and adults."[48] Furthermore, Mr. Brown states in his deposition dated May 12, 2020:

> *"So I just think it's impracticable to say that you're going to apply cost accounting to the operation of a court, and my guess is that a judge -- any judge you ask, they would say, "Don't do that." What you want to do is have court fees, which are used throughout all of the different systems in Georgia, and, as far as I know, elsewhere. And you just set fees, and that's what they are. You don't do cost accounting for them. I'm just saying, there should be a meter in the court, and then you pay according to how much of the meter you use. That's not right."[49]*

Mr. Brown's interpretation of the Zielke report is incorrect. I did **not** conclude that the court fee must be subject to a cost-of-service analysis because it is intended to be a full cost recovery of the court's operating costs. Instead, I concluded that it should help recover a pre-defined portion of the overhead and administrative, non-personnel costs to provide the court service.[50] A cost of service analysis is used precisely to determine the overhead and administrative, non-personnel costs. My conclusion accords with the guidance provided by the National Center For State Courts' National Task Force on Fines, Fees and Bail Practices (the "Task Force"). The Task Force was

---

[48] Expert Report of Michael B. Brown, April 13, 2020, pp. 89.
[49] Deposition of Michael B. Brown, May 12, 2020, p. 143.
[50] Expert Report of Nancy L. Zielke, February 5, 2020, p. 17-18.

established to provide guidance to municipal and state courts on fine and fee collection best practices. The Task Force's findings, outcomes and recommendations state the following:

> "While situations occur where user fees and surcharges may be necessary, such fees and surcharges should always be minimized and **should never fund activities outside the justice system**. Fees and surcharges **should be established only for "administration of justice" purposes.** "Administration of justice" should be narrowly defined and in no case should the amount of such a fee or surcharge exceed the actual cost of providing the service. **The core functions of courts, such as personnel and salaries, should be funded by general tax revenues**."[51]

Per the guidance of the National Center For State Courts Task Force, it is recommended best practice for municipalities to determine fee schedules based on the actual cost of delivering the service, in this case, court services. Additionally, the municipal court cost fee should be used to support court purposes, not fund capital projects of the City.

## 9.    MR. BROWN'S DOES NOT ADEQUATELY JUSTIFY DORAVILLE'S HIGH POLICE EXPENDITURES .

### Excluding Fire Department expenditures, police spending constitutes as higher percent of General Fund spending than peers.

Mr. Brown argues that Doraville's police department expenditures looks artificially high versus peers as the City does not pay for fire department expenditures from General Fund expenditures. Doraville contracts with DeKalb County to provide fire protection services to the City which is common to several peer cities. Exhibit 14 below presents Doraville's police department expenditures as a percent of General Fund expenditures against Mr. Brown's "true peers" excluding fire department expenditures.

---

[51] National Center for State Courts, National Task Force on Fines, Fees and Bail Practices: Principles on Fines, Fees and Bail Practices:
https://www.ncsc.org/~/media/Files/PDF/Topics/Fines%20and%20Fees/Principles%201%2017%2019.ashx

**Exhibit 14: Doraville's Police Expenditures as a Percent of General Fund Revenues Net of Fire Expenditures Compared to Peers**

| Category | FY2008-FY2019 Doraville | FY2018 Doraville | FY2018 Hapeville | FY2018 College Park |
|---|---|---|---|---|
| Police Expenditures | 5,351,908 | 6,378,605 | 2,950,783 | 11,581,981 |
| General Fund Expenditures Net Fire Dept. Expenditures | 10,465,113 | 12,432,878 | 8,891,594 | 24,264,208 |
| Police Expenditures as a percent of GF Expenditures (net Fire Dept. Expenditures) | 51.1% | 51.3% | 33.2% | 47.7% |

Even when excluding fire department expenditures, Doraville's police department expenditures are higher than that of peer cities. Doraville's police expenditures were 51.3 percent of General Fund expenditures in FY2018 compared to the average of the 67 peer cities[52] of 31.6 percent.

