## IN THE UNITED STATES DISTRICT COURT
## FOR THE NORTHERN DISTRICT OF GEORGIA
## ATLANTA DIVISION

| | |
|---|---|
| HILDA BRUCKER; JEFFERY THORNTON; JANICE CRAIG; and BYRON BILLINGSLEY,<br><br>     Plaintiffs,<br><br>vs.<br><br>THE CITY OF DORAVILLE, a Georgia municipal corporation,<br><br>     Defendant. | Civil Action No. 1:18-cv-02375-RWS<br><br>**PLAINTIFFS' BRIEF IN SUPPORT OF THEIR MOTION FOR SUMMARY JUDGMENT**<br><br>**ORAL ARGUMENT REQUESTED** |

Joshua A. House*†
California Bar No. 284856
Institute for Justice
901 N. Glebe Road, Suite 900
Arlington, VA 22203
Tel: (703) 682-9320
Fax: (703) 682-9321
jhouse@ij.org

Anthony Sanders*
Minnesota Bar No. 0387307
Institute for Justice
520 Nicollet Mall, Suite 550
Minneapolis, MN 55402
Tel: (612) 435-3451
Fax: (612) 435-5875
asanders@ij.org

Frank B. Strickland
Georgia Bar No. 687600
Taylor English Duma LLP
1600 Parkwood Circle, Suite 200
Atlanta, GA 30339
Tel: (770) 434-6868
Fax: (770) 434-7376
fstrickland@taylorenglish.com

*Admitted pro hac vice
† Lead Counsel

# TABLE OF CONTENTS

TABLE OF AUTHORITIES .................................................................................... iv

INTRODUCTION ................................................................................................1

BACKGROUND ..................................................................................................2

I.   Doraville Is Financially Dependent on Fines, Fees, and Forfeitures .............2

II.  Doraville Uses Its Court, Prosecutor, and Law Enforcement to Generate
     Fines, Fees, and Forfeitures Revenue. ................................................................3

III. Doraville's Reliance on Fines, Fees, and Forfeitures Is Highly Unusual .......6

IV.  Plaintiffs Filed This Case to Enjoin Doraville's Unconstitutional Reliance on
     Fines, Fees, and Forfeiture Revenue. ..................................................................7

LEGAL STANDARD...........................................................................................8

ARGUMENT .......................................................................................................9

I.   Doraville's Reliance on Fines, Fees, and Forfeitures Creates an
     Unconstitutional Potential to Bias, or Appear to Bias, the City's Municipal
     Court. ................................................................................................................10

     A.  Doraville's municipal court has a conflict of interest. .............................10

         1. Doraville controls all aspects of the appointment and tenure of its
            municipal court judge.............................................................................. 12

         2. Doraville budgets for fines and fees and expects the municipal court
            to achieve that targeted revenue ............................................................ 16

              a. There is a direct relationship between the number of court cases
                 and Doraville's general revenues.............................................. 17

              b. Doraville aims at annual municipal court revenue targets........ 20

         3. Doraville's municipal court knows that the City's budget heavily
            depends on fines and fees .................................................................... 22

     B.  The municipal court's conflict of interest is more than de minimis. .........25

*1. The conflict is substantial because the court contributes a large amount of revenue to the general fund* .................................................... 26

*2. The conflict is substantial because of the number of cases processed by the municipal court* .............................................................. 27

II.   Doraville's Reliance on Fines, Fees, and Forfeitures Creates an Unconstitutional Potential for Bias, or the Appearance of Bias, of the City's Prosecutor. ....................................................................................... 28

III.  Doraville's Reliance on Fines, Fees, and Forfeitures Creates an Unconstitutional Potential for Bias, or the Appearance of Bias, of the City's Law Enforcement ........................................................................... 32

CONCLUSION ...................................................................................... 35

# TABLE OF AUTHORITIES

Cases

*Alpha Epsilon Phi Tau Chapter Hous. Ass'n v. City of Berkeley*,
   114 F.3d 840 (9th Cir. 1997) ...................................................................9

*Bonner v. City of Prichard*,
   661 F.2d 1206 (11th Cir. 1981) ...........................................................12

*Brown v. Vance*,
   637 F.2d 272 (5th Cir. 1981) ..................................................... *passim*

*Cain v. City of New Orleans*,
   281 F. Supp. 3d 624 (E.D. La. 2017)............................................ 19, 26

*Cain v. White*,
   937 F.3d 446 (5th Cir. 2019) .............................................. 19, 22, 23

*Caliste v. Cantrell*,
   937 F.3d 525 (5th Cir. 2019) ...............................................................24

*Celotex Corp. v. Catrett*,
   477 U.S. 317 (1986)........................................................................8, 9

*Grange Indem. Ins. Co. v. BeavEx, Inc.*,
   804 S.E.2d 173 (Ga. 2017)................................................................15

*Harjo v. City of Albuquerque*,
   326 F. Supp. 3d 1145 (D.N.M. 2018)..................................................34

*Hickson Corp. v. N. Crossarm Co.*,
   357 F.3d 1256 (11th Cir. 2004) .......................................................8, 9

*Marshall v. Jerrico, Inc.*,
   446 U.S. 238 (1980)................................................................ 9, 29, 34

iv

*Northern Mariana Islands v. Kaipat*,
  94 F.3d 574 (9th Cir. 1996) .................................................... 13, 14, 23

*Tumey v. Ohio*,
  273 U.S. 510 (1927).............................................................. 9, 25, 28

*Van Harken v. City of Chicago*,
  103 F.3d 1346 (7th Cir. 1997) .................................................... 27, 28

*Wolkenstein v. Reville*,
  694 F.2d 35 (2d Cir. 1982)..................................................... 13, 26, 27

*Young v. United States*,
  481 U.S. 787 (1987)..................................................................9

Statutes

Doraville Charter § 3.01  .............................................................13

Doraville Charter § 3.02...............................................................14

Doraville Mun. Code § 9-1 ...........................................................14

Ga. Code § 36-32-1 ......................................................................14

Rules

Fed. R. Civ. P. 56(a)....................................................................8

Other Authorities

U.S. Commission on Civil Rights, *Targeted Fines and Fees Against Communities of Color*, https://www.usccr.gov/pubs/2017/
  Statutory_Enforcement_Report2017.pdf.........................................6, 7

U.S. Census Bureau, Doraville, Georgia, data available at
  https://data.census.gov/cedsci/map?q=doraville%20ga
  (last visited July 23, 2020). ................................................... 27

# INTRODUCTION

This is a constitutional challenge to Defendant City of Doraville's policy and practice of ticketing, prosecuting, and fining individuals to generate revenue. Due process requires that a tribunal may not have a financial interest in convicting those who appear before it. Yet Doraville is dependent on fines, fees, and forfeitures revenue for nearly a quarter of its annual budget. And that dependence drives it to ticket more people for small infractions, prosecute more people without regard to the justice of a case, and impose heavy fines for even minor offenses.

