IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF GEORGIA
ATLANTA DIVISION

HILDA BRUCKER, JEFFERY
THORNTON, JANICE CRAIG, *and*
BYRON BILLINGSLEY,

    Plaintiffs,

    v.

THE CITY OF DORAVILLE, *a*
*Georgia Municipal Corporation*,

    Defendant.

Civil Action No.

1:18-CV-2375-RWS

## ORDER

This case comes before the Court on the parties' Motions for Summary

Judgment [Dkt. 89, Dkt. 91]. After a careful review of the record, the Court enters

the following Order.

## BACKGROUND

This civil rights case raises the question of whether a city's reliance on fines

and fees to fund its municipal operations unconstitutionally infringes on the rights

of those subject to the fines and fees. The Plaintiffs—all of whom received

citations requiring that they pay a monetary sanction—contend that because the

City of Doraville relied on their fines and fees to balance its budget, and because

the city controls the employment of all the actors in the criminal justice system—police, prosecutor, and judge—those officials were subject to a conflict of interest that violated the Plaintiffs' Due Process rights.

## I.  Nationwide Context

This lawsuit arises in part out of a growing national concern over the expanded role of fines and fees in municipal budgets and operations. In 2017, the United States Commission on Civil Rights dedicated its Annual Statutory Enforcement Report to this topic, charting the rise of cities' use of fines and fees to raise revenue and outlining the potential problems that could arise as a result. See generally U.S. Comm'n on Civil Rights, Targeted Fines and Fees Against Communities of Color: Civil Rights and Constitutional Implications (Sept. 2017), http://www.usccr.gov/pubs/Statutory _Enforcement_Report2017.pdf.

The increased reliance on fines and fees could be traced to tightening budgets and a reluctance—or sometimes inability—to raise taxes:

> Reductions in state and local court budgets have caused local jurisdictions to fund courts through the imposition and collection of fines and fees. At the same time, many states prohibit local courts from raising taxes without a public referendum, but raising fees usually does not have the same restrictions.

Id. at 7. Consequently, fines and fees "have become one of the easier and faster ways through which local governments can increase revenue." Id. at 9. These fines

and fees pass on the costs of governing to the "users" of the criminal justice system, rather than the taxpayers. Id.

But such a shift is not without its drawbacks. One risk is the perception of the justice system as a "pay as you go enterprise." Id. at 10. Because "many people's experiences with the justice system are based on their interaction with local courts," such a perception can create "distrust" in the system as a whole. Id.

And beyond the *perception* of injustice, a system of overreliance on fines and fees might in fact distort the system of justice itself, creating faulty incentives for those charged with administering it. Nowhere is that more apparent than for traffic citations, which often comprise a "large percentage" of the fines collected:

> Dependence on traffic citations to fund local governments creates an incentive for law enforcement to issue as many citations and fines as possible, regardless of the severity of the offense. Such revenue systems can result in abuse when raising funds replaces public safety as the primary goal of law enforcement.

Id. at 12. Such a shift turns the justice system on its head.

Of course, whether those drawbacks raise constitutional concerns is a separate question. But to the extent that the courts themselves become dependent on that fundraising, such reliance could "interfere with the judiciary's independent constitutional role." Id. at 16. In its most extreme form, it might "threaten the impartiality of judges and other court personnel." Id. Ultimately, the Report

concluded, such a conflict of interest may well run afoul of the Constitution's guarantee of Due Process.

The Commission Report highlighted Ferguson, Missouri, as the exemplar of the problems outlined above.[1] In Ferguson, fines and fees comprised 13% of the city's budget—a significant outlier next to the average for comparable cities, which was 2%. Id. at 20. But the Report also noted that Ferguson was not unique among American cities—in fact, there were seventeen others whose budgets comprised an *even higher* percentage of fees. Id. at 21–22.  Of those, five were in Georgia. And among them, ranked sixth nationwide, was Doraville.

## II.  Case History

In light of the Commission Report and other coverage of Doraville's practices, the Plaintiffs, who were subjected to various fines and fees, sued the City. They claimed that Doraville's policy and practice of relying on the high percentage of fines and fees to balance its budget is unconstitutional because it creates a conflict of interest for the judge, the prosecutor, and police.

---

[1] Separately, the Department of Justice issued a lengthy report detailing the problems in Ferguson as a result of its investigation following the shooting death of Michael Brown there. See generally United States Dep't of Justice Civil Rights Division, Investigation of the Ferguson Police Department (March 4, 2015), https://www.justice.gov/sites/default/ files/opa/ press-releases/attachments/2015/03/04/ferguson_police_department_report_1. pdf. Eventually, after the Justice department sued Ferguson, the city entered into a consent decree concerning its police and court practices.

Doraville moved to dismiss their Complaint, arguing that the Court lacked jurisdiction and that the Plaintiffs failed to state a viable claim. The Court denied the Motion on the jurisdictional basis, holding that the Plaintiffs did have standing and that the case was not barred by the *Rooker-Feldman* doctrine.[2]

However, due to the limited authority addressing this type of claim, the Court ordered the parties to appear for a hearing on the merits of the claim itself. They did so. Afterward, and with the benefit of supplemental briefing, the Court denied the Motion, holding that the Plaintiffs had properly stated a claim under the Supreme Court's conflict of interest analysis in a trio of old cases. See Brucker v. City of Doraville, 391 F. Supp. 3d 1207, 1210–17 (N.D. Ga. 2019) [Dkt. 39] (citing Tumey v. Ohio, 273 U.S. 510 (1927); Dugan v. Ohio, 277 U.S. 61 (1928); Ward v. Village of Monroeville, 409 U.S. 57 (1972)). In that Order, the Court noted that it was proceeding cautiously, and that  for a fact-dependent claim like this, summary judgment would likely be an important stage to test the allegations.