Additionally, Doraville's police department expenditures exceed that of its "true peers" as identified by Mr. Brown. Doraville's police expenditures are higher than Hapeville's 33.2 percent and College Park's 47.7 percent. In his report Mr. Brown states the following:

> "According to the Zielke Report, it is not necessary to consider sex trafficking, illegal drugs and criminal offenses associated with travelers, the airport, and conventions.26 College Park law enforcement works with airport police, MARTA, and Atlanta and other cities' law enforcement agencies to combat these problems for the City of Atlanta, the Atlanta metro area, and the state. College Park Police must address traffic safety on the roads and streets. College Park has a 2 million average daily traffic volume in the portion of the College Park shown on the map above.27 College Park, with effectively no help from the Georgia state patrol, and with no help from any other agency, must ensure traffic safety in these areas."[53]

---

[52] Average of 49 out of 67 peer cities using FY2018 CAFR data where I was able to clearly identify the inclusion or exclusion of fire department expenditures; Public Safety and General Fund Expenditures were reduced by amount of fire department expenditures for those cities that include fire department expenditures in the general fund; the average includes Hapeville and College Park

[53] Expert Report of Michael B. Brown, April 13, 2020, p. 36.

Mr. Brown identifies that College Park has additional policing needs due to the presence of the airport. Even with these additional needs, Doraville exceeds College Park's police spending as a percent of General Fund revenues.

**Mr. Brown makes unsupported justifications that the City has a higher proportion of General Fund expenditures on police spending due to factors such as population density, diversity and traffic measures.**

Mr. Brown's report indicates that the proportion of Doraville's General Fund expenditures spent on police is higher than its peers due to Doraville's population density.[54] According to the United States Census Bureau, Doraville's population density is 2,326 people per square mile, which ranks as one of the highest among Doraville's 67 peers with populations ranging between 5,000 and 15,000 people.[55] In response to Mr. Brown's report, I compared Doraville's population density and police expenditures against six major metropolitan cities, as shown in Exhibit 15 below. This analysis is based on data gathered from CAFRs related to Doraville and the six major metropolitan cities listed below.

**Exhibit 15: Doraville Population Per Square Mile Peer Comparison**

| City | Population Per Square Mile | Compared to Doraville | Percent of Total Expenditures | Compared to Doraville |
|---|---|---|---|---|
| **Doraville, GA** | **2,326** | **1.00** | **51.3%** | **1.00** |
| New York, NY | 27,013 | 0.09 | 6.8% | 7.55 |
| Chicago, IL | 11,842 | 0.20 | 42.1% | 1.22 |
| Los Angeles, CA | 8,092 | 0.29 | 30.6% | 1.68 |
| Dallas, TX | 3,518 | 0.66 | 37.3% | 1.38 |
| Houston, TX | 3,502 | 0.66 | 52.5% | 0.98 |
| Atlanta, GA | 3,154 | 0.74 | 32.1% | 1.60 |
| **Average** | **8,492** | **0.27** | **36.1%** | **1.42** |

As previously mentioned, Doraville's population density totals 2,326 people per square mile. However, in 2018, Doraville spent 51.3 percent of its annual expenditures on its police department. In contrast, the average major metropolitan city spent 36.1 percent with a population density of

---

[54] Ibid., p. 24.
[55] United States Census Bureau.

8,492 people per square mile. Doraville's police expenditures as a percent of total expenditures are nearly one and a half times (1.5X) greater than the average major metropolitan city, while its population density is nearly four times (4X) less than the average major metropolitan city. Therefore, Doraville spends a disproportionate amount of its annual expenditures on police enforcement, even when compared to cities with significantly higher population densities.

Additionally, Mr. Brown argues that the City's high traffic count is a reason for higher than average police expenditures. Mr. Brown states, that the City "Has more commuters and more dense employment commuting. Exhibit 16 below compares Doraville to other cities with high traffic such as College Park, Covington and Douglas.

**Exhibit 16: Doraville's Traffic and Police Expenditures Compared to High Traffic Area Peers**

| Category | FY2008-FY2019 Doraville | FY2018 Doraville | FY2018 College Park | FY2018 Covington | FY2018 Douglas |
|---|---|---|---|---|---|
| AADT | - | 1,003,780 | 2,259,710 | 681,130 | 577,130 |
| Police Expenditures | 5,351,908 | 6,378,605 | 11,581,981 | 6,850,387 | 3,553,396 |
| Police Expenditures as % of General Fund Revenues (net Fire) | 51.1% | 51.3% | 47.7% | 42.9% | 35.6% |

Compared to other cities with high traffic counts with a similar population size, Doraville spends a higher portion of General Fund revenues on police expenditures.