This unconstitutional incentive to pursue revenue instead of justice biases Doraville's court, prosecutors, and police alike.  Doraville's municipal court judges face a conflict of interest because their continued employment, not to mention the court's operation, is contingent on municipal court revenues. Doraville's prosecutor has a conflict of interest because he is paid per court date, and because he must prosecute to raise revenue for the City. And Doraville's law enforcement officials have an institutional financial incentive to issue citations because they directly serve the city council, which controls the City's budget and which can direct law enforcement to boost revenues by increasing enforcement. All these conflicts are substantial, because without fines, fees, and forfeitures, the City

would be unable to balance its budget. Because it creates a substantial conflict of interest, Doraville's dependence on those revenues is unconstitutional.

## BACKGROUND

### I.   Doraville Is Financially Dependent on Fines, Fees, and Forfeitures.

Doraville's operations are funded mostly by its "general fund." Zielke Decl. ¶ 15 (stating general fund revenues comprised 88.9% of total city revenues). That fund includes spending on police, parks, administration, and various other typical municipal functions, including the municipal court. Platto Dep. 18:17–19:3, Ex. 1 at 025325.[1] From fiscal years 2008 to 2019, fines, fees, and forfeitures[2] constituted an average of 21.9% of revenue for the general fund. Zielke Decl. ¶ 16. This reached nearly 35% in fiscal year 2010. Zielke Decl. ¶ 16 & Ex. 2.

The municipal court costs between approximately $400,000 and $600,000 a year to operate. Zielke Decl. ¶ 41 & Ex. 17. But it brings in much more than that, anywhere from $1.7 to $3.2 million. Zielke Decl. ¶ 18 & Ex. 3. Court revenue is correlated to the number of court hearings. Rivera Dep. 73:5–11. And when

---

[1] Relevant transcript excerpts are attached to the Sanders Declaration.

[2] When referring to the general fund, Plaintiffs use "forfeitures" to refer to bond forfeitures. Civil asset forfeiture revenue does not go to the general fund but instead stays within the police department. This, however, creates a conflict of interest for law enforcement, as discussed in Part III.

revenue dropped, the City created an "action plan" to "restore Municipal Court fines and forfeitures" by "getting more court dates." Rivera Dep. 69:10–23 & Ex. 7; Gillen Dep. 124:16–125:15 & Ex. 12; *see also* Platto Dep. 45:11–23, Ex. 6 at 026500 ("The addition of more court dates this fiscal year has resulted in increased collections of municipal court fines."). The City even bragged about the court's central role in revenue generation in a newsletter, stating that "[a]veraging nearly 15,000 cases and bringing in over $3 million annually, the court system contributes heavily to the city's bottom line." Gillen Dep. 96:18–97:8, Ex. 7 at 029159.

## II.  Doraville Uses Its Court, Prosecutor, and Law Enforcement to Generate Fines, Fees, and Forfeitures Revenue.

Doraville's city council, which controls the City's finances, has direct control over the judge, prosecutor, and law enforcement that generate court revenue. The council oversees the city manager, who in turn oversees most of the city's administration, including the police department, the private code enforcement company, and the municipal court clerk. Gillen Dep. 21:9–13 (police), 21:14–22:8 (code enforcement), 45:20–22 (municipal court clerk), 17:5–14 & Ex. 2 (organizational chart).[3] The municipal court judge and the city

---

[3] By stipulation (Doc. 70), all depositions of City officials except Mayor Pittman's are Rule 30(b)(6) depositions for all relevant subjects, except for where the deponent was told the specific question was to him or her as an individual.

prosecutor (called the city "solicitor") serve at the pleasure of the council, which has the power to terminate either. Gillen Dep. 19:9–20:3; Carter Dep. 20:21–22 (judge); Riley Dep. 10:6–16 (solicitor). Similarly, the city manager, at the council's direction, can fire the court clerk and other non-judicial court employees, Rivera Dep. 8:19–21, 10:1–3, as well as the police chief. King Dep. 10:13–19.

Over ten thousand cases go through Doraville's municipal court in most years. Zielke Decl. ¶ 24 & Ex. 6. These include violations of state statutes and municipal ordinances, with the large majority being traffic violations. Zielke Decl. ¶ 24 & Ex. 6. When a defendant is convicted, either through a plea or a guilty verdict, there is a fine and several fees he or she will owe, depending on the violation. Some of these go to the state. Rivera Dep. 59:12–24. But the largest amounts, including the fine itself, go to the City's general fund. Rivera Dep. 81:5–22, Ex. 9 at 029488. Further, in 2013 the City added to each citation a $25 fee, also deposited in the City's general fund. Zielke Decl. ¶ 28; Gillen Dep. 85:18–86:11; Rivera Dep. Ex. 9 at 029492.

Doraville's solicitor prosecutes cases in the municipal court. The solicitor is a private law firm that is also retained to be Doraville's City Attorney. Riley Dep. 9:21–10:16. Most prosecutions end in pleas. Riley Dep. 23:2–18.

To bring in fines, fees, and forfeitures, Doraville's police department issues thousands of tickets every year. Zielke Decl. ¶¶ 23–24 & Ex. 6. And Doraville's law enforcement is aware that it must generate revenue: Approximately half of Doraville's general fund is committed to the police department. Zielke Decl. ¶ 38 & Ex. 16.  This is much higher than in other cities. In fiscal year 2017 the average spending on a police department as a percentage of total expenditures for Georgia cities with 5,000 to 15,000 residents was 19.2 percent, and the same nationally is 17.2 percent. Zielke Decl. ¶ 43. For Doraville it was 55.9%. Zielke Decl. ¶ 44.

Doraville also employs an outside firm, Clark Patterson Lee, to police property code violations. Gillen Dep. 162:12–16, 164:13–165:13. It is paid hourly, and its contract is periodically evaluated and renewed. Platto Dep. 35:11–23, 36:2–11. The firm issued the property code citations Plaintiffs received, as discussed below. Gillen Dep. 162:12–16; 165:5–21. The city council can direct Clark Patterson Lee to police certain neighborhoods. Gillen Dep. 139:3–15; *see also* Gillen. Dep. 158:4–8. Although few compared to traffic citations, property code citations have risen 315% in the past half-decade. Zielke Decl. ¶ 27. In that time Doraville's code enforcement spending similarly tripled. Zielke Decl. ¶ 42, Ex. 18.

### III.   Doraville's Reliance on Fines, Fees, and Forfeitures Is Highly Unusual.

Doraville's reliance on its municipal court and law enforcement to balance its budget stands in marked contrast to the vast majority of other cities, both in Georgia and nationwide. Over the past decade, approximately 22% of the revenue for Doraville's general fund came from fines, fees, and forfeitures. Zielke Decl. ¶ 16. Comparatively, using 2017 Census data, the average amount of all revenue that came from fines, fees, and forfeitures for Georgia cities of comparable size (between 5,000 and 15,000 residents) was only 3.1%. Zielke Decl. ¶ 35. For cities with 5,000 to 50,000 residents, the average is 3.0%. Zielke Decl. ¶ 72.