Now the case has arrived at that crucial stage. After the Motion was denied, Doraville answered, and the parties proceeded to discovery. Once they completed discovery, both parties moved for summary judgment.

---

[2] In its brief, the City re-raises some of those jurisdictional challenges. But the Court will not entertain arguments that it has already decided.

## III.   Facts of the Case

To determine whether Doraville's municipal justice system is constitutionally defective involves—as noted in the Court's prior Order—a fact-intensive inquiry. For that reason, the Court has endeavored to lay out in some detail the relevant facts drawn from the evidence in the summary judgment record.

### A.   Doraville's Reliance on Fines and Fees

Situated just to the north of metro Atlanta, the city of Doraville, like every Georgia municipality, is required to prepare a balanced budget—meaning that its planned spending on services cannot exceed its planned revenue for a given year. Doraville's operations are mostly paid for through a general fund. The fund covers expenses for administration, parks, police, and the municipal court. Revenue for the fund comes from property and business taxes, licenses and permits, charges for service, and, pertinent here, fines and fees. In 2017, the year before this lawsuit, Doraville's general fund revenue totaled $11.3M.

As part of that total, Doraville collected approximately $2.0M in fines and fees through its municipal court.[3] Depending on whether you look only at the general fund or include other funds, that amount represented 14.5–17.5% of the

---

[3] That amount is fairly representative, and on the lower end of a downward trend: since 2008, the amount has fluctuated from a high of approximately $3.1M, in 2010, to a low of approximately $1.7M, in 2019. The 2020 budget estimates $1.6M in revenue.

budget. (For simplicity, the Court will use 15% as a shorthand.) In prior years, the proportion was higher, sometimes reaching above 20%. Most of the $2.0M came from fines for approximately 13,000 citations, of which about 11,500 were traffic-related. A smaller amount—closer to $100,000—came from citations for code enforcement violations. Revenue also came from a $25 court fee attached to each conviction, which generated $200,000 for the city.

Considering the findings in the Commission's report, that proportion—15%— undoubtedly seems high. Unsurprisingly, the parties have sought to contextualize it, mainly by comparing Doraville against other cities.

## B.  Comparisons to Other Cities

The parties both contend that Doraville is an outlier—just for different reasons. Similar to the Commission Report, the Plaintiffs (via their expert) argue that Doraville's high proportion of fines and fees, at 15%, far exceeds the average of peer cities: approximately 3% for peer cities in Georgia, and 1.5% for peer cities nationwide. Peer cities in their analysis are identified based on population sizes.

Doraville (via its expert) attacks these comparisons as flawed because of one significant feature: the city's high traffic volume. Doraville covers a stretch of highway I-285 (known colloquially as "the perimeter"), and sits adjacent to the interchange at the intersection of I-285 and I-85 (known colloquially as "spaghetti

junction"), which the city contends is the worst freight bottleneck in the country. As a result, the city's average daily traffic volume totals at least one million trips.[4] And if you calculate the amount of traffic fines ($2.0M) against the amount of traffic (1.0M), Doraville, at a factor of 2, starts to look much closer to "peers."

Doraville then points to what it sees as its true "peers": Hapeville and College Park, two cities on the opposite side of Atlanta. Both contain or abut major highways going to or around Atlanta. In addition, both are near the airport, which means their traffic volumes are high and that they provide services not just for their own taxpayers but passers-through from all parts of the state and country.

Still, as the Plaintiffs note, it is not clear that comparing Doraville against these cities changes the overall outlook. Despite their high traffic, both Hapeville and College Park collect only 2–3% of their budget from fines and fees. And even when looking at the amount collected compared to traffic counts, their totals are much lower: multiples of between 0.3–0.5, compared to Doraville's multiple of 2.

In sum, the conclusion is inescapable: whether justified or not, Doraville collects a high percentage of its budget from fines and fees relative to other cities.

---

[4] There appears to be some dispute over the traffic totals, including whether the traffic passing through the interchange counts as traffic passing through Doraville itself. But the Court need not get into those specifics to summarize the facts.

The constitutional significance of that reliance, however, does not follow simply from the high total. It depends greatly on the city's governmental structure.

### C.   Doraville's Municipal Structure

Doraville is a Georgia municipal corporation—a city—that is governed primarily by the city council (including a mayor). According to Doraville's charter and organizational chart, the municipal court judge, solicitor (prosecutor), city attorney, and city manager fall under the authority of the city council. The city manager, in turn, oversees other city employees and contractors, including the finance director, the municipal court clerk, the police, and the private firm contracted to oversee code enforcement:

**Doraville Organizational Chart**



For purposes of this case, three aspects in particular warrant more detailed consideration: the operation of the municipal court, the personnel of the municipal court, and the City's budget process.

### 1.   *Municipal Court Operations*

In keeping with Georgia law, <u>see</u> <u>Teagan v. City of McDonough</u>, 949 F.3d 670, 672 (11th Cir. 2020) (citing Ga. Code Ann. § 36-32-1(a)) ("Municipal courts in Georgia are generally creatures of local government."), the municipal court was created through Doraville's charter. Under that charter, it has jurisdiction to try violations of city ordinances and some state misdemeanor offenses, including traffic offenses.[5] The court has sessions two days per week. In a given day, the court calendar includes approximately 150–200 cases.