Further, Mr. Brown's report asserts Doraville's police expenditures are in part due to Doraville's location "at the epicenter of traffic and traffic congestion in metro Atlanta."[56] To illustrate his point, Mr. Brown cites ATRI, which compiles a Top 100 list of worst freight bottlenecks. As previously mentioned, Mr. Brown notes the intersection of I-285 and I-85 is located within the city limits of Doraville. ATRI ranked the intersection of I-285 and I-85 (north) as the worst freight bottleneck in 2017. However, ATRI cites that the intersection is located within Atlanta, GA. In addition, a review of a Doraville city map indicates the intersection of I-285 and I-85 is located

---

[56] Expert Report of Michael B. Brown, April 13, 2020 p. 53.

outside of the city limits. Nonetheless, even considering the other cities noted in the 2017 Top Ten worst freight bottlenecks list, Doraville spends a disproportionate amount of its annual expenditures on police enforcement, as shown in Exhibit 17 below.[57]

**Exhibit 17: Doraville's Police Expenditures Compared to Top Ten Worst Freight Bottleneck Cities**

| City | Percent of Total Expenditures | Compared to Doraville |
|---|---|---|
| Atlanta, GA | 32.1% | 1.60 |
| Auburn, WA | 49.8% | 1.03 |
| Chicago, IL | 42.1% | 1.22 |
| Cincinnati, OH | 35.3% | 1.45 |
| **Doraville, GA** | **51.3%** | **1.00** |
| Fort Lee, NJ | 19.6% | 2.62 |
| Houston, TX | 52.5% | 0.98 |
| Los Angeles, CA | 30.6% | 1.68 |
| Louisville, KY | 28.9% | 1.77 |
| Seattle, WA | 25.5% | 2.01 |
| **Average** | **36.8%** | **1.40** |

**<u>Mr. Brown does not provide justification or a reason why diversity is a contributing factor to the City's higher police expenditures.</u>**

Mr. Brown also makes the assertion that the City's diversity and ethnographic makeup should influence the level of police expenditures in the community.[58] Mr. Brown reference's the City's higher than average Latino population as a unique quality to the City that contributes to higher police department expenditures. However, this assertion is unsupported and irrelevant to justify the City's police expenditures. In his report Mr. Brown states the following:

> Q. ...Doraville has a high number of persons per household reflective of the predominantly Latino
> population," why is that relevant to the conclusions in your report?
> A. Because every police officer needs to fully understand the population that they serve.[59]

---

[57] American Transportation Research Institute, 2017 Top 100 Truck Bottleneck List. Data gathered from CAFRs related to Doraville and the cities listed in the Top Ten worst freight bottlenecks list, except for Fort Lee, NJ. Data for Fort Lee, NJ was gathered from the *2017 Census of Governments*, United States Census Bureau.
[58] Expert Report of Michael B. Brown, April 13, 2020, p. 72.
[59] Deposition of Michael B. Brown, May 12, 2020, pp. 43-44.

Mr. Brown also adds the following:

> Q. And I understand that. What is the connection between the predominantly Latino population and density?
> A. Well, the census actually shows that the size of -- it's in the research, but there tends to be a little bit higher household.

Mr. Brown does not explain why the size of a Latino household would ultimately justify higher police expenditures, nor does he provide a source upon which he based his own statement.

**<u>Mr. Brown incorrectly states that my analysis of police expenditures relied on a comparison to peer cities on a per capita basis although I never provided a comparison on a per capita basis.</u>**

Mr. Brown's report incorrectly asserts that my expert report submitted on February 5, 2020 compared Doraville's police expenditures to its peers on a per capita basis.[60] My report compared police department expenditures as a percent of total expenditures to Georgia and US peer cities with a similar population of between 5,000 and 15,000.