Doraville compares even less favorably nationwide. According to the same Census data, in 2017, fines, fees, and forfeitures comprised 1.4% of the budget for U.S. cities with between 5,000 and 15,000 residents, and 1.3% for cities with between 5,000 and 50,000 residents. Zielke Decl. ¶¶ 35, 72. Looking at revenue per capita tells the same story. In 2017 Doraville collected $185.54 per capita from fines, fees, and forfeitures, while Georgia cities of 5,000 to 15,000 residents collected on average only $46.64. Zielke Decl. ¶ 36. Nationwide, the average was only $20.25. Zielke Decl. ¶ 72. Unsurprisingly, Doraville ranked among the most fine-dependent cities nationally in a U.S. Commission on Civil Rights report. *See* U.S. Commission on Civil Rights, *Targeted Fines and Fees Against Communities*

*of Color*, Sept. 2017, https://www.usccr.gov/pubs/2017/

Statutory_Enforcement_Report2017.pdf (last visited July 23, 2020).

### IV. Plaintiffs Filed This Case to Enjoin Doraville's Unconstitutional Reliance on Fines, Fees, and Forfeiture Revenue.

Plaintiffs are four citizens that Doraville prosecuted in its municipal court. Their stories demonstrate what happens when a municipality has a large financial incentive to use its court and law enforcement to generate revenue.

Doraville prosecuted Plaintiff Hilda Brucker for having cracks in her home's driveway. Brucker Decl. ¶¶ 11–12. She was fined $100 and given a six-month probation term, requiring her to, among other irrelevant conditions, abstain from becoming intoxicated. *Id.* ¶¶ 11–14. Hilda later challenged her conviction and the judgment was vacated, but only after hiring an attorney and attending numerous municipal court dates. *Id.* ¶¶ 18–20.

Doraville prosecuted Plaintiff Jeff Thornton for having improperly stacked wood in his backyard that he used for his woodworking hobby. Thornton Decl. ¶¶ 3–10. Jeff was convicted and sentenced to a $300 fine and a year's probation and registered with the City's private probation company. *Id.* ¶ 11.

Doraville police ticketed Plaintiff Janice Craig for changing out of a left-turn lane in a way that allegedly held up traffic. Craig Decl. ¶¶ 2–4. She paid $215 in fines. *Id.* ¶ 7. And Plaintiff Byron Billingsley was prosecuted, and paid a $100 fine,

for changing lanes without a turn signal to pass a slow-moving truck. Billingsley Decl. ¶¶ 4–8. For each Plaintiff, minor violations led to criminal prosecution, fines, and even probation terms.

Plaintiffs filed this case seeking to enjoin Doraville's policy and practice of budgeting to receive and relying on fines, fees, and forfeitures. Pls' Compl. (Doc. 1). Plaintiffs' suit raises two claims. First, Doraville's reliance on court revenues violates due process because it makes Doraville's municipal court a biased adjudicator. *Id.* at 23–26. Second, Doraville's reliance on court revenues violates due process because it biases Doraville's prosecutor and law enforcement. *Id.* at 26–28.

Doraville moved to dismiss, which this Court denied. (Doc. 30.) This Court then granted reconsideration *sua sponte* to consider the legal standard applicable to Plaintiffs' claims. *Id.* at 20. After argument, this Court reaffirmed its denial of the motion to dismiss. (Doc. 39.) Discovery closed on June 8, 2020. (Doc. 65.)

## LEGAL STANDARD

Federal Rule of Civil Procedure 56 provides "[t]he court shall grant summary judgment if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). The moving party bears the burden of showing there is no genuine

dispute as to any material fact that should be decided at trial. *Hickson Corp. v. N. Crossarm Co.*, 357 F.3d 1256, 1260 (11th Cir. 2004) (citing *Celotex Corp. v. Catrett*, 477 U.S. 317, 323 (1986)).

## ARGUMENT

The Due Process Clause forbids a tribunal from having a financial interest in convicting those who appear before it. *Tumey v. Ohio*, 273 U.S. 510, 532 (1927). Prosecutors and law enforcement officials likewise may not have a significant financial interest in obtaining convictions. *See Marshall v. Jerrico, Inc.*, 446 U.S. 238, 249–50 (1980); *see also Young v. United States*, 481 U.S. 787, 814 (1987) (stating prosecutors must "be guided solely by their sense of public responsibility for the attainment of justice"). These rules are not limited to personal financial interests: "[E]ven if the decisionmaker does not stand to gain personally, due process may also be offended where the decisionmaker, because of his institutional responsibilities, would have 'so strong a motive' to rule in a way that would aid the institution." *Alpha Epsilon Phi Tau Chapter Hous. Ass'n v. City of Berkeley*, 114 F.3d 840, 844 (9th Cir. 1997) ("*AEP*") (quoting *Tumey*, 273 U.S. at 532).

This case is about whether Doraville's municipal court, solicitor, and law enforcement have an unconstitutional, ***institutional*** financial bias to ticket, prosecute, and fine individuals. To determine whether this institutional interest

9

violates due process, this Court must "examine whether Doraville's municipal structure and systemic reliance on fines, fees, and forfeitures creates a potential for biasing City officials sufficient to violate due process." Order Recons. Den. Mot. Dismiss ("Order Recons.") (Doc. 39) at 10 & n.4 (citing *Brown v. Vance*, 637 F.2d 272, 284 (5th Cir. 1981)). As shown below, Doraville's systemic reliance on fines and fees does just that, creating an unconstitutional potential for bias by the municipal court, the city prosecutor, and Doraville law enforcement.

## I.    Doraville's Reliance on Fines, Fees, and Forfeitures Creates an Unconstitutional Potential to Bias, or Appear to Bias, the City's Municipal Court.

As this Court recognized, the standard for determining whether a court has an institutional conflict of interest "involves two questions: First, is there a conflict of interest? Second, is the conflict of interest substantial?" Order Recons. (Doc. 39) at 14. Here the answer to both questions is "yes."

### A.    Doraville's municipal court has a conflict of interest.

An institutional conflict of interest exists where an official's concern for the institution's finances infects the official's adjudications, thereby appearing to bias those adjudications. *Ward v. Village of Monroeville*, 409 U.S. 57, 60 (1972) (finding conflict where "responsibilities for village finances may make [the mayor] partisan to maintain the high level of contribution from the mayor's court"). To

decide this, courts must examine whether "the system as a whole" creates the potential for unconstitutional bias. *Brown*, 637 F.3d at 280; Order Recons. (Doc. 39) at 9–10. This Court has recognized three factors that may contribute to an institutional conflict of interest, all of which are present in Doraville:

First, Doraville has "control over the appointment and tenure of municipal court judges." Order Recons. (Doc. 39) at 18. This creates a conflict because the municipal court judge could be removed if he does not produce enough revenue.

Second, Doraville's budgeting for fines "sets a target for municipal court judges to hit." Order Recons. (Doc. 39) at 18. This creates a conflict because it tempts city officials, including the City's judge, to use the municipal court to achieve the City's revenue goals.

Third, Doraville's municipal court operates with the understanding that "criminal penalties make up" a large percentage of "the City's general fund." Order Recons. (Doc. 39) at 19. This creates a conflict because the municipal court knows the City's, and thus the court's, operating revenues depend on continued convictions.