The courthouse has three courtrooms, and each serves a separate function when the court is in session. Upon arrival, a defendant proceeds to Courtroom 2, where the defendant checks in with clerk's staff. If the defendant wants to simply pay the ticket, she/he can do so. But if they want to negotiate some aspect of the ticket or the fine, they are sent over to Courtroom 1, where the solicitor awaits. If they decide to plead guilty, but need to do so before the court, they proceed to Courtroom 3. If they decide to plead not guilty and take their case to a bench trial, they are scheduled for a later date to appear in Courtroom 3, where the issuing

---

[5] Georgia law authorizes municipal courts to try certain state misdemeanor offenses, including traffic offenses, if the parties waive their right to a jury trial. <u>Teagan</u>, 949 F.3d at 672 (citing <u>Kolker v. State</u>, 391 S.E.2d 391, 393–94 (Ga. 1990)).

officer will prosecute the case against them. Finally, if they want a jury trial, the case is bound over to the state court, and the defendant is dismissed.

### 2. *Municipal Court Personnel*

As noted above, the municipal court is comprised primarily of three positions: a **clerk**, a **solicitor**, and a **judge**. The clerk, along with a few supervised employees, is responsible for administering the court; the solicitor is responsible for negotiating pleas in cases; and the judge is responsible for accepting pleas and trying the cases (and thus, for purposes of this case, shoulders the most responsibility for ensuring Due Process). Because of the type of claim here, it is important to outline the responsibilities and employment status for each.

**The Clerk**. The clerk is a City employee and has served in her role for fifteen years. She has several responsibilities: overseeing staff members, inputting case information into the management system, preparing reports and budgets, operating the window for constituents, answering the phone, responding to open records requests, etc. She reports to the city manager, but while he may occasionally make big-picture decisions—for example, to close the court due to COVID 19 or whether to shift some employees from full-time to part-time—he does not oversee her day-to-day activities. The clerk attends city council meetings only when required—typically when the budget is being presented—and when

there, she rarely provides any input. She rarely communicates with members of the city council and only occasionally communicates with the city manager.

**The Solicitor**. The solicitor is a contractor who has served in his role essentially since the inception of the court.[6] His role in the court proceedings largely involves negotiating pleas with defendants who do not simply want to pay the fine and leave. He rarely (but occasionally) tries the cases in which defendants plead not guilty; in most of the city's bench trials, the police officer prosecutes the case against the defendant.[7]

**The Judge**. The judge has served in Doraville for nearly thirty years. Yet, despite—or perhaps because of—his long tenure, no one seems to know exactly what his employment status is, or whether he can be summarily terminated. There is no doubt that he was initially hired on a contractual basis, and that his salary, which has not changed throughout the years, is set by the city council and paid from the general fund. But the city admits it is uncertain about whether he counts as an employee or a contractor. Even the judge himself is not entirely sure, though

---

[6] The solicitor is a private firm lawyer who, along with his law partner and brother, specializes in this kind of work across various cities. In Doraville, his brother serves as the city attorney; the solicitor also serves as assistant city attorney.

[7] There is some uncertainty regarding this point; the police chief appears to think that the solicitor prosecutes all the cases.

he does receive a W-2. Moreover, despite the City's charter (and ordinance) stating that the judge holds the office "at the pleasure of" the city council, the City argues that he cannot be summarily terminated due to protections of Georgia law.[8] The judge also related his belief that he had some protection from termination:

> Q. Are you an at-will employee?
>
> A. Meaning?
>
> Q. Meaning could the city tomorrow just say, look, we're going with a different judge?
>
> A. Well, my understanding is they have to have cause at this point. It's changed over the years, the law, as far as terminations of the judges. But I think, ultimately, you know, I serve at the pleasure of the council, but they can't just fire me, I don't think. They're not supposed to.

[Carter Deposition, Dkt. 85, at 20]. The judge never discussed his employment status with the City. Notably, however, a few years ago, the City *did* terminate two other judges due to budgetary concerns. It also eliminated the judge's health benefits. After that, because of his increased workload, the judge—now the only

---

[8] Under Georgia law, a municipal judge may only be removed from office by a two-thirds' vote of the governing body—here, the city council—for specific reasons outlined in the statute or the city's charter. See Ga. Code Ann. § 36-32-2.1. But that protection only applies during the "term" for which the judge is appointed. That term is required by statute to be outlined in writing. See Ga. Code Ann. § 36-32-2 ("Such term shall be memorialized in a written agreement between such individual and the governing authority of the municipal corporation or in an ordinance or a charter."). Here, because the Judge's employment appears to have continued beyond the "term" outlined in his contract, the availability of those protections remains unclear.

one—emailed the mayor to ask for a pay increase. The mayor replied that the city council denied his request.

The judge works two days a week, and his role focuses entirely on the cases. In practice, he does not report to anyone in the City. He has no responsibility over other staff. He attends no council meetings. Indeed, outside of the court proceedings, rarely does he communicate with any City employees—except perhaps the clerk—for any reason at all. As for his communication with the clerk, most of it concerns the administration of the cases themselves; yet even concerning the cases, his focus remains limited: for example, he testified that he was not familiar with the $25 fee attached to the convictions.

And, perhaps most importantly, the judge has no role in setting the budget.

### 3. *City Budget Process*

Doraville's budget is overseen by a finance director. He meets with representatives from each department (including the municipal court clerk) in advance of the fiscal year deadline. The department representatives present requests for both capital and operating expenditures for the following year. The finance director then calculates estimated revenues based on historical trends. He balances the proposed expenditures against the estimated revenues, prioritizing and

eliminating expenditures as necessary. Once complete, he presents the budget to the city manager, and then, once approved, to the city council.

For the municipal court, the process is self-contained. When preparing her requested expenditures, the municipal court clerk does not consult with any other City employee, including the judge or the solicitor. She looks at the previous year's expenditures and estimates what the expenses will be for the following year. She does not estimate revenue.

As for the police department, due to its bigger scope, the chief involves some of his subordinates. He works with his assistant and two captains to identify expenditure requests—particularly compared to the previous year's expenditures. They create a detailed request, and then the chief presents the request to the finance director. After the finance director and city manager have reviewed it, the city manager presents the budget to the city council. The final budget never includes all the chief's requests.