Per capita metrics, however, are commonly used by government agencies, financial services organizations, universities and policy thought leaders as a directional indicator. Some of the leading research and data organizations commonly use per capita metrics including, but not limited to, FBI Uniform Crime Reporting Program in reporting crime, National Statistical Rating Organization in reporting debt metrics and, the Kaiser Family Foundation in reporting government health expenditures. These metrics provide a directional indication of crime frequency, debt load and spend on the average citizen.

As such, the Bureau of Justice Statistics (BJS) measures Georgia's local government police expenditures in the 2016 Justice Expenditure and Employment[61] series, as seen in Exhibit 18 below.

---

[60] Ibid., p. 6.
[61] Bureau of Justice Statistics Justice Expenditure and Employment Extracts presents estimates of government expenditures and employment at the national, federal, state, and local levels for the following justice categories: police protection, all judicial and legal functions (including prosecution, courts, and public defense), and corrections.

**Exhibit 18: Doraville's Police Expenditures versus Georgia Cities As Reported By BJS**

| Category | FY2008-FY2019<br>Doraville | FY2018<br>Doraville | Georgia: All Cities (BJS)<br>*State and Local Cumulative* |
|---|---|---|---|
| Police expenditures as percent of government expenditures | 51.14% | 51.30% | 11.50% |
| Police expenditures per Capita | $538.90 | $585.41 | $263.80 |

Georgia's cumulative state and local government police expenditures constitute 11.5 percent of total expenditures. Doraville's Police Department expenditures, in comparison, are nearly five times (5X) that at 55.9 percent of General Fund expenditures in FY2019. Similarly, BJS measures Georgia's cumulative state and local government police expenditures per capita as $263.8 compared to Doraville's per capita expenditures of $696.2.

## 10.   MR. BROWN MAKES ADDITIONAL ARGUMENTS THAT ARE INCORRECT AND UNSUPPORTED.

### Mr. Brown incorrectly asserts that my report compared Doraville's budget and traffic flow to that of Ferguson, Missouri.

In his report, Mr. Brown states, "the Zielke Report references Ferguson MO, clearly making a comparison between Ferguson and Doraville as it relates to police expenditures. However, Ferguson and Doraville are not comparable based on key measures of traffic volume (as well as numerous demographic and economic measures)."[62] My report cites an article titled "Ferguson City Finances: Not the New Normal."[63] The intent of this citation is to show a similar analysis performed for a larger municipality which was benchmarked against a larger peer range of between 5,000 and 50,000 inhabitants. The City of Ferguson, Missouri has a population of approximately 21,000 compared to Doraville's approximate 10,000. Doraville's peer range of between 5,000 and 15,000 was narrower than Ferguson's peer range of 5,000 to 50,000 to reflect a smaller population, economic base and city services. A comparison of fine collections or traffic flows to Ferguson, Missouri is not provided at any point in the body of my report.

---

[62] Expert Report of Michael B. Brown, April 13, 2020 p. 66.
[63] Urban Institute, Ferguson City Finances: Not the New Normal, April 2015: https://www.urban.org/urban-wire/ferguson-city-finances-not-new-normal

Mr. Brown also incorrectly compares Ferguson's traffic volume to Doraville's, a comparison which was never mentioned or alluded to in my expert report. Mr. Brown's report states the following:

> "*The highest daily traffic count near Ferguson is 148,222 vehicles which is at the intersection of I-270 and I-170 five miles from the center of Ferguson. Ferguson is not directly connected to this traffic and it is buffered from the I-270/I-70 intersection by the City of Kinloch, MO. Ferguson is on the periphery of St. Louis employment and population. The St. Louis metro area is half of the employment and one third of the population of the Atlanta MSA.*"[64]

I never said that Doraville and Ferguson have a similar city profile in my report. Despite this, Mr. Brown makes a comparison of traffic volumes.

## Mr. Brown incorrectly references City of Kansas City, Kansas' traffic data.

Mr. Brown incorrectly cites that traffic volume of I-435 West is located in Kansas City, Kansas. The traffic count Mr. Brown provided is in Leawood, Kansas at  I-435 West near the Missouri border which is approximately 15 miles from the city of Kansas City, Kansas.  The location cited by the Brown Report is in Johnson County, Kansas (Leawood, Kansas) versus Kansas City, Kansas.  The highest daily volume of traffic along I-435 North/South in Kansas City, Kansas just north of the I-70 and I-435 interchange is 67,900 according to the 2018 Kansas Department of Transportation traffic maps.