Plaintiffs will address each factor separately. As this Court noted, "a variety of factors could bear on whether a conflict of interest exists, and the absence of one or more factors might be outweighed by the substantiality of other factors . . ."

11

Order Recons. (Doc. 39) at 15 (citation omitted). Because the conflict here is so substantial, *see* Part I.B. below, each of the three factors detailed below is sufficient to create an unconstitutional conflict of interest.

> 1. *Doraville controls all aspects of the appointment and tenure of its municipal court judge.*

This Court stated that the city council's control over the employment of the municipal court judge is a "critical aspect of Plaintiffs' argument," Order Recons. (Doc. 39) at 16, because "it calls into question those judges' autonomy," Order Recons. (Doc. 39) at 18. The undisputed facts support Plaintiffs' argument.

In *Brown v. Vance*, the former Fifth Circuit[4] held there was an unconstitutional conflict of interest when judges' continued employment was dependent on fees from traffic cases. *Brown*, 637 F.2d at 282–83. There, the charging police officers decided which judge would hear their traffic cases. Officers would select the judges most likely to convict. *Id.* at 281. This meant that, even if the judges themselves were innocent of bias, the system created a bias by selectively employing judges who were likely to generate revenue. *See id.* Indeed,

---

[4] All decisions of the Fifth Circuit decided before October 1, 1981, are binding precedent in the Eleventh Circuit. *Bonner v. City of Prichard*, 661 F.2d 1206, 1209–10 (11th Cir. 1981) (en banc).

some judges complained of having to close their judicial law practice precisely because officers were not bringing enough cases to them. *Id.* at 282.

Other courts have also examined judges' employment conditions when determining whether there is a conflict of interest. For instance, in *Commonwealth of Northern Mariana Islands v. Kaipat*, the Ninth Circuit held that the territorial court did not have a conflict because its existence was permanent. 94 F.3d 574, 581 (9th Cir. 1996). It would continue to exist "whether or not persons accused of traffic offenses are . . . fined." *Id.* Likewise, in *Wolkenstein v. Reville*, the Second Circuit held there was no conflict where the adjudicating official was insulated from removal by a six-year term, which allowed that official "to take the long view." 694 F.2d 35, 42 n.8 (2d Cir. 1982).

Here, Doraville's court is more analogous to the judges in *Brown* because, if the court does not produce enough revenue, Doraville's city council can disband the court or fire its judge. Doraville's court does not have any kind of permanent, general jurisdiction. It is a creature of the City's charter, Doraville Charter § 3.01; Riley Dep. 101:1–6, and the court can be disbanded or its jurisdiction reduced if the City amends its Charter.[5] Thus, unlike the court in *Kaipat*, there is no guarantee

---

[5] Although Doraville claims not to know if it can disband its court, Gillen Dep. 71:16–18, Georgia law has no prohibition on its doing so. Indeed, there is no

that the City's court "will exist whether or not persons accused of traffic offenses

are . . . . fined." *Kaipat*, 94 F.3d at 581.

The municipal judge's employment is equally dependent on the city council.

The city council initially hired Doraville's municipal judge on a contract basis.

Carter Dep. 21:3–6; Pittman Dep. 20:21–21:14. Now, however, the City admits it

"has no obligation, legal or otherwise" to continue his employment. Sanders Decl.

Ex. 9 at No. 9; Pittman Dep. 81:19–22. And under the City Code the municipal

judge serves "at the pleasure of the city council." Doraville Mun. Code § 9-1; *see*

*also* Carter Dep. 20:21–22 (stating "ultimately, you know, I serve at the pleasure of

the council"). In fact, Doraville used to employ three judges simultaneously, but it

decided to let the other two judges go following budget cuts. Carter Dep. 10:16–

11:7.[6]

And so, when revenues dip, Doraville's judges find themselves on the

chopping block. The City decided "to let [two] judges go" when it "wanted to cut

---

requirement that a city even establish a court, as Georgia merely "authorize[s],"
municipalities to create one, subject to county laws. Ga. Code § 36-32-1(a).
Similarly, although state law "authorize[s]" jurisdictional maximums, the court's
jurisdiction is set by Doraville's Charter and Code. Ga. Code § 36-32-1(a), (c).
[6] If Doraville's sole remaining judge cannot sit for a case, the Doraville Charter
authorizes the city attorney to sit as the municipal court judge. Doraville Charter
§ 3.02, https://library.municode.com/ga/doraville/codes/code_of_ordinances.
However, because the city attorney in Doraville is also the city prosecutor, Gillen
Dep. 63:17–20, that creates its own conflict of interest.

costs" due to "financial concerns." Carter Dep. 12:6–11. Doraville cut the number of judges from three to one because it did not "want[] to pay anybody else." Carter Dep. 11:6–9.

Short of removal, the city council also controls the municipal judge's compensation. The municipal court judge's salary is paid from the City's general fund. Sanders Decl. Ex. 9 at No. 2. His salary is set by the city council.[7] He brings requests for raises to the Mayor and city council. Carter Dep. 23:1–15, 43:12–15. The city council can decide to reduce the judge's pay or cut his benefits. Rivera Dep. 127:7–21. In fact, when the City experienced financial concerns and began "downsizing," Doraville "cut off" the municipal judge's health benefits. Carter Dep. 12:16–13:2.

In *Brown*, the judges' employment depended on "currying favor with" the officers that brought them cases. 637 F.2d at 282. That, the court found, created an unconstitutional incentive. *Id.* So too here. Doraville's judge must please the city council to retain his employment. Doraville's judge is selected by the city council,

---

[7] Doraville is "uncertain" whether its municipal court judge is a contractor with the City or a City employee. Gillen Dep. 28:19–22; Carter Dep. 6:5–7. He receives a W-2 and is in the City's pension plan, Carter Dep. 6:8–9, 12:20–21, which heavily implies he is an employee, not a contractor. *Grange Indem. Ins. Co. v. BeavEx, Inc.*, 804 S.E.2d 173, 175 (Ga. 2017). In either case, the judge's salary is set by the city council, whether under a contract with the City, Gillen Dep. 34:1–14, or the City's internal compensation structure, Gillen Dep. 36:14–15.

can be removed by the city council, and is compensated by the city council. The council, which has responsibility for the City's finances, can select a judge that convicts more often and levies more fines. And it can remove a judge who does not fine enough. Even if the judge himself is innocent of bias, the city council is biased to select for a judge that convicts and fines enough: "The convicting judges may even have been actuated by the highest motives . . . but the system results in a biased tribunal." *Id.* at 281. Thus, Doraville's control over the judge's employment creates the "potential for bias[]" that violates due process. Order Recons. (Doc. 39) at 9–10 & n.4.

2.  *Doraville budgets for fines and fees and expects the municipal court to achieve that targeted revenue.*

As this Court's Order noted, a conflict may exist where "the city council essentially sets a target for municipal court judges to hit." Order Recons. (Doc. 39) at 18. Here, Doraville budgets to receive fines and fees revenue. Ziekle Decl. ¶ 17. The City then uses the municipal court to achieve that revenue target in two ways: First, it can increase revenues by increasing the number of court dates. And second, the City encourages its officials to meet those revenue goals.

a.    There is a direct relationship between the number of court
cases and Doraville's general revenues.