### D. The Plaintiffs' Citations

The Plaintiffs all received or were threatened with tickets—either from the police or the code enforcers. They all argue that their citations were unconstitutional—though not because they were innocent of the violations charged. Indeed, none of the Plaintiffs disputes that the citations were supported by

probable cause for the violations charged. They attack only the City's systemwide reliance on fines and fees from their citations. Thus, the Court need not detail the nature of their offenses: it suffices to note that two of the Plaintiffs were charged with housing code violations, and two were charged with traffic violations. For each, a minor violation led to criminal prosecution.

## DISCUSSION

Undoubtedly, Doraville's proportion of the budget supported by fees is high—an outlier, even. But is it unconstitutional? The question before the Court is not whether Doraville operates a speed trap (a charge the City has protested against for years) or whether the reliance on fines and fees is merely problematic (a question better suited for the governing authorities of city and state); instead, the question is whether the undisputed facts show that the City's reliance on fines and fees in its budget creates a *systemic conflict of interest* among those City officials that violates the Due Process rights of the people prosecuted there.

The Plaintiffs correctly divide this challenge into two claims: one for biased *adjudication* and one for biased *enforcement*. The former centers on the municipal court judge; the latter addresses the solicitor, the police, and the code enforcement department. These claims are addressed in separate sections below. Before turning to those, however, the Court outlines the legal standard for summary judgment.

## I. Summary Judgment Standard

The standard for summary judgment is well-established. Summary judgment must be granted "if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." FED. R. CIV. P. 56(a). A fact is "material" if it "might affect the outcome of the suit under the governing law." <u>BBX Capital v. Fed. Deposit Ins. Corp</u>, 956 F.3d 1304, 1314 (11th Cir. 2020) (citing <u>Anderson v. Liberty Lobby, Inc.</u>, 477 U.S. 242, 248 (1986)). A dispute over such a fact is "genuine" if "the evidence is such that a reasonable jury could return a verdict for the nonmoving party." <u>Id.</u>

At summary judgment, the court's function is not "to weigh the evidence and determine the truth of the matter," but rather "to determine whether there is a genuine issue for trial." <u>Sears v. Roberts</u>, 922 F.3d 1199, 1205 (11th Cir. 2019) (citing <u>Anderson</u>, 477 U.S. at 249). Accordingly, the Court must "consider the record and draw all reasonable inferences in the light most favorable to the non-moving party." <u>Blue v. Lopez</u>, 901 F.3d 1352, 1357 (11th Cir. 2018).

The standard of review for cross-motions for summary judgment does not differ from the standard applied when only one party files a motion. "In practice, cross motions for summary judgment may be probative of the nonexistence of a factual dispute, but this procedural posture does not automatically empower the

court to dispense with the determination whether questions of material fact exist." Georgia State Conference of NAACP v. Fayette Cty. Bd. Of Comm'rs, 775 F.3d 1336, 1345 (11th Cir. 2015) (internal quotations omitted). Rather, the Court applies the standard outlined above to each party's Motion.

## II.  Conflict of Interest: Municipal Court Judge

In their first claim, the Plaintiffs contend that Doraville's reliance on fines and fees creates an institutional bias for the municipal court judge tasked with trying the cases.

### A.  Legal Framework[9]

The Due Process Clause "entitles a person to an impartial and disinterested tribunal in both civil and criminal cases." Harper v. Prof'l Prob. Servs. Inc., 976 F.3d 1236, 1241 (11th Cir. 2020) (citing Marshall v. Jerrico, Inc., 446 U.S. 238,

---

[9] In its prior Order, the Court laid out in full the relevant legal framework for assessing the constitutionality of Doraville's justice system, explaining in some detail how it arrived at that framework. See Brucker v. City of Doraville, 391 F. Supp. 3d 1207, 1210–17 (N.D. Ga. 2019) [Dkt. 39] (citing Tumey v. Ohio, 273 U.S. 510 (1927); Dugan v. Ohio, 277 U.S. 61 (1928); Ward v. Village of Monroeville, 409 U.S. 57 (1972); Marshall v. Jerrico, Inc., 446 U.S. 238 (1980); Brown v. Vance, 637 F.2d 272 (5th Cir. 1981); Caliste v. Cantrell, 329 F. Supp. 3d 296 (E.D. La. 2018), aff'd, 937 F.3d 525 (5th Cir. 2019); Cain v. City of New Orleans, 281 F. Supp. 3d 624 (E.D. La. 2017), aff'd sub nom. Cain v. White, 937 F.3d 446 (5th Cir. 2019)). And so, the Court need not retrace that entire analysis here. The Court does note that, since that Order, the Eleventh Circuit decided Harper v. Prof'l Prob. Servs. Inc, 976 F.3d 1236 (11th Cir. 2020), a case that applies Tumey and Ward, but in a different context than presented here.

242 (1980)). Thus, Due Process "forbids adjudication by a judge who has a financial interest in the outcome of his decisions, provided that the interest—personal or otherwise—is substantial enough to give him a 'possible temptation' to forsake his obligation of impartiality." Id. at *1242 (citing Ward v. Vill. of Monroeville, 409 U.S. 57, 60 (1972)).

This judicial-impartiality requirement is measured objectively and "imposes a stringent rule that may preclude adjudication even by judges who have no actual bias." Id. (citing Marshall, 446 U.S. at 243). Indeed, the Court's "focus should be on the municipal structure as a whole and whether it would appear, to the average citizen, that that system potentially fuels impropriety in judicial proceedings." Brucker v. City of Doraville, 391 F. Supp. 3d 1207, 1212 (N.D. Ga. 2019) [Dkt. 39] (citing Brown v. Vance, 637 F.2d 272, 284 (5th Cir. 1981)).