## Mr. Brown denigrates, without any support, the professional integrity and creditability of Nancy Zielke and her former employer the City of Kansas City, Kansas.

Mr. Brown, in his report and deposition, question my professional integrity and creditability as the author of the Plaintiff's Expert Report dated February 5, 2020. The Brown Report cites the following:

> "*The Zielke Report admonishes Doraville for failing to follow "best practice" by not conducting cost accounting for the $25 fee. Yet, Ms. Zielke herself, followed "worst financial and environmental practice" during her 16-year tenure with the Unified Government and Utilities Board since the Unified Government continues to discharge storm water and sewage during minor and major rainfall amounts.*

---

[64] Expert Report of Michael B. Brown, April 13, 2020 p. 66.

> *This means that, during rain events, all materials and items that go into the sanitary*
> *sewer system are flushed into the streams and onto the shores of the communities'*
> *rivers and creeks."[65]*

Additionally, Mr. Brown alleges that I did not follow "best practices" in recommending a plan for the City of Kansas City, Kansas in its combined stormwater and sewer challenges. In fact, Mr. Brown states that "Ms. Zielke herself, followed 'worst financial and environmental practice' during her 16-year tenure with the Unified Government and Utilities Board since the Unified Government continues to discharge storm water and sewage during minor and major rainfall amounts."[66] However, in his deposition, Mr. Brown cannot state what the standards for worst financial practices are or where they come from.[67]

For clarification purposes, the City of Kansas City, Kansas' ("KCK") original sewer system was built over 100 years ago with much of the original system still in use today. Like many other urban communities across the US with aged sewer system infrastructure, heavy storm rainwater can occasionally filter into the sewer system through storm drains and cracks in the pipes resulting in sewer overflows, which release a mixture of rainwater and sewage into our environment.

When I was employed with the KCK and later the Unified Government of Wyandotte County and Kansas City, Kansas, best practices in financial management were demonstrated and implemented. In fact, when I was employed with the then KCK various senior financial management and budget positions from 1984 to 1997, I did present in the City's five-year Capital Maintenance and Improvement Plan ("CMIP") studies to begin planning for the storm water challenges. During my tenure as the Finance/Budget Director, the City's annual budget funded CMIP projects to begin working to eliminate these types of overflows through an aggressive Sewer Repair Program to

---

[65] Expert Report of Michael B. Brown, April 13, 2020 pp. 89-90.
[66] Ibid.
[67] Deposition of Michael B. Brown, May 12, 2020, pp. 145-147 ("*Q. So just to nail down an answer on that, so there's no external like handbook on worst financial practices or environmental practices that you're referring to? A. Yes, it is because to the extent that we're still going to follow environmental laws in this country, since 1975 a worst environmental practice is to discharge combined storm water and sewage into the waters of the state. That is a worst practice anyone in the business would tell you that it is. I could take the quotes off. I could put them back on. That's a terrible, reprehensible don't go to the river's edge after a rainstorm. You may see some things you don't want to see. So I consider that, yes, to be a worst practice.*")

repair and rehabilitate KCK's wastewater pipes.  A new wastewater treatment plant was also planned which would also significantly relieve our separate sewer system.

The Brown Deposition[68] also failed to discuss the financial challenges of the KCK service area which is economically disadvantaged compared to the national population, including median household income, unemployment, and the portion of the population living below the poverty level. The Unified Government 2016 DRAFT ISO Plan stated that "Wyandotte County residents have the Integrated Overflow Control Plan lowest per capita income, highest rate of unemployment, and lowest overall health ranking compared to the remaining 104 Kansas counties". The financial reality of the KCK service area "creates substantial challenges to fund the utility adequately while maintaining tolerable rate burden".[69]

City and Unified Governments financial statements and budgets will show that due to financial limitations of the economically disadvantaged City ratepaying community, initial investments will target continued repair and renewal of the existing sewer system and the construction of critically important early action projects. Such projects will preserve existing assets and are expected to deliver the greatest possible benefits from these critical early program dollars.