*Brown* recognized that "the relation between the judge's volume of cases

and the amount of his judicial income . . . creates a possible temptation for judges

to be biased against defendants." *Brown*, 637 F.2d at 281. Here, the relationship

between the number of cases heard in Doraville's court and the City's revenues

(and thus the judge's continued employment) creates the same potential for a

conflict of interest.

The City stated that increasing the size of court calendars would result in

more fines. Rivera Dep. 73:5–8.[8] Adding more court dates increases fine collection

because "you're able to process more of the tickets that are run through the court

system. So it just speeds up the process." Gillen Dep. 120:12–17, Ex. 11 ("The

addition of more court dates this fiscal year has resulted in increased collections of

municipal court fines."). Further, Doraville's $25 court fee creates a direct link

between the number of cases and Doraville's revenues. The fee attaches to each

citation heard in the municipal court that results in a conviction. Rivera Dep.

85:24–25, 88:16–22. A defendant can even pay multiple $25 fees per case if there

---

[8] *See also* Rivera Dep. 73:9–11 ("[T]o finance, being able to fix the calendars to
where there were more cases per each -- per calendar would mean more money."),
74:9–10 (stating that "if you have more cases, there would be more fines
collected").

are multiple citations adjudicated at once. Gillen Dep. 88:12–20. The revenue from this fee goes into Doraville's general fund. Gillen Dep. 80:11–12. It was originally enacted to help the City afford various capital projects, including building, vehicle, water, and street projects. Gillen Dep. 103:16–104:19. Many of these capital projects had been deferred because Doraville was experiencing "budget distress." Gillen Dep. 105:17–106:14. The City uses this municipal court fee revenue to cover general city projects, even though doing so violates established government accounting best practices. Zielke Decl. ¶ 32.

The municipal court judge determines whether to add court dates, but the City can request he do so. Gillen Dep. 120:21–121:4; *see also* Rivera Dep. 64:17–19. And it has done just that. The City's Finance Department, which is under the control of the council and city manager, Gillen Dep. 17:5–14 & Ex. 2, came up with an "action plan" to "restore municipal court fines and forfeitures to previous levels" by "getting more court dates," Gillen Dep. 124:16–125:15 & Ex. 12. This action plan was important enough that the former finance director highlighted it for the City's new finance director, telling him the City "had seen a trend in municipal fines and fees revenue trending downward" and that increasing the number of court dates "might be something [he] wanted to put on [his] radar screen to possibly explore." Platto Dep. 32:16–33:3.

Doraville collects a large portion of the fees it assesses, so there is a direct relation between guilty convictions and city revenue. *Cf. Cain v. City of New Orleans*, 281 F. Supp. 3d 624, 658 (E.D. La. 2017), *aff'd sub nom. Cain v. White*, 937 F.3d 446 (5th Cir. 2019) (finding conflict of interest even though "collection rates are only 40% to 50%"). In the five fiscal years before this lawsuit was filed, Doraville's collection rates were nearly 100%:

| FISCAL YEAR | FINES AND FEES ASSESSED | | FINES AND FEES COLLECTED | | COLLECTION RATE |
|---|---|---|---|---|---|
| **2013** | $ | 3,031,305.80 | $ | 2,999,226.05 | **99%** |
| **2014** | $ | 3,541,659.36 | $ | 3,504,738.36 | **99%** |
| **2015** | $ | 3,543,793.97 | $ | 3,505,797.09 | **99%** |
| **2016** | $ | 2,851,608.58 | $ | 2,762,497.58 | **97%** |
| **2017** | $ | 2,965,423.35 | $ | 2,840,191.31 | **96%** |

Sanders Decl. Ex. 8 at No. 2. And the City faces no disincentive to zealously pursue money from defendants: Collection is done at no cost to the City by a privatized probation company, which makes its money by adding collection fees on top of the defendant's original debt. *See id.* at No. 4; Sanders Decl. Ex. 10 at 026386. This means criminal probation sentences are standard even for minor violations: Plaintiffs Brucker and Thornton were given probation for their cracked driveway and improperly stacked wood, respectively. Brucker Decl. ¶ 12; Thornton Decl. ¶ 11.

19

Doraville's fine collection is notably distinct from that in *AEP*, in which the Ninth Circuit held that there was no conflict where the adjudicator "regularly waive[d] penalties." *AEP*, 114 F.3d at 847. Doraville has no such practice. Riley Dep. 66:14, 67:1–8. Instead, as the city solicitor testified, "the bottom line is all these cases, everybody comes in gets a penalty [sic], you know? . . . [Y]ou come in, you pay a fine, and you go home." Riley Dep. 68:2–13. For defendants that cannot pay up front, they are put on a "pay-only" probation plan, which is administered by the private probation company. Carter Dep. 41:1–4, 41:14–17; Gillen Dep. 89:1–5, 89:17–21. Court fees or costs—including the $25 court fee imposed by the City—are automatically imposed on top of those fines by the municipal court's computer: The municipal court judge and solicitor have no discretion to waive them. Carter Dep. 50:2–5; Riley Dep. 68:20–69:7.

      b.    <u>Doraville aims at annual municipal court revenue targets.</u>

Doraville aims to hit municipal court revenue targets, and praises officials for meeting those targets. This creates the "possible temptation" to bias city officials, including the municipal court judge, "to maintain the high level of contribution from the . . . court." *Ward*, 409 U.S. at 60.

Unlike other forms of revenue—which may be dependent on economic conditions or property prices—fines and forfeitures can be directly manipulated by

the City to reach revenue goals. Zielke Decl. ¶ 20. Plaintiffs' expert shows there is correlation between the City's revenue needs and its fine collections: "[A]s . . . the gap between revenues and expenditures grew, the City simultaneously increased collections of Fine and Forfeiture revenues." Zielke Decl. ¶ 104 & Ex 10a.

When court revenue falls below the City's target, Doraville takes corrective action by changing the court's operations. In one instance, the City instituted an "action plan" to "restore Municipal Court fines and forfeitures to previous levels." Platto Dep. 31:14–32:15, Ex. 4 at 027235; Gillen Dep. 123:1–9, Ex. 12 at 027243. In another, the City had to lay off judges and then "restructure the way that [it] had court" after budget cuts. Rivera Dep. 65:20–67:1 ("It had to do with money.").

Conversely, if the City reaches its fines and fees revenue target, it hails it as an accomplishment. In one city newsletter, Doraville boasted that "[a]veraging nearly 15,000 cases and bringing in over $3 million annually, the court system contributes heavily to the city's bottom line." Gillen Dep. 96:18–97:8, Ex. 7 at 029159. In another, "accomplishments for the year" included "enhanced code compliance efforts" and "collection of over $3.6 million in fines and fees by the city court." Pittman Dep. 51:12–52:12, Ex. 4 at 029182. As Doraville's mayor from 2011 to 2019 testified, "every city has a problem collecting fees from people." Pittman Dep. 58:17–18. Thus, "if you are able to collect fees and fines,

21

that's a good thing." Pittman Dep. 57:20–58:4. Doraville is especially good,

collecting nearly 100% of the fines it assesses. Sanders Decl. Ex. 8 at No. 2.