Practically speaking, this standard boils down to two questions: "First, is there a conflict of interest? Second, is the conflict of interest substantial?" Id. at 1214. And for each question, a "variety of factors could bear" on the determination. Id.

## B.  Analysis

The Court begins, as it did previously, by reiterating a critical feature of this case that distinguishes it from many of the conflict-of-interest cases decided by

other courts: namely, that Doraville's municipal court judge has essentially *no* executive authority or responsibility whatsoever. He has practically no contact with the governing city council, he has no responsibility over the general fund, where the fees and fines go, and he does not participate in the budget process for the court. This contrasts sharply with cases like Cain v. City of New Orleans, 281 F. Supp. 3d 624, 654 (E.D. La. 2017), aff'd sub nom. Cain v. White, 937 F.3d 446 (5th Cir. 2019) ("Fines and fees revenue goes into the Judicial Expense Fund," and the "Judges exercise total control" over the Fund), and Caliste v. Cantrell, 329 F. Supp. 3d 296, 317 (E.D. La. 2018), aff'd, 937 F.3d 525 (5th Cir. 2019) (the Judge "participates in the management of the Fund"), not to mention Tumey and Ward, where the official at issue served both executive and judicial functions. See Tumey v. Ohio, 273 U.S. 510 (1927); Ward, 409 U.S. 57.

Of course, as the Court noted in its prior Order, the municipal judge's lack of executive responsibility is not dispositive (though it is relevant). The Court held previously that, despite such a lack, the Plaintiffs had properly alleged that the municipal judge faced a conflict of interest—a "possible temptation" to forsake impartiality—based on three key allegations: (1) fines and fees make up a large percentage of the City's general fund; (2) the city council essentially sets a target of revenue for the judge to hit; and (3) the judge could be fired at will by the city

council. Unsurprisingly, these three make up the bases of the Plaintiffs' argument

at summary judgment that a substantial conflict exists.

But are they borne out by the evidence? The Court considers each in turn.

### 1. Proportion of Fines and Fees

The evidence undoubtedly bears out the first allegation (though perhaps to a

lesser extent than alleged). As detailed in the Background section above, fines and

fees make up roughly 15% of Doraville's budget,[10] which puts Doraville well in

range of cases deemed high by other courts. See Cain, 281 F. Supp. 3d 624, 657

(10% of total court budget, 25% of Judicial Expense Fund); Caliste, 329 F. Supp.

---

[10] There are two potential questions of fact concerning the percentage adopted by the Court, but neither is ultimately material to the claim:

*First*, the parties' experts disagree about how to calculate the precise percentage as well as which years are appropriate for assessment (because more recent years reflect a lower percentage). But the Court finds that even Doraville's expert's more conservative estimates are sufficiently high to be considered relevant, and so the Court finds that this dispute is immaterial.

*Second*, though not really argued by the parties, there is a question of what amount of the fines and fees are actually traceable to the judge's adjudicative role. The evidence shows that not all the ticketed defendants even appear before him—some simply pay their ticket with the clerk. And most that appear before him do so to plead guilty. Only about 10–15% of cases go to a bench trial. In Ward, the Supreme Court distinguished between these nolo or guilty pleas and contested cases: "We intimate no view that it would be unconstitutional to permit a mayor or similar official to serve in essentially a ministerial capacity in a traffic or ordinance violation case to accept a free and voluntary plea of guilty or nolo contendere, a forfeiture of collateral, or the like." 409 U.S. at 62, n.2. Nevertheless, especially when weighing the facts in the Plaintiffs' favor, the Court has opted to follow the parties' lead and consider all revenue from fines and fees. See Rose v. Vill. of Peninsula, 875 F. Supp. 442, 451 (considering all revenue generated by court).

21

at 315 (20–25% of Judicial Expense Fund); <u>Rose v. Vill. of Peninsula</u>, 875 F.

Supp. 442, 454 (N.D. Ohio 1995) (12–14% percent of the city's general fund).

### 2. Setting Revenue Targets

The second allegation, on the other hand, is not borne out by the evidence.

The Plaintiffs argue that—simply by virtue of setting a budget—the city council

implicitly communicates that the municipal judge needs to generate a

predetermined amount of revenue by convicting enough defendants. But that gets it

exactly backwards from how the budget actually gets set (and ignores the fact that

the judge has no involvement with the budget process).

In actuality, the finance director—wholly independently of anyone at the

court—calculates the estimated revenue for the upcoming year based on the trend

from prior years. And his estimate is just that: an estimate. In fiscal year 2018, for

example, the revenue from fines and fees ($2M) totaled only 80% of the estimated

amount in the budget ($2.5M). And what happened as a result of that rather large

$500k shortfall? In short, nothing: no phone call to the judge, no meeting to

discuss drumming up more fees, no change to court practices—except that for

fiscal year 2019, the budget for revenue from fines and fees decreased to $2M.

To be sure, there have been allusions to changes at different times in the

City's history (before a lawsuit was filed). In particular, the Plaintiffs point to two

references to increased fines and fees that appeared in the budget plans from prior years: first, for fiscal year 2015, the City noted in its budget documents that the court had added court dates, which would lead to increased collections. Second, for fiscal year 2018, the City discussed an "action plan" that would "restore" fines to previous levels. The Plaintiffs see these references as indications that a decrease in revenue bears heavily on how the court operates.

But the Plaintiffs overstate the significance of these process changes. In actuality, the purpose of each change was to improve the efficiency of the court; that increased efficiency led to an increase in the amount of revenue *collected* was both incidental and unsurprising. As for the 2015 increase in dates, the goal was to lessen the workload of an individual day, to decrease backlog, and to add a date specific to code-enforcement citations. And as for the 2018 "action plan," it was to resolve a technical issue that arose when the City began using a new ticketing system that automatically scheduled court dates many months in the future. The aim was to fix the system to set the court dates at a more appropriate time.