In 2013, sixteen years after my departure, the Unified Government entered a Partial Consent Decree ("PCD") with the United States Environmental Protection Agency to develop and Integrated Overflow Control Plan ("IOCP"). The IOCP focused on repairing KCK's aging pipes and facilities to reduce sewer overflows and improve the reliability of the government's  sewer system. Like other US cities, the completion of the overall IOCP will require several decades to implement and must feature an iterative and adaptive process to ensure that it reflects the most affordable, cost-effective, and beneficial approaches.  Former City of KCK City Council's and the current Unified Governments have stated that:

> *"Once the existing system is renewed to a more sustainable condition and the early action projects are completed, the UG will reevaluate the community's financial capability, the benefits that have been achieved, and the identified goals and*

---

[68] Deposition of Michael B. Brown, May 12, 2020, pp. 145-150.
[69] DRAFT Integrated Overflow Control Plan (IOCP) Unified Government of Wyandotte County and Kansas City, Kansas Integrated Overflow Control Program September 30, 2016

*priorities to achieve additional sewer overflow reduction and water quality improvements."[70]*

Mr. Brown failed to mention or summarize in his report, as the 2013 Consent Decree Agreement recognized, during my employment with KCK the City obtained the required NPDES permits before discharging stormwater to local waterways: *"The existing stormwater management program at issue in this settlement was drafted by the Unified Government and made part of the stormwater discharge permit issued by the State of Kansas in 2001 and reissued in 2007."[71]*

## 11.    OVERALL CONCLUSION

In conclusion, Mr. Brown's report makes erroneous assertions about Doraville's dependence on Fine and Forfeiture revenues.  Mr. Brown's arguments regarding traffic data are invalid because he incorrectly included traffic outside of Doraville's boundaries. Additionally, the assertion he makes that Doraville's traffic volume explains its high Fine and Forfeiture revenues is not supported by the data. In fact, a city he identifies as a "true peer" generates less than half of the Fine and Forfeiture revenue than Doraville does, despite having almost double the amount of traffic volume. Even when compared to a larger peer group of cities with a resident population of between 5,000 and 50,000, Doraville is comparatively more dependent on Fine and Forfeiture revenues. This is primarily due to the City's limitation to raise general purpose revenues from primary Georgia local government revenue sources such as the Property and Sales Tax. Doraville's Property Tax mill cap and lack of LOST revenue collections, both general revenue sources, hinders its ability to raise general purpose revenues. The "options" that Mr. Brown cites – the option to create a Special Tax District and the SPLOST/HOST revenues, are limited options. The Special Tax District must be created with a special purpose / project. Similarly, SPLOST/HOST revenues are dedicated toward capital projects. These limitations lead to the City's comparative dependence on Fine and Forfeiture revenues as a source of general fund revenues to fund City operations.

---

[70] Ibid.
[71] DRAFT Integrated Overflow Control Plan (IOCP) Unified Government of Wyandotte County and Kansas City, Kansas Integrated Overflow Control Program September 30, 2016

## 12.    ACKNOWELEDGEMENT

This report is based on analyses, assumptions, and information gathered from our research related to the City of Doraville's current and prior year budgets, CAFRs, industry best practices and documents provided during discovery. The sources of information and bases for the expert opinions are stated herein.

Doraville did not provide the Plaintiffs with a complete set of requested documents, and therefore acceptable substitutes have been used where appropriate. For example, Doraville did not provide financial statements showing actual revenues and expenditures. The City's CAFRs were instead used as the basis for analysis for these years. For certain kinds of analysis, such as the review of Doraville's citation data, no real substitute was available.

While the sources of information reviewed appear reasonable and reliable, Alvarez & Marsal Public Sector Services, has not, as part of this engagement, performed an audit or review of any of the financial information used and therefore does not express an opinion or any other form of assurance on the accuracy of such information. Appendix A lists documents used in the preparation of this report.

Since my observations and conclusions are based on data provided by the City that are inherently subject to uncertainty and variation depending on evolving events, I do not represent them as results that will or will not be achieved. Some assumptions inevitably will not materialize while unanticipated events and circumstances will occur; therefore, the actual results achieved may vary materially from the examples and conclusions herein. The terms of our engagement do not provide for reporting on events and transactions that occurred subsequent to our research completed on June 5, 2020.