> 3. *Doraville's municipal court knows that the City's budget heavily depends on fines and fees.*

Not only does Doraville set a specific revenue target for its municipal court

to achieve, but the City also heavily depends on those municipal court revenues.

As this Court recognized in its Order, if a City is dependent on court revenues,

"failure to maintain a strict policy of conviction might make it impossible for the

City to balance its budget." Order Recons. (Doc. 39) at 19.[9] The undisputed facts

now show that the City needs fines, fees, and forfeitures to balance its budget.

Courts have held that a conflict exists when the adjudicating entity is

dependent on fines and fees for revenue. In *Ward*, court "revenue was of such

importance to the village that when legislation threatened its loss, the village

retained a management consultant for advice upon the problem." 409 U.S. at 58.

And in *Cain*, the Fifth Circuit held there was a conflict because, "[w]hen collection

of the fines and fees is reduced, the [court] can have a difficult time meeting its

---

[9] Although the **extent** of the City's reliance on this revenue factors into the substantiality analysis, *see* below at Part I.B., the **fact** of the City's reliance is sufficient to create a conflict of interest. *See* Order Recons. (Doc. 39) at 15 ("[A] variety of factors could bear on whether a conflict of interest exists, and the absence of one or more factors might be outweighed by the substantiality of other factors under the test's second prong." (citation omitted)).

operational needs, leading to cuts in services, reduction of staff salaries, and leaving some positions unfilled." 937 F.3d at 449.

Conversely, receiving fines and fees income is less likely to create a conflict of interest if courts have access to other sources of funding. In *Kaipat*, for example, the Ninth Circuit held there was no conflict where the territorial court's building fund—which was funded in small part by fines—was mostly funded by non-court revenues. 94 F.3d at 582. And, again, the Ninth Circuit found no conflict in *AEP* where the adjudicatory body had "other sources" of funding besides fines and fees. 114 F.3d at 847. By contrast, in *Cain*, the court budget did not have ready access to alternative funds, leading "Judges . . . to increase their collection efforts and . . . also request[] assistance from other sources of funding." 937 F.3d at 449.

Here, Doraville is reliant on fines and fees to balance its budget. As Plaintiffs' expert witness has shown, in the decade before this lawsuit the City received anywhere from 16 to 34 percent of its general revenues from fines and fees. Zielke Decl. ¶ 16, Ex. 2 (fiscal years 2008–18).

The City has admitted that, without sufficient fines and fees revenues, Doraville might have to push back projects or decide not to make purchases. Gillen Dep. 48:2–19. The City may have to cut services, adjust employee salaries, or even lay off employees. Gillen Dep. 95:9–19. Doraville could even have to cut

23

employee benefits like health insurance. Gillen Dep. 115:4–7, 118:18–119:7. And as shown above, the City uses its administrative court fee to subsidize city operations such as capital projects. *See* Part I.A.2.a., above. Capital projects was one of the funds in which the Georgia auditor found Doraville had a shortfall, leading the City to create a corrective action plan. Pittman Dep. 26:12–27:2, Ex. 1.

Doraville also lacks ready access to alternative revenue sources. Doraville's property tax is currently as high as the City's charter allows. Zielke Decl. ¶ 19–20 & Ex. 5 & n.6. Increasing property tax revenues would require the never-popular decision to amend the City's charter simply to raise taxes. Doraville's tax revenues are further constrained by the lack of a local option sales tax. Zielke Decl. ¶ 21. And although Doraville could create a special tax district or special sales tax, any revenues from those taxes would be limited to specific projects and could not supplement general fund revenues. Zielke Decl. ¶ 87.

Moreover, as shown above in Part I.A.1., Doraville's municipal court is very much aware of the City's need for revenue. When revenues dipped, the City had to cut two positions from the court, making the sole remaining judge's work "more difficult." Carter Dep. 47:24–48:2. *Cf. Caliste v. Cantrell*, 937 F.3d 525, 530 (5th Cir. 2019) (finding conflict of interest where, "[w]ithout support staff, a judge must spend more time performing administrative tasks. Time is money. And some

important tasks cannot be done without staff."). When Doraville was facing "financial problems," the municipal court judge assisted the City with pursuing outstanding court fines by providing the city council with records of all outstanding warrants. Carter Dep. 44:12–25. Moreover, Doraville's municipal court clerk attends city council meetings when they concern the city budget. Rivera Dep. 12:22–25. The City's budget is thus an ever-present concern for the court.

### B.   The municipal court's conflict of interest is more than *de minimis*.

The second part of the *Tumey-Ward* inquiry is whether the conflict is substantial or, in other words, not "*de minimis*." *Tumey*, 273 U.S. at 531.[10] This Court's previous order mentioned two factors used to weigh the substantiality of Doraville's conflict: ***First***, the conflict can be substantial where the City's financial dependence on municipal court revenues is quantitatively large. Order Recons. (Doc. 39) at 20. And ***second***, the conflict can be substantial where "the number of people exposed to and potentially affected by it" is large. Order Recons. (Doc. 39) at 21. Here, both factors show that the conflict of interest is substantial.

---

[10] *See also Ward*, 409 U.S. at 59–60 (holding due process violated where "court provides a ***substantial*** portion of a municipality's funds" (emphasis added)); *AEP*, 114 F.3d at 842 (examining whether conflict was "so strong" that it was not "*de minimis*").

*1. The conflict is substantial because the court contributes a large amount of revenue to the general fund.*

Doraville's municipal court has a substantial conflict because it "contributes heavily to the city's bottom line." Gillen Dep. 96:18–97:8, Ex. 7 at 029159. Doraville receives up to 34 percent of its general fund from fines and fees, with an annual average of 21.9 percent between 2008 and 2019. Zielke Decl. ¶ 16. Doraville's conflict—its dependence on fines and fees—is therefore greater than that in other recent cases that held a conflict was substantial. *See Cain*, 281 F. Supp. 3d at 657 ("[F]ines and fees provide approximately 10% of the total budget and one quarter of the Judicial Expense Fund."). Indeed, the conflict is closer in scale to the unconstitutional system in *Ward*, where the Supreme Court noted the mayor's court contributed between 35 and 51 percent of the village's income. 409 U.S. at 58. And it is much greater than the incomes courts have held to be insubstantial. *See AEP*, 114 F.3d at 846 ("about two to five percent" (citation omitted)); *Wolkenstein*, 694 F.2d at 43 ("little more than half of one percent"). In fiscal years 2009–11, court revenues were Doraville's highest source of income, exceeding property taxes and ranging from approximately 27 to 34 percent of the general fund. Zielke Decl. ¶ 16 & Ex. 2. Those millions of general-fund dollars create a substantial conflict.