The Plaintiffs also point to a comment from the old finance director to the new (who started shortly after the 2018 budget was put in place) that the decline in court fees might be something for him to "possibly explore." But he explained that his predecessor was not referring to the "action plan," and that, in practice, his own

understanding of the court system amounted only to speculation. In any event, such a stray comment is not enough to connect the finance director to the court—much less to sustain an allegation that the City sets revenue targets for the court to hit.

Even the imposition of the $25 administrative fine in 2013—unquestionably added for the express purpose of generating more revenue—does not mean that that City was attempting to direct the court toward more *convictions*. In fact, the judge testified that he was not familiar with the fee: it, like other aspects of court administration, was handled entirely by the clerk.

All told, this factor is not borne out by the evidence.

### 3.   *Ability to Summarily Fire the Judge*

The final consideration is trickier to assess. As explained in the Background section above, the City's ability to summarily fire the judge is somewhat unsettled due to the City's failure to reestablish his "term" in writing, as Georgia law appears to require. It is difficult to say whether the City could terminate him (without a hearing, etc.) in keeping with Georgia law. It is, in a sense, a factual issue masquerading as a legal issue. But it may also be more academic than practical: in practice, the City has terminated judges in the past; it has similarly cut the current judge's health benefits. And, as the Court noted previously, just because Georgia law says so does not guarantee that the City would abide by those requirements.

24

Still, even assuming the city council could fire him, the evidence does not indicate that the City's priorities unduly bear on the judge. In its prior Order, the Court noted that the scheme alleged by the Plaintiffs of city council control over the judge's employment status raised serious concerns about his "autonomy." Brucker, 391 F. Supp. 3d at 1215–16 ("Doraville's municipal court judges, then, are not well insulated from the pressures of their partisan superiors or the burden of funding the municipality."). But that concern has proven more illusory than real.

In practice, on a day-to-day (or week-to-week) basis, the judge operates quasi-independently, and has done so for nearly three decades. Cf. id. at 1212 n.4 ("[The] Plaintiffs have not articulated why, for instance, a wholly independent judiciary—say, with judges having life tenure—that operates under the same system as Doraville would nevertheless violate the Due Process Clause."). To wit: he has essentially no interaction with the council; he is in the dark on the fees generated by the court; and he appears to carry no expectation that his continued employment depends on anything other than performing his job—that is, resolving the cases that come before him. Unlike the judges in Brown v. Vance, his employment is *not* contingent on "currying favor" with executive officials. 637 F.2d 272, 282 (5th Cir. 1981). In sum, based on the evidence in the record, the Court does not find that the risk of termination impedes the judge's autonomy.

Of course, the critical question is not whether *this* judge suffers from actual temptation, but whether an average person in his shoes *could*. See <u>Tumey</u>, 273 U.S. at 532. Still, looking at the municipal structure objectively does not mean that the Court shuts its eyes to the judge's experience. Quite the contrary, because, in fact, the judge's experience is the only evidence of that structure in action.

In this regard, the Plaintiffs' arguments against Doraville's structure are mostly hypothetical: they contend that the judge's employment status subjects him to a conflict because the City "*can* select a judge that convicts more often and levies more fines" and "*can* remove a judge who does not fine enough." [Plaintiffs' Brief, Dkt. 91–19 at 16 (emphasis added)]. But there is simply no evidence that the City has ever done so—or, for that matter, that it ever will.[11] Merely raising the specter of those possibilities cannot sustain a constitutional challenge of this magnitude. Doing so amounts only to speculation.

In making this finding, the Court finds additional support in <u>Nelson v. Constant</u>, 2020 WL 836351, at *11–13 (E.D. La. Feb. 20, 2020). Like the judge here, the magistrates subject to challenge there "serve[d] at the pleasure of the Mayor who . . . [was] also responsible for administering the General Fund." <u>Id.</u> at

---

[11] Even with respect to the judges that the City terminated (among many other employees) for "financial reasons," there is no evidence that the decision to eliminate those positions was linked to those judges' failure to generate enough revenue.

12. Still, the court found that the evidence did not support the plaintiffs' theory that the magistrates could be possibly tempted by the threat of termination:

> Moreover, there is no other evidence to support plaintiffs' "threat of dismissal" theory. The Magistrates were not subject to periodic performance reviews by the mayor where the issue of fee generation might have arisen. Indeed, the evidence indicates the Mayor only met with the Magistrates here once at the beginning of her term. Both Magistrates have served more than one mayor, indicating the permanency and non-political nature of the appointments. Further, the actual revenue figures do not suggest any pressure exerted on the Magistrates.

Id. The court there ultimately denied the plaintiffs' claim. Id. at 13.

Here, likewise, the Plaintiffs' contention is not borne out by the evidence.

### 4. Conclusion

In its prior Order, the Court explained that, although the Plaintiffs had not alleged that Doraville's municipal court judge had either a direct pecuniary interest in the outcomes of his cases or some overarching executive responsibility—the traditional hallmarks of a conflict-of-interest claim—still, the case could proceed "cautiously." That was because the Plaintiffs had identified three factors that, considered together, *could* amount to a substantial conflict of interest.

Now, having reviewed the evidence, the Court finds that, of those three allegations, at most, only one really stands firm. The Plaintiffs argue that each of the factors is sufficient *on its own* to create a conflict of interest, but the Court

disagrees. Absent evidence of other structural features of the municipal court that tend to show a "possible temptation to forsake [the judge's] obligation of impartiality," merely establishing that large proportion of revenue from fines and fees does not itself give rise to a conflict of interest. Harper, 976 F.3d 1242. Doraville's collection of fines and fees may well be problematic, but it is not *unconstitutional*—at least, not as far as its municipal judge is concerned.