Respectfully submitted,

_Nancy L. Zielke_

_____
Nancy L. Zielke, Senior Director
Alvarez & Marsal Public Sector Services, LLC
June 5, 2020

**APPENDIX:  LIST OF REVIEWED MATERIALS**

1.  Doraville Comprehensive Annual Financial Statements, FY2008 – FY2019

2.  FY2018 College Park City Comprehensive Annual Financial Report

3.  FY2018 Doraville City Comprehensive Annual Financial Report

4.  FY2018 Byron City Comprehensive Annual Financial Report

5.  FY2018 Morrow City Comprehensive Annual Financial Report

6.  FY2018 Port Wentworth City Comprehensive Annual Financial Report

7.  FY2017 Clarkston City Comprehensive Annual Financial Report

8.  FY2018 Fairburn City Comprehensive Annual Financial Report

9.  FY2017 Richmond Hill City Comprehensive Annual Financial Report

10. FY2018 Garden City Comprehensive Annual Financial Report

11. FY2018 Powder Springs City Comprehensive Annual Financial Report

12. FY2015 Adel City Comprehensive Annual Financial Report

13. FY2018 Stone Mountain City Comprehensive Annual Financial Report

14. FY2018 Fort Oglethorpe City Comprehensive Annual Financial Report

15. FY2015 Moultrie City Comprehensive Annual Financial Report

16. FY2018 Braselton Town Comprehensive Annual Financial Report

17. FY2018 Jefferson City Comprehensive Annual Financial Report

18. FY2018 Grovetown City Comprehensive Annual Financial Report

19. FY2018 Villa Rica City Comprehensive Annual Financial Report

20. FY2018 Austell City Comprehensive Annual Financial Report

21. FY2018 Covington City Comprehensive Annual Financial Report

22. FY2018 Cumming City Comprehensive Annual Financial Report

23. FY2018 Toccoa City Comprehensive Annual Financial Report

24. FY2018 Locust Grove City Comprehensive Annual Financial Report

25. FY2018 Hapeville City Comprehensive Annual Financial Report

26. FY2018 Rincon Town Comprehensive Annual Financial Report

27. FY2018 Commerce City Comprehensive Annual Financial Report

28. FY2018 Flowery Branch City Comprehensive Annual Financial Report

29. FY2018 Holly Springs City Comprehensive Annual Financial Report

30. FY2018 Waycross City Comprehensive Annual Financial Report

31. FY2018 Dallas City Comprehensive Annual Financial Report

32. FY2018 Douglas City Comprehensive Annual Financial Report

33. FY2018 Centerville City Comprehensive Annual Financial Report

34. FY2018 Thomaston City Comprehensive Annual Financial Report

35. FY2017 Hampton City Comprehensive Annual Financial Report

36. FY2018 Monroe City Comprehensive Annual Financial Report

37. FY2018 Mcrae-Helena City Comprehensive Annual Financial Report

38. FY2018 Tyrone Town Comprehensive Annual Financial Report

39. FY2018 Camilla City Comprehensive Annual Financial Report

40. FY2018 Thomson City Comprehensive Annual Financial Report

41. FY2018 Bainbridge City Comprehensive Annual Financial Report

42. FY2018 Barnesville City Comprehensive Annual Financial Report

43. FY2017 Sylvester City Comprehensive Annual Financial Report

44. FY2016 La Fayette City Comprehensive Annual Financial Report

45. FY2018 Bremen City Comprehensive Annual Financial Report

46. FY2018 Vidalia City Comprehensive Annual Financial Report

47. FY2018 Eatonton City Comprehensive Annual Financial Report

48. FY2015 Fort Valley City Comprehensive Annual Financial Report

49. FY2018 Jesup City Comprehensive Annual Financial Report

50. FY2018 Cairo City Comprehensive Annual Financial Report

51. FY2016 Cordele City Comprehensive Annual Financial Report

52. FY2018 Auburn City Comprehensive Annual Financial Report

53. FY2018 Folkston City Comprehensive Annual Financial Report

54. FY2018 Sandersville City Comprehensive Annual Financial Report