26

2. *The conflict is substantial because of the number of cases processed by the municipal court.*

The scope of Doraville's reliance on fines and fees is magnified by the amount of citations adjudicated by its court. *See* Order Recons. (Doc. 39) at 21. Courts have held that a judicial conflict is less likely to be substantial where the number of cases and people affected is low. *See AEP*, 114 F.3d at 842 (holding conflict not substantial where "[d]isputes before the Board . . . number about 35 per year"); *Wolkenstein*, 694 F.2d at 43 ("The imposition of penalties is sporadic and occasional . . . ."). Courts have also considered whether the maximum penalty was substantial. *See AEP*, 114 F.3d at 846; *Van Harken v. City of Chicago*, 103 F.3d 1346, 1353 (7th Cir. 1997).

Doraville's court adjudicates an extraordinary number of cases for a city numbering only 8,330 residents in the last census.[11] Between 2013 and 2019, Doraville issued 76,338 number of citations. Zielke Decl. ¶ 24, Ex. 6. A 2015 city newsletter speaks of Doraville "[a]veraging nearly 15,000 cases . . . annually." Gillen Dep. Ex. 7 at 029159. And in 2016 and 2017 Doraville's municipal court heard 11,557 and 10,666 cases respectively. Sanders Decl. Ex. 8 at No. 2. These cases are mostly moving violations, like speeding tickets. Zielke Decl. ¶ 25 & Ex.

---

[11] *See* U.S. Census Bureau, Doraville, Georgia, data available at https://data.census.gov/cedsci/map?q=doraville%20ga (last visited July 23, 2020).

6. Doraville's ex-mayor even acknowledged Doraville's historical reputation as a speed trap. Pittman Dep. 85:10–13.

Further, for each of these cases, Doraville can charge up to $1,000, the maximum fine. Gillen Dep. 150:21–151:7. This contrasts sharply with *Van Harken*, where the court held there was no conflict because the maximum parking fine was "only $100," 103 F.3d at 1353, and *AEP*, where the maximum per-adjudication fee was only $125, 114 F.3d at 846. Doraville's maximum is about ten times larger. And the average fine Doraville collects is almost $300, Zielke Decl. ¶ 24, nearly six times the average in *Van Harken*, 103 F.3d at 1351.

The City's dependence on municipal court revenues, and the volume of cases it churns through its municipal court, shows that the municipal court's conflict of interest is substantial and therefore violates due process.

## II.   Doraville's Reliance on Fines, Fees, and Forfeitures Creates an Unconstitutional Potential for Bias, or the Appearance of Bias, of the City's Prosecutor.

Doraville's prosecutor, the city solicitor, also has an institutional conflict of interest. Doraville depends on fines and fees, and the city solicitor knows he must achieve convictions to produce those fines and fees. *Cf.* Part I.A.3., above.

The *Tumey-Ward* analysis does not apply as strictly to prosecutors. *See* Order Recons. (Doc. 39) at 22. Nevertheless, the Supreme Court has said

prosecutors' institutional financial interests may violate due process when the potential for bias is severe enough. *See Marshall*, 446 U.S. at 249–50 (holding due process not violated where possibility of bias was "exceptionally remote" because fine revenue was "substantially less than 1% of the [agency's] budget").

Here, Doraville's solicitor has a strong financial incentive to bring more cases and obtain more convictions. The solicitor's compensation—approximately $500 per court date—is directly dependent on the number of court dates. Riley Dep. 9:24–10:5. Doraville increases court dates if there are increased numbers of cases. Gillen Dep. 121:4–6. The solicitor has sole discretion whether to prosecute cases. Riley Dep. 22:23–23:1. The solicitor can therefore increase the caseload and create a demand for more court dates, boosting his own pay. In addition, the solicitor does have some direct say, along with the judge, in the decision to increase court dates and thus directly increase his pay. Rivera Dep. 64:11–19, 66:2–5.

The solicitor's prosecutions, most of which result in pleas, Riley Dep. 16:23–24, 23:2–18, generate much-needed revenue for the City, *see* Part I, above. If the solicitor does not generate enough revenue, he can be replaced. Doraville's solicitor is an employee of the city council. The solicitor is nominated by the mayor and hired by the city council on a contract basis. Gillen Dep. 27:22–28:6;

Riley Dep. 97:14–16; *see also* Riley Dep. 10:11–12 ("I'm appointed. I was appointed by the Mayor."). The solicitor, who maintains a private law practice, competes with other law firms for this position. Riley Dep. 11:16–12:15. The solicitor acknowledges that his employment rests on the city council's continuing approval of his performance.[12] And the city council can instruct the city manager to direct the solicitor's enforcement priorities. Pittman Dep. 69:21–70:4 & Ex. 5 at 048669 (directing city attorney, who is also solicitor, to "go[] back . . . and really try[] to crack down in the court system instead of the little slap on the hand").

The solicitor uses his position to increase Doraville's revenues. The solicitor has discretion to send any case to the DeKalb County state court, and he does so when it would be more cost-effective. Riley Dep. 22:2–11. As was the case in *Ward*,[13] here the solicitor can change state violations to municipal ordinance violations to keep them within Doraville's jurisdiction, thereby ensuring fines go to Doraville, not DeKalb County. Riley Dep. 38:22–24; Rivera Dep. 105:18–19.

---

[12] "A. I'm an at-will contractor. . . . Q. [I]f the city wanted to remove you, it would be -- A. Just call me up, and I'll give them a resignation letter." Riley Dep. 10:6–20; *see also* Riley Dep. 99:23–100:1 ("You start the city, and then you get to be the prosecutor. And as long as it all goes along okay, you get to stay there.").

[13] *Ward*, 409 U.S. at 58 n.1 ("[R]egular practice [was] to charge suspects under a village ordinance, rather than a state statute . . . . [F]ines and forfeitures collected by the Mayor in state cases shall be paid to the county treasury, whereas fines and forfeitures collected in ordinance and traffic cases shall be paid into the municipal treasury.").

Conversely, when the solicitor declines to prosecute it can result in "intense conversation[s]" with the other officials, namely the police department who, as shown below in Part III, has its own incentive to ticket and convict individuals. Riley Dep. 59:14–22.

Finally, Doraville's solicitor is not a disinterested contractor but rather has extensive executive responsibilities in the City. The solicitor is the same law firm as the city attorney. Riley Dep. 6:19–7:10; Gillen Dep. 63:17–20; *see also* Riley Dep. 7:22–23 ("You can be both the prosecutor and the city attorney in the city."). As city attorney, the solicitor attends city council meetings whenever a budget document is discussed. Gillen Dep. 59:15–22. The city attorney is responsible for taking the city council's policies and "draft[ing] those policies in a legal way, mak[ing] it all legal." Gillen Dep. 63:5–6. Thus, the solicitor must not only please the city council in his prosecutorial role, but he must also serve the City's executive, including budgetary, interests in his role as city attorney.

In sum, Doraville's solicitor is an executive official, serving at the pleasure of the city council, who has total prosecutorial discretion to drive more revenue to the general fund. Doraville's reliance on fines and fees revenues creates a strong institutional bias for the solicitor to prosecute for revenue-generation rather than to serve the public good. This conflict violates due process.