Accordingly, as to the claim concerning biased adjudication, the Plaintiffs' Motion for Summary Judgment [Dkt. 91] is **DENIED**, and the City's Motion for Summary Judgment [Dkt. 89] is **GRANTED**.

## III.  Conflict of Interest: Solicitor, Police, and Code Enforcement

In their second claim, the Plaintiffs challenge the City's policy of relying on the fines and fees as unconstitutional because those fees were generated though biased *enforcement*—by the solicitor, police, and code enforcement officers. The Court begins by outlining the legal framework for this claim and then analyzing each official (or department) in turn.

### A.  Legal Framework

Compared with the claim above, the legal framework for a financial conflict-of-interest claim brought against prosecutors or police is less straightforward.

As the Court explained in its prior Order, the Supreme Court made clear that the "rigid requirements" of cases like Tumey and Ward do not apply "to those acting in a prosecutorial or plaintiff-like capacity." Marshall v. Jerrico, Inc., 446 U.S. 238, 248 (1980). By contrast, a city or state "may, and often ought to, stimulate prosecutions for crime by offering to those who shall initiate and carry on such prosecutions rewards for thus acting in the interest of the state and the people." Id. at 249 (citing Tumey, 273 U.S. at 535). Police and prosecutors are not required to be impartial in the same way as the judge.

Still, the Supreme Court in Marshall left open the possibility that such a claim could arise under certain circumstances. Prosecutors and police are public officials and thus must serve the public. Thus, a governmental scheme that injects "a personal interest, financial or otherwise, into the enforcement process" or that brings "irrelevant or impermissible factors" into the decision-making process *could* "raise serious constitutional questions." Id. at 250.

The Supreme Court did not explain what the limits on such an interest were or how the standard for a prosecutor (or police) differed from that for a judge— other than acknowledging that it was higher. Moreover, in the many years since Marshall was decided, there is almost no authority regarding these conflict of interest claims (sometimes called unconstitutional profit motive claims) involving

prosecutors or, for that matter, police—at least none that appears to be binding on this Court.[12] Part of that may be due to the relative newness of these types of claims.[13] But whatever the reason, absent any additional guidance, it falls to the Court to determine how to proceed.

So, here is the approach: rather than attempting to craft an overarching legal framework, the Court instead has opted to focus on the facts; that is, to carefully review the evidence specific to each official and then to simply decide the overall Constitutional question accordingly—effectively, a totality of the circumstances determination. Doing so fairly directly follows the Supreme Court's approach in Marshall and comports with what other district courts have done in similar cases. See, e.g., Nelson v. Constant, 2020 WL 836351, at *11 (E.D. La. Feb. 20, 2020).

With that in mind, the Court turns to the facts for each position.

---

[12] From the parties' briefs and its own review, the Court has only identified one case that addresses prosecutors. See Nelson v. Constant, 2020 WL 836351, at *13 (E.D. La. Feb. 20, 2020). And the only case that appears to address police, Harjo v. City of Albuquerque, 326 F. Supp. 3d 1145, 1193 et seq. (D.N.M. 2018), involves claims concerning asset forfeitures, which, as discussed below, are not at issue here.

[13] Even recent scholarly articles that raise the specter of possible conflict of interest violations do not cite any cases or outline a clear framework for analyzing them. See Policing and Profit, 128 HARV. L. REV. 1723, 1737 (2015) (noting only that "the modern examples of financial motives in law enforcement *may* reach the level of bias that the Court warned of [in Marshall]" (emphasis added)); cf. also Bernadette Atuahene, Predatory Cities, 108 CAL. L. REV. 107, 180 (2020) (highlighting this type of claim as an area for *future* research and referencing this case).

**B.  Analysis: Solicitor**

The factual analysis for the solicitor mirrors in many ways that for the judge. Because of the similarities, and because the standard to prevail on a conflict-of-interest claim is much higher here, it follows straightforwardly that the Plaintiffs' claim concerning the solicitor necessarily fails. See id. at *13.

The Court need not retrace all those similarities. It suffices to note that the solicitor, like the judge, has served in his role for decades, that he has continued to be paid on a contract basis that has remained largely unchanged through the years (though he did, unlike the judge, get a slight pay increase upon request), and that his continued employment has essentially no relationship with the amount of fees brought in through the court. While his position may lack some of the legal protections of the judge, and while he may have some more contact with the city council because of his dual role as the assistant city attorney, still in practice, he has experienced no pressure concerning his job.

As such, except for the high percentage of fees relied upon by the city, this claim lacks any indicia of an institutional conflict of interest. And if the amount alone was not enough to show a constitutional violation with regard to the judge, it certainly is not enough to find one here either.

31

Accordingly, as to the claim concerning the solicitor, the Plaintiffs' Motion for Summary Judgment [Dkt. 91] is **DENIED**, and the City's Motion for Summary Judgment [Dkt. 89] is **GRANTED**.

### C.   Analysis: Police

The Plaintiffs point to two primary reasons that they believe Doraville's police face a strong institutional incentive to write more tickets. Ultimately, however, neither is supported by the record in the way they suggest.

Before turning to those arguments, however, it is important to say what this case is *not* about: asset forfeiture. Though the Complaint lumps "fines, fees, and forfeitures" together, and though the Plaintiffs argue about Doraville's asset forfeiture policy in their briefs, this case is not and has never been about funding the police through the forfeiture of assets. Indeed, none of the Plaintiffs alleged that they had any of their assets seized. That distinguishes this case from Harjo v. City of Albuquerque, 326 F. Supp. 3d 1145 (D.N.M. 2018), the only case that appears to have found certain police practices unconstitutional under Marshall. What is relevant here is the City's budgeting for fines and fees; to the extent the police raise funds through seizure of assets, that would be relevant only insofar as it affected the police's budget in the City's general fund. However, as the police

chief made clear, those are separate processes entirely.[14] So, the Court's focus here is limited to the fines and fees.

The Plaintiffs first argue that revenue from those fines and fees has a *direct* effect on police staffing. But that is simply not the case. As a more general proposition, the Plaintiffs state that when City revenues drop, the police department is forced to make cuts. But that commonsense observation does not mean that revenue *from fines* has the direct effect that the Plaintiffs suggest. Rather, it reflects all the City's revenue—including that from property taxes. And in fact, the only instance of budget reductions leading to cuts identified by the Plaintiffs occurred in the wake of the 2008 financial crisis. It is hardly surprising that budget cuts and staff reductions were required then; and such an instance, considered alone, does not point to a direct link between fine revenue and staffing.

Second, the Plaintiffs argue that the City can manipulate law enforcement by directing them to ticket certain kinds of violations, such as speeding. But the record reveals first, that the council's "control" is indirect at most,[15] and second, the

---

[14] In fact, as the Plaintiffs note, the use of asset forfeiture may well *reduce* the police's dependence on the City budget.

[15] Moreover, the Court is not entirely convinced of the Plaintiffs' assumption that city council control over police activity biases enforcement. Police necessarily serve an executive function, so it is not particularly surprising that, at the top of the hierarchy, the department falls under the purview of the city council (via the city manager), who are charged with administering the City. Indeed, one could well argue that oversight of police

reason the council or a member would do so bears no relation to increasing

revenue. Neither the city manager nor the council directs police operations on a

day-to-day basis. And, as Doraville's former city manager testified, in those

occasional instances where they requested additional "spot enforcement," the

reason always had to do with the targeted area facing an underlying issue:

> Q: Did the city council do the same thing,
> either on its own or through you, with the
> police department, telling them to focus on
> specific things?
>
> A: The only time the council would direct me to
> that -- you know, they'd say it, in general,
> make sure they go out there and write plenty
> of tickets. It's like, oh, this particular
> street has a very bad speeding problem. So
> people are speeding through this particular
> street all the time. Can we -- can we pick up
> the enforcement over in that area to see if
> we can get people to down? And you'd do spot
> enforcement. You'd go out there and say,
> okay, there's a lot of speeding on this
> street. We'd go out there at the times we
> know they're speeding, and they would write a
> few tickets. And that would typically be --
> make the problem go -- go away, at least for
> the time being.

[Gillen Dep., Dkt, 88 at 139–40]. Read in context, the council's hypothetical

directive to "write plenty of tickets" is linked to a specific request for an area

---

by elected officials—and police responsiveness to their concerns—is a *positive* feature of
Doraville's government, so long as those elected officials' directives are valid.

where a speeding problem was identified. This accords with the police chief's testimony that what drives traffic enforcement are accidents and complaints from citizens, rather than setting up enforcement for the sake of generating tickets.

Thus, the Plaintiffs' claim of institutional bias in the police department does not find the necessary support in the record. Again, the standout fact here is the relatively high percentage of Doraville's budget comprised of fines and fees (and perhaps the higher percentage of budgeted expenditures dedicated to police). But that alone does not create an institutional conflict of interest for the police. Absent other evidence that the City's need for revenue somehow infects its officers' policing, the Court is unwilling to conclude that the City's budgetary practice renders the entirety of its law enforcement operation unconstitutional. Whatever the standard is for such a claim to prevail, it is not met here.

Accordingly, as to the claim concerning the police, the Plaintiffs' Motion for Summary Judgment [Dkt. 91] is **DENIED**, and the City's Motion for Summary Judgment [Dkt. 89] is **GRANTED**.

### D.  Analysis: Code Enforcement

In the Complaint as well as the briefs, the parties lump together Doraville's code enforcement department with the police. But while both issue tickets, the two operations differ entirely in their structure, as well as in their overall revenue totals.

Thus, for a claim that concerns the effect of the budget on enforcement, the Court thinks the better approach is to treat them separately.

Of the $2M in fines, code enforcement only amounted for less than $100,000, or about 5%. But recall that fines constituted about 15% of the general fund. So, if considered on its own, code enforcement accounts for less than 1% of the City's overall budget. Straightaway, that means that the Plaintiffs' most important argument concerning the relatively high percentage of the overall budget comprised of fines and fees does not carry the same weight here as it did with the police or the judge.

And there are other reasons why the code enforcement here raises less of a concern. To be sure, it is managed by a private company, which raises the specter of the officers having a more direct financial interest in enforcement. Cf. Harper v. Prof'l Prob. Servs. Inc., 976 F.3d 1236 (11th Cir. 2020). But the City's contract with the enforcement company provides for a flat hourly rate at a pre-determined level of budget. It does not provide for any quota concerning the amount of revenue generated. Moreover, the City spends far more on code enforcement— $400,000 in FY 2018—than it generates in revenue.

As with the police, above, the Plaintiffs simply cannot carry the day with these facts alone. Again, the Court does not suggest that no such claim could

prevail—particularly when citations are generated by a private company. Nor does the Court endeavor to suggest what such a claim would require. It suffices to say that the Plaintiffs have failed to carry their burden here.

Accordingly, as to the claim concerning the code enforcement, the Plaintiffs' Motion for Summary Judgment [Dkt. 91] is **DENIED**, and the City's Motion for Summary Judgment [Dkt. 89] is **GRANTED**.

## CONCLUSION

For the foregoing reasons, the Plaintiffs' Motion for Summary Judgment [Dkt. 91] is **DENIED**, and the City's Motion for Summary Judgment [Dkt. 89] is **GRANTED**. The Plaintiffs' claims are hereby **DISMISSED**.

 **SO ORDERED** this 16th day of December, 2020.

_____

**RICHARD W. STORY**
United States District Judge