55. FY2017 Waynesboro City Comprehensive Annual Financial Report

56. FY2018 Glennville City Comprehensive Annual Financial Report

57. FY2018 Dahlonega City Comprehensive Annual Financial Report

58. FY2018 Fitzgerald City Comprehensive Annual Financial Report

59. FY2018 Lilburn City Comprehensive Annual Financial Report

60. FY2018 Dacula City Comprehensive Annual Financial Report

61. FY2018 Loganville City Comprehensive Annual Financial Report

62. FY2014 Swainsboro City Comprehensive Annual Financial Report

63. FY2018 Hawkinsville City Comprehensive Annual Financial Report

64. FY2018 Buford City Comprehensive Annual Financial Report

65. Expert Report of Michael B. Brown, April 13, 2020

66. American Transportation Research Institute, 2017 Top 100 Truck Bottleneck List, https://truckingresearch.org/2017/01/17/2017-top-100-truck-bottleneck-list/

67. *2017 Census of Governments,* United States Census Bureau, accessed via the Willamette University Government Finance Database, https://willamette.edu/mba/research-impact/public-datasets/

68. Georgia Department of Transportation, Road & Traffic Data, http://www.dot.ga.gov/DS/Data

69. Georgia Department of Transportation, Traffic Analysis and Data Application, 2018 All Station Annualized Statistics

70. Atlanta Regional Commission, ArcGIS Georgia Cities Shapefile. https://opendata.atlantaregional.com/datasets/34520575dfc34b8cac783caff702b8cc_58

71. National League of Cities, Small Cities Council, https://www.nlc.org/small-cities-council

72. 2010 Census Urban and Rural Classification and Urban Area Criteria, https://www.census.gov/programs-surveys/geography/guidance/geo-areas/urban-rural/2010-urban-rural.html

73. United States Census Bureau

74. Dunwoody Comprehensive Annual Financial Reports

75. Doraville FY2020 Adopted Budget Document.

76. The Tax Policy Center, Briefing Book, https://www.taxpolicycenter.org/briefing-book/how-do-state-and-local-property-taxes-work

77. Georgia State University Andrew Young School Fiscal Research Center, Georgia's Taxes: A Summary of Major State and Local Government Taxes, 2020

78. Deposition of Michael B. Brown, May 12, 2020

79. City of Doraville Ordinance No. 2017-13,
    http://cms.revize.com/revize/doraville/Ord.%20No.%202017-13%20Create%20Special%20Tax%20District%20(05-15-2017).pdf

80. Doraville FY2019 Adopted Budget Document.

81. Government Finance Officers' Association Recommended Budget Practices,
    https://www.gfoa.org/sites/default/files/RecommendedBudgetPractices.pdf

82. National Center for State Courts, National Task Force on Fines, Fees and Bail Practices: Principles on Fines, Fees and Bail Practices,
    https://www.ncsc.org/~/media/Files/PDF/Topics/Fines%20and%20Fees/Principles%201%2017%2019.ashx

83. Bureau of Justice Statistics, Justice Expenditure and Employment Extracts,
    https://www.bjs.gov/index.cfm?ty=pbdetail&iid=6728

84. Urban Institute, Ferguson City Finances, Not the New Normal, April 2015,
    https://www.urban.org/urban-wire/ferguson-city-finances-not-new-normal

85.  DRAFT Integrated Overflow Control Plan (IOCP) Unified Government of Wyandotte County and Kansas City, Kansas Integrated Overflow Control Program, September 30, 2016

86. FY2018 Atlanta, GA Comprehensive Annual Financial Report

87. FY2018 Auburn, WA Comprehensive Annual Financial Report

88. FY2018 Chicago, IL Comprehensive Annual Financial Report

89. FY2018 Cincinnati, OH Comprehensive Annual Financial Report

90. FY2018 Houston, TX Comprehensive Annual Financial Report

91. FY2018 Los Angeles, CA Comprehensive Annual Financial Report

92. FY2018 Louisville, KY Comprehensive Annual Financial Report

93. FY2018 Seattle, WA Comprehensive Annual Financial Report