31

### III.   Doraville's Reliance on Fines, Fees, and Forfeitures Creates an Unconstitutional Potential for Bias, or the Appearance of Bias, of the City's Law Enforcement.

The conflict of interest facing Doraville's police department is similar to that facing Doraville's solicitor: Doraville's police and code enforcement officers have an institutional incentive to write citations and prosecute violations in order to generate revenue. Doraville's law enforcement officials are at-will employees whose pay can be adjusted at any time by the city manager and city council. Gillen Dep. 17:5–14 & Ex. 2; 21:6–19; *see also* Gillen Dep. 15:7–11, 74:18–75:11 (stating employee handbook is binding on city employees and, under handbook, city manager can dismiss or promote officers). Law enforcement therefore has a strong incentive to appease the city council.

Fines revenue has a direct effect on law enforcement staffing. When City revenues drop, the police department is forced to make cuts. King Dep. 67:22– 68:11; *see also* Pittman Dep. 34:21–10, 36:16–18 (recalling police department budget cut when city experienced "revenue issues"). And the police are intimately aware that the City's budget will affect their employment: "[T]he budget was decreasing. So, we knew that [a budget cut] was coming." King Dep. 100:18– 101:5. In addition, the city council considered funding additional law enforcement by increasing the court administrative fee—a fee that is paid by defendants after

being ticketed by law enforcement and convicted. Gillen Dep. 74:18–75:11, Ex. 4 at 045340. Funding the police department through fines perhaps explains why the police chief has input on the City's fine schedule. *See* King Dep. 34:6–35:1.

Doraville's city council can direct law enforcement to find more violations. The council directs code enforcement to write certain kinds of citations. Gillen Dep. 139:3–15, 158:4–8. The council can direct police to do "spot enforcement," which means to patrol certain streets or neighborhoods. Gillen Dep. 139:20–141:9; King Dep. 101:6–9. In fact, council members would reach out about particular prosecutions. King Dep. 76:1–13. And the council's wishes carried weight with the police chief: "I usually paid a lot of attention to what the city managers tell me to look into." King Dep. 85:4–11. The long-time mayor testified that the city council, through the city manager, may give precise enforcement instructions to code enforcement. Pittman Dep. 72:6–73:3.

Doraville's city council can also manipulate enforcement in a less direct manner by adjusting law enforcement funding. For instance, in a City newsletter, the city manager wrote that "the number of code violations addressed has more than doubled" after Doraville "increased the budget" for code enforcement. Gillen Dep. 98:17–99:10., Ex. 7 at 029158. Doraville also acknowledged that, with traffic enforcement, "[w]hen you increase the number of police officers, logically, one

could assume you could have more tickets written." Gillen Dep. 134:16–21. That is because, the City stated, there is a relationship between the number of officers on payroll and the level of ticketing. King Dep. 74:22–75:4.

Unlike the judge and solicitor, if law enforcement budgets are cut, the police department has another source of revenue: asset forfeitures. But this source of revenue just exacerbates the conflict of interest. In *Harjo v. City of Albuquerque*, the district court applied *Marshall* to a city's civil forfeiture program and concluded that the city's forfeiture program had an unconstitutional conflict of interest. 326 F. Supp. 3d 1145, 1195 (D.N.M. 2018). The court held that constitutional problems arise where forfeiture program officials have complete discretion over the spending of forfeiture funds. *Id.* at 1194 (finding "no money is returned to the general fund" but instead it "is used to fund discretionary purchases"). A program where forfeiture officials can spend all the revenue received through forfeitures creates an unconstitutional financial incentive to engage in civil forfeiture. *Id.* at 1195.

Here, civil forfeiture revenue is generated by the police department's forfeiture cases. King Dep. 87:9–88:1, Ex.3; *see also* King Dep. 94:13–15.[14] These

---

[14] In 2017, for example, this constituted $293,011.42 in federal funds and $49,978.32 in state funds. King Dep. 91:21–92:10, Ex. 4.

forfeiture funds become a slush fund, rather than reducing the police department's dependence on the City's budget. King Dep. 89:4–13. This is "on purpose" because the police chief wanted to use forfeiture funds to "expand" past the funds allotted by the city council. King Dep. 89:14–22.

The upshot of all of this is that Doraville's law enforcement officials face a strong institutional incentive to write more tickets and thereby generate more City revenue. Yet, as the City acknowledges, writing more tickets does not solve the underlying problem: "Enforcement doesn't stop the speeding from happening." Gillen Dep. 142:22–143:1; *see also* Gillen Dep. 141:7–9, 144:3–13. And, despite having above-average violent and property crime rates, Doraville's police appear to focus on traffic and public-nuisance citations. Zielke Decl. ¶ 25. But while it does not solve the problem, prolific ticketing does generate a substantial amount of City and police department revenue. It is law enforcement's financial incentive to generate that revenue that violates due process.

## CONCLUSION

For the above reasons, Plaintiffs respectfully request that this Court grant Plaintiffs' Motion; declare unconstitutional and enjoin Doraville's policy and practice of relying on fines, fees, and forfeitures to balance its budget; and award Plaintiffs nominal damages of $1.

35

Dated July 24, 2020.

Respectfully submitted,

/s/ Joshua A. House*†                    Frank B. Strickland
California Bar No. 284856              Georgia Bar No. 687600
Institute for Justice                        Taylor English Duma LLP
901 N. Glebe Road, Suite 900       1600 Parkwood Circle, Suite 200
Arlington, VA 22203                      Atlanta, GA 30339
Tel: (703) 682-9320                       Tel: (770) 434-6868
Fax: (703) 682-9321                       Fax: (770) 434-7376
jhouse@ij.org                                fstrickland@taylorenglish.com

Anthony Sanders*
Minnesota Bar No. 0387307
Institute for Justice
520 Nicollet Mall, Suite 550
Minneapolis, MN 55402
Tel: (612) 435-3451
Fax: (612) 435-5875
Email: asanders@ij.org

*Admitted pro hac vice
† Lead Counsel

## CERTIFICATE PURSUANT TO LOCAL RULE 7.1(D)

I certify that the foregoing Brief conforms to the requirements of Local

Rules 5.1(C) and 7.1(D). The Brief is prepared in 14 point Times New Roman

font.


/s/ Joshua A. House
Institute for Justice
Counsel for Plaintiffs

## CERTIFICATE OF SERVICE

I HEREBY CERTIFY that on this July 24, 2020, a true and correct copy of

the **PLAINTIFFS' BRIEF IN SUPPORT OF THEIR MOTION FOR**

**SUMMARY JUDGMENT** was served with the Clerk of Court using the CM/ECF

system, which will automatically send email notification of such filing to the

following counsel of record:

GRAY, RUST, ST. AMAND, MOFFETT & BRIESKE, LLP
Harvey S. Gray
Alex Joseph
1700 Atlanta Plaza
950 E. Paces Ferry Rd.
Atlanta, GA 30326
Tel: (404) 870-7376 (Gray), (404) 870-5955 (Lee)
Fax: (404) 870-7374
Email: hgray@grsmb.com, ajoseph@grsmb.com


/s/ Joshua A. House
Institute for Justice
Counsel for Plaintiffs